## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY LARKIN and DAG SAGFORS, Derivatively on Behalf of Nominal Defendant PEGASYSTEMS INC., | Case No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| ALAN TREFLER, PETER GYENES, RICHARD JONES, CHRISTOPHER LAFOND, DIANNE LEDINGHAM, SHARON ROWLANDS, LEON TREFLER, LARRY WEBER, KENNETH STILLWELL, DON SCHUERMAN, KERIM AKGONUL, and BENJAMIN BARIL, | |
| Defendants, | |
| and | |
| PEGASYSTEMS INC., | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Mary Larkin and Dag Sagfors ("Plaintiffs"), by and through their undersigned

attorneys, bring this derivative complaint for the benefit of nominal defendant Pegasystems Inc.

("Pega," "Pegasystems" or the "Company"), against its Board of Directors (the "Board") and

certain of its executive officers seeking to remedy their breaches of fiduciary duties and violations

of federal law. Plaintiffs allege the following based upon personal knowledge as to themselves and

their own acts, and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiffs' attorneys, which included, *inter alia*, review

and analysis of (i) regulatory filings made by Pegasystems with the United States Securities and

Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Pegasystems; (iii) court filings in a securities class action against certain officers and members of the Board alleging issuance of false and misleading statements of material fact entitled *City of Fort Lauderdale Police and Firefighters Retirement System v. Pegasystems, Inc.*, Case No. 22-cv-11220-WGY (D. Mass.) (the "Securities Class Action"), including documents produced in that action; (iv) filings in the action entitled *Appian Corporation v. Pegasystems, Inc. et. al.*, C.A. No. 2020-07216 (D. Ct. Va.) (the "*Appian* Action"), including trial transcripts and related documents, and other publicly available information and documents.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Pegasystems against certain officers and directors of the Company for breaches of their fiduciary duties as set forth below.

2.      Pegasystems provides a low-code development platform that allows its customers to build customized workflow-based applications for their business needs. The Company operates in the competitive "Business Process Management" ("BPM") industry.

3.      One of Pegasystems' main competitors is Appian Corporation ("Appian").

4.      Starting as early as 2012, Pegasystems and its senior executives and employees crafted a scheme to misappropriate and profit from Appian's trade secrets and other confidential information. At that time, the Company commenced "Project Crush," which involved recruiting an experienced Appian developer who would be willing to clandestinely misappropriate Appian's

trade secrets for Pega. To that end, Pegasystems hired KForce Inc. ("KForce") to identify candidates, indicating to KForce that the candidate could not be loyal to Appian.[1]

5.      In February 2012, KForce introduced the Company to Youyong Zou ("Zou"), who worked for United States government contractors utilizing Appian's platform to build software applications. Zou's employment provided him with access to Appian's software and confidential information.

6.      Between February 2012 and September 2014, Zou used his Appian credentials to access Appian's trade secrets and sell them to Pegasystems in exchange for the Company's funneling payments to Zou through KForce. Pega also employed several measures to conceal its improper operation, including assigning Zou the pseudonym "Matt (so that he isn't 'outed' as our spy)."[2]

7.      Among other things, Zou secretly downloaded Appian's confidential information, recorded videos of Appian's platform, showed Pegasystems how to use Appian's platform, and provided the Company with insight into Appian's software. Additionally, Zou met with and collaborated with Pegasystems' officers, senior executives, engineers, and managers.

8.      For example, Individual Defendant Alan Trefler ("Trefler"), Chief Executive Officer ("CEO"), founder, and Chairman of the Board, met with Zou at the Company's headquarters, reviewed information stolen from Appian by him, and employed that information to "blow . . . up" Appian's deals.[3]

---

[1]  PLT 4. References to "PLT," "PLTD," "Depo. Tr.," and "Trial Tr." herein are to exhibits and/or transcripts in the *Appian* Action. Emphasis is added throughout.

[2]  PLT 377.

[3]  PLT 227.

9.      Numerous other senior executives – including the Company's Chief Technology Officer ("CTO") Don Schuerman ("Schuerman"), Chief Product Officer ("CPO") Kerim Akgonul ("Akgonul"), Head of Product Marketing Douglas Kim ("Kim"), and Chief of Clients and Markets ("CMM") Leon Trefler ("Leon," Trefler's brother) – also participated in Project Crush. As one of the two whistleblowers who alerted Appian to Pegasystems' scheme in 2020 later testified, "***Alan Trefler [and] all of these people obviously knew we were doing this***."[4] Pegasystems persisted in its scheme despite explicit concerns raised internally over the "legality" of Pegasystems' actions.[5]

10.      Subsequently, the Company used Appian's trade secrets and other confidential information to, among other things, train the Company's sales employees to compete with Appian, develop sales materials, improve the Company's software, and acquire new customers and deals. Pegasystems distributed Appian's confidential information to hundreds of Company employees, stressing its importance. Pegasystems used the information it misappropriated through Zou until at least 2020.

11.      Starting in approximately 2019, Pegasystems also began using false names and companies to infiltrate Appian's platform and gain further access to its trade secrets. Defendant Trefler misrepresented his own identity in his mission to "make[] [Appian] go away for good,"[6] employing several aliases (including "Albert Scii," "A. Ewe," and "Paul Foon") to access Appian's information.

12.      In early 2020, two former Pegasystems employees notified Appian of the Company's misconduct. Soon after, in May 2020, Appian filed the *Appian* Action against the Company by filing a complaint (the "*Appian* Action Complaint").

---

[4]  9/20/21 Bearden Depo. Tr. at 246.

[5]  PLT 643-A.

[6]  1/10/22 Baril Depo. Tr. at 238.

13.     According to the *Appian* Action Complaint, Pegasystems engaged in "unlawful schemes . . . involv[ing] stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers." Appian alleged that the Company's scheme "[i]nvolv[ed] personnel at Pegasystems up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives."

14.     According to the Company's 2024 proxy statement, filed with the SEC on April 26, 2024, the percentage of Pegasystems shares beneficially owned by Trefler was 48%.

15.     As set forth herein, Defendants failed to disclose the *Appian* Action to investors. Instead, the Company misled investors by stating that litigation from unnamed competitors could hypothetically arise at some unspecified time in the future when, in truth, Appian was already prosecuting such litigation against Pega. The Individual Defendants (as defined herein) also caused the Company to falsely state to investors that it prohibited the very tactics its management and other employees were secretly employing against Appian, including, *inter alia*, using "illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . misrepresenting your identity in hopes of obtaining confidential information." In truth, Defendants not only permitted such illicit means of unfair competition, but they also encouraged them. Defendants' statements and omissions alleged herein violated the securities laws, SEC regulations, and Generally Accepted Accounting Principles ("GAAP"), including SEC Regulation S-K Item 103 ("Item 103") and Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 450, Contingencies ("ASC 450"), as well as the common law.

16.     Pegasystems' failure to disclose the *Appian* Action by no later than the filing of Pegasystems' Form 10-Q in the second quarter of 2020 was in direct violation of Item 103, which requires disclosure of any material pending legal proceedings. Pegasystems also failed to disclose the *Appian* Action as a loss contingency in its financial statements in violation of GAAP.

17.     On February 16, 2022, almost two years after the *Appian* Action was commenced and as the case approached trial, the Company finally disclosed to investors the existence of the *Appian* Action.

18.     On May 9, 2022, after a seven-week trial, a jury unanimously decided in Appian's favor and found that the Company and Zou misappropriated Appian's trade secrets. The jury awarded damages of over ***$2 billion*** against the Company and found that the Company acted willfully and maliciously, thereby entitling Appian to seek tens of millions of dollars in attorneys' fees and costs.

19.     Following the news of the jury verdict, the Company's stock price fell nearly twenty-one percent. On May 11, 2022, the stock price fell an additional eight percent when analysts cut their price targets for the Company.

20.     On September 16, 2022, the Company announced that a final judgment was entered in the *Appian* Action, which affirmed the jury verdict, and that the Company was ordered to pay Appian more than $23.6 million in attorneys' fees and costs as well as post-judgment interest at an annual rate of 6%.

21.     Following this news, the Company's stock price fell nearly another six percent on both September 16 and September 19, 2022.

22.    As a result of the foregoing, the Securities Class Action commenced against Company, Defendant Trefler, and the Company's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") Kenneth Stillwell ("Stillwell").

23.    The Individual Defendants breached their fiduciary duties by, among other things, (i) failing to establish or maintain sufficient controls and reporting systems to enable the Board to exercise its duty of oversight, including with respect to the misappropriation of trade secrets and the accuracy of the Company's public statements; (ii) violating state and federal laws and regulations in regard to corporate espionage and trade secrets; and (iii) causing or allowing Pegasystems to disseminate to its stockholders materially misleading and inaccurate information.

24.    On November 21, 2022, Plaintiff Larkin filed a stockholder derivative complaint (the "*Larkin* Action") in this Court asserting claims on behalf of Nominal Defendant Pegasystems against certain of its officers and directors.

25.    On January 4, 2023, Plaintiff Larkin and the named defendants in the *Larkin* Action filed a joint motion to stay proceedings until either (i) the Securities Class Action was dismissed, with prejudice, and all appeals related thereto were exhausted; (ii) the motion to dismiss filed by defendants in the Securities Class Action was denied; or (iii) a related derivative action was not stayed for the same or longer duration as the *Larkin* Action. Pursuant to that motion, the parties proposed to meet and confer and submit a proposed scheduling order within 30 days following the lifting of the stay.

26.    On January 10, 2023, the Court granted the joint motion to stay the proceedings in the *Larkin* Action. Pursuant to that order, "all hearings, conferences, and deadlines currently scheduled shall be postponed until the date and time that will be specified in the proposed

scheduling order to be submitted by the parties after the stipulated stay of proceedings is lifted." The order also administratively closed the case.

27.    In accordance with Massachusetts law,[7] on March 24, 2023, Plaintiff Larkin made a written demand (the "Larkin Demand") on the Pegasystems Board to investigate and take the necessary legal action against those responsible for the damages the Company has suffered based upon the allegations set forth in the therein, which were substantially similar to those set forth in the *Larkin* Action.

28.    On April 12, 2023, the Board created a Demand Review Committee (the "DRC") comprised of directors Christopher Lafond, Dianne Ledingham, and Sharon Rowlands, purportedly vesting the DRC with authority to investigate and respond to shareholder demands.

29.    On April 26, 2023, Plaintiffs' counsel received a letter from counsel for the DRC advising of the formation of the DRC in response to the Larkin Demand, and the retention of Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank") as counsel to the DRC. Fried Frank advised that the DRC had undertaken a review of the matters underlying the Larkin Demand.

30.    On April 28, 2023, Plaintiff Sagfors filed a stockholder derivative complaint in this Court, captioned *Sagfors v. Gyenes et al.*, Case No. 1:23-cv-10933 (D. Mass.), asserting claims on behalf of Pegasystems against certain of its officers and directors (the "*Sagfors* Action").

31.    In accordance with Massachusetts law,[8] on May 5, 2023, Plaintiff Sagfors made a written demand (the "Sagfors Demand", together with the Larkin Demand, the "Demands") on the Pegasystems Board to investigate and pursue the claims alleged in the *Sagfors* Action.

---

[7]  Massachusetts Business Corporation Act ("MBCA") G.L. 156D, §§ 7.42. 7.44.

[8]  *Id.*

32.     On May 8, 2023, counsel for the DRC advised counsel for Plaintiff Sagfors of the formation of the DRC in response to the Larkin Demand. Counsel further advised that the DRC had retained Fried Frank and that the DRC had undertaken a review of the matters underlying the Demands and the litigation.

33.     The parties to the *Larkin* Action and the *Sagfors* Action thereafter conferred and agreed to request the consolidation of those actions and a stay of the resulting consolidated action until the later of the following events: (i) the Securities Class Action was dismissed, with prejudice, and all appeals related thereto had been exhausted; (ii) the motion to dismiss filed by defendants in the Securities Class Action was denied; (iii) a related derivative action was not stayed for the same or longer duration as the consolidated action; and (iv) the completion of the investigation of the DRC. Pursuant to that joint motion, the parties were to meet and confer and submit a proposed scheduling order within 30 days following the lifting of the stay.

34.     On May 17, 2023, this Court consolidated the *Sagfors* Action with the *Larkin* Action under the caption *In re Pegasystems Inc. Derivative Litigation*, Master File No. 1:22-cv-11985-WGY. The Court took the parties' request that the consolidated action be stayed under advisement.

35.     On July 24, 2023, the court in the Securities Class Action denied the defendants' motion to dismiss that action in its entirely with respect to Pegasystems and Trefler.[9] The Court found that "[t]he allegations in the Complaint suffice at this stage to raise a compelling inference that Trefler was aware, involved, and directed Pega's corporate espionage into Appian."[10] In support of this finding, the Court noted that Trefler personally met with Zou,[11] that Trefler

---

[9] Memorandum and Order, ECF No. 92.

[10] *Id.* at 15.

[11] *Id.*

"personally directed 'Teardown'" and Project Crush,[12] and Trefler's conspirators "did not understand [his] request[s] as something that could be fulfilled without accessing restricted information – such as an Appian Trial."[13] The Court concluded, as Plaintiffs expect it will here, that "Pega's most senior executives orchestrated and directed the conspiracy while fostering a corporate culture that promoted and harbored precisely the kind of behavior that Pega promised investors it would prohibit."[14] It further found that "far from involving just 'a few bad apples,' Pega's espionage campaign was organized and directed by the very 'nerve center' of the organization."[15]

36.    On March 5, 2024, the court in the Securities Class Action entered a Settlement Order of Dismissal after being advised by the parties to that action that it had settled. On September 25, 2024, the court in the Securities Class Action entered a Final Judgment and Order of Dismissal with Prejudice. ECF No. 165.

37.    By letter dated April 22, 2024, Fried Frank advised that the DRC had conducted an investigation and that, as of late December 2023, the DRC had substantially completed its investigative work and legal analysis. However, Fried Frank further reported that the DRC was

---

[12] *Id*. at 16-17.

[13] *Id*. at 18.

[14] *Id*. at 26.

[15] *Id*. at 25-26. The Court likewise concluded that "Trefler knew or was reckless in not knowing that his and Pega's statements posed a substantial danger to mislead investors" *Id*. at 19. Specifically, the Court stated that "there is little doubt that Trefler knew or was reckless in not knowing that falsely reassuring investors that Appian's $3,000,000,000.00 claims against Pega had no merit – despite his knowledge to the contrary – posed a 'substantial likelihood of misleading a reasonable investor.'" *Id*. at 20. The Court further found as follows:

> As Trefler knew, the relief sought in the [*Appian*] Action amounted to almost four times Pega's current assets and roughly three times Pega's 2021 revenue. A false denial of Appian's claims' merit posed an obvious danger to mislead investors as to the substantial financial risks Pega was facing in connection with the [*Appian*] Action. The same can be said of Pega's promise not to engage in the very conduct underlying the [*Appian*] Action, which caused the emergence of that financial risk.

*Id*.

waiting to complete its work pending developments in the facts in the Securities Class Action and the mediation of that case and the Demands. Fried Frank also revealed that, as of that date, the DRC was "working to finalize its report and expected to issue it on or before June 30, 2024."

38.     On July 30, 2024, the Court of Appeals of Virginia issued its decision on Pegasystems' appeal of the jury verdict in the *Appian* Action, *affirming in part*, *reversing in part*, and *remanding* the case for a new trial. The court rejected Pegasystems' arguments that Appian had failed to establish the defendants' misappropriation of any trade secrets, ruled that certain of the trial court's evidentiary rulings were erroneous, and remanded the case for a new trial consistent with the court's decision.

39.     By letter dated October 15, 2024, Pegasystems' counsel advised Plaintiffs' counsel that, on October 7, 2024, the DRC had rejected the Demands because the DRC had concluded that pursuing the demanded claims against Pegasystems' officers and directors would not be in Pegasystems' best interests (the "Refusal").

40.     As detailed herein, the DRC was not independent; the DRC's investigation was not reasonable in scope or conducted in good faith; and the DRC did not have reasonable bases for its conclusions.

41.     On December 4, 2024, Defendants moved to dismiss the consolidated action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and Massachusetts law, arguing *inter alia* that Plaintiffs failed to make a pre-suit demand on Pegasystems' Board as required by Massachusetts law before filing the action, that Pegasystems had not rejected the Demands at the time of the suit, and that the DRC report supports dismissal of the action.

42.     On December 17, 2024, Plaintiffs filed an unopposed motion to voluntarily dismiss the actions in order to refile them now that the Plaintiffs had by then fully satisfied the pre-suit

demand requirements by (i) making written demands on the Board and (ii) receiving the Board's rejection of those demands through the DRC's October 15, 2024 letter from counsel. The Court entered the Order of dismissal without prejudice on December 17, 2024.

43.    Therefore, Plaintiffs made a demand on the Board that the DRC refused on October 15, 2024, several months prior to the commencement of this Action. The DRC's decision to reject the Demands is flawed and demonstrates the DRC's bad faith consideration of the potential claims discussed in the Demands and any related claims. The DRC ignored the jury's findings on willfulness, the Virginia Court of Appeals' decision affirming that portion of the jury verdict, and the finding that Appian had proven that Pegasystems misappropriated Appian's trade secrets.

44.    Further, the DRC's attempt to lay responsibility for the misconduct on lower-level employees at Pegasystems is equally flawed. Particularly in finding as follows, the DRC ignores extensive sworn testimony to the contrary and the jury's verdict on liability:

> The DRC's investigation showed that the conduct at issue was initiated and executed by lower-level employees, and, . . . [t]he DRC did not identify any red flags that should have put the Fiduciaries on notice that employees were engaging in potentially unlawful or impermissible behavior. Indeed, *none* of the Independent Directors were aware of the conduct at issue before the Appian Litigation. The DRC found that the Fiduciaries who *were* aware of the alleged misconduct all genuinely, reasonably, and in good faith believed that the Appian information accessed by the third-party consultant or lower-level Pegasystems employees (*i.e.*, Appian's developer interface and free trial environment) did not constitute trade secrets or otherwise confidential material and, with respect to the consultant, was accessed pursuant to an appropriate agreement that disclaimed any intent by the consultant to disclose confidential material. . . . Thus, the DRC's investigation did not find adequate support for a claim that the Fiduciaries engaged in intentional misconduct, acted in bad faith, or behaved unreasonably.

45.    As described herein, the DRC's alleged reliance on a lower-level employee defense to exculpate the Individual Defendants was unfounded. According to the testimony at the trial of the *Appian* Action, the existence of Pegasystems conduct, including the hiring of Zou and employing him as a spy, was reasonably well known to executives at Pegasystems. To the extent

certain fiduciaries were kept in the dark by lower-level employees, that outcome was the product of grossly inadequate internal controls and systems.

46.     Moreover, the DRC, in bad faith, adopted and followed an analysis that accepted the Individual Defendants' self-serving assertions of innocence without considering any contrary facts when evaluating the Individual Defendants' alleged violations of securities laws as set forth in the Demands and, in large part, validated by the court in the Securities Class Action. Relying on defenses that ordinarily must be resolved at trial, the DRC determined it was unwise to pursue claims despite the court's decision and the evidence showing that Trefler and others were well aware of the material risks to the Company presented by the *Appian* Action.

47.     The DRC also discounted the fact that the *Appian* Action will continue, the claims are set to be retried, and the ultimate outcome and potentially huge exposure remain unresolved. The Individual Defendants' conduct continues to expose Pegasystems to enormous potential liability. Shockingly, nothing in the DRC report holds any Individual Defendant directly or even inferentially responsible for that misconduct.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

49.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between Plaintiffs and Defendants.

50.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

13

51.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

52.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

53.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Pegasystems is incorporated in this District and conducts business in this District.

## PARTIES

*Plaintiffs*

54.     Plaintiff Mary Larkin has been a shareholder of Pegasystems since June 25, 2020. Accordingly, she was a shareholder at the time of the wrongdoing alleged herein and has continuously held stock in the Company at all times relevant to the alleged misconduct. She is a citizen of Texas.

55.     Plaintiff Dag Sagfors has been a shareholder of Pegasystems since February 14, 2019. Accordingly, he was a shareholder at the time of the wrongdoing alleged herein and has continuously held stock in the Company at all times relevant to the alleged misconduct. He is a citizen of Sweden.

*Nominal Defendant*

56.     Nominal Defendant Pegasystems is incorporated under the laws of the Commonwealth of Massachusetts. The Company's principal executive offices are located at One Main Street, Cambridge, Massachusetts 02142. Pegasystems' common stock trades on the NASDAQ under the ticker symbol "PEGA." Pegasystems is a citizen of Delaware and Massachusetts.

*Individual Defendants*

57.    Defendant Trefler is the Company's Founder, CEO, Chairman of the Board, and is a controlling stockholder. He has served as a member of the Board since 1983 and owns approximately 46.30% of the outstanding shares of the Company. Trefler personally met with Zou at Pegasystems' headquarters on January 29, 2013, during which meeting Zou logged into Appian's platform and demonstrated it for Pegasystems. Pegasystems and Zou "collaborat[ed] around [a] whiteboard" regarding ways to employ Appian's trade secrets against Appian.[16] The next day, then Director of Product Marketing John Petronio ("Petronio") emailed Trefler to "[t]hank [him] for [his] time" the previous day and tell him that Pegasystems was "updating the competitive brief, attack plan, and Appian scalability whitepaper" following Pegasystems' meeting with Zou.[17] Trefler also received and reviewed materials showing what Pegasystems created using Zou's information. For example, on February 19, 2013, Trefler advised Petronio, Leon, and Kim (Pegasystems' Head of Product Marketing) that Defendant Trefler was meeting with Rabobank the following week "in a head-to-head interaction against Appian" and that he "would like a 'prop' [he] could leave with [Rabobank] that will help blow this up." Accordingly, Trefler requested "some[thing] simple and winning by the end of this week."[18] Petronio promptly responded to Trefler presenting "that draft of that updated competitive brief on Appian (for Rabo)" that "included the new information [they had] learned." *Id.* Pegasystems then left the "competitive brief" with Rabobank, and Pegasystems then won Rabobank's business over Appian. As another example, on or about February 26, 2014, Trefler and other Pegasystems executives received over

---

[16] 3/30/22 Trial Tr. at 1678-80; 4/27/22 Trial Tr. at 6387-88.

[17] PLT 194.

[18] PLT 227.

two hundred presentation slides featuring information on Appian (including actual screenshots of Appian's platform) that Pegasystems had obtained from Zou. Trefler is a citizen of Massachusetts.

58.     Defendant Peter Gyenes ("Gyenes") is a director of the Company and has served as a member of the Board since March 2009. Gyenes has been a member of the Audit Committee and the Nominating and Corporate Governance Committee (the "Governance Committee") since 2009. He is a citizen of Massachusetts.

59.     Defendant Richard Jones ("Jones") is a director of the Company and has served as a member of the Board since November 2000 and served as Vice Chairman from September 2002 to July 2007. Jones is a member of the Compensation Committee, and he has served as a member of the Governance Committee since 2011. He is a citizen of Kansas.

60.     Defendant Christopher Lafond ("Lafond") is a director of the Company and has served as a member of the Board since April 2019. Lafond had been a member of the Audit Committee since 2019, serving as its Chair since 2020. He has also served as a member of the Governance Committee since 2019. He is a citizen of Florida.

61.     Defendant Dianne Ledingham ("Ledingham") is a director of the Company and has served as a member of the Board since September 2016. Ledingham has also served as a member of the Compensation and Governance Committees since January 2017. She is a citizen of New Hampshire.

62.     Defendant Sharon Rowlands ("Rowlands") is a director of the Company and has served as a member of the Board since April 2016. Rowlands has served as the Chair of the Compensation Committee and as a member of the Governance Committee since January 2017. She is a citizen of Florida.

63.     Defendant Larry Weber ("Weber") is a director of the Company and has served as a member of the Board since August 2012. Weber has been a member of the Audit Committee since 2021 and has also been a member of the Governance Committee since 2013, serving as its Chair since 2015. He is a citizen of Massachusetts.

64.     Defendant Stillwell is the CFO and COO of the Company and has served in these positions since 2016. He is a citizen of Massachusetts.

65.     Defendants Gyenes, Jones, Lafond, Ledingham, Rowlands, Trefler, and Webber are collectively referred to herein as the "Director Defendants."

66.     Defendants Gyenes, Lafond, and Weber are collectively referred to herein as the "Audit Committee Defendants."

67.     Defendants: Gyenes, Jones, Lafond, Ledingham, Rowlands, and Weber are collectively referred to herein as the "Governance Committee Defendants."

68.     Defendant Leon is the Company's Chief of Clients and Markets and Alan Trefler's brother. Leon also participated in Project Crush. In addition to helping arrange funding to hire Zou and meeting with Zou at Pegasystems' headquarters on January 29, 2013, Leon also helped develop Pegasystems' sales team and strategy, and in that role spurred Pegasystems' salesforce to exploit Appian's misappropriated information. For instance, in a February 2, 2013 internal email declaring Pegasystems "should never lose against Appian," Leon advised Pegasystems' management that "[i]f your team is competing against Appian anywhere, please get in touch with Don Schuerman or John Petronio ASAP to get a briefing on where you should attack Appian" explaining that "we know where and how to attack them" and that "[t]he competitive materials on Appian are being revised to reflect what we have learned." Accordingly, they should "[g]et a hold

of Don or John and . . . get these attacks in the hands of our sales teams ASAP."[19] Leon is a citizen
of Florida.

69.     Defendant Don Schuerman ("Schuerman") is the Company's Chief Technical
Officer and Vice President of Marketing. Schuerman met with Zou and others at Pegasystems'
headquarters on January 29, 2013. As Schuerman has testified, Zou showcased Appian's platform
to Pegasystems during this in-person meeting:

> Q. By the way, during that meeting [the January 29, 2013 meeting], Mr. Zou logged
> into Appian's platform and demonstrated it to Pegasystems' personnel, correct?
>
> A. I believe so, yes."[20]

Schuerman's involvement also included receiving progress updates on Project Crush and
reviewing internal documents and videos Pega created using Appian's trade secrets. In addition,
Schuerman drafted specific technical questions he wanted Zou to answer for Pegasystems, and
helped Pegasystems develop salesforce training materials using Appian's trade secrets. Schuerman
also signed verifications to Pegasystems' interrogatory responses in the *Appian* Action and
testified on behalf of Pegasystems as a corporate designee. Schuerman is a citizen of
Massachusetts.

70.     Defendant Kerim Akgonul ("Akgonul") is the Company's Chief Product Officer.
He is a citizen of Massachusetts.

71.     Defendant Benjamin Baril ("Baril") is the director of the CTO at the Company.
Baril helped Petronio hire Zou in 2012 and worked closely with Zou as part of Project Crush. Baril
also developed several internal documents using Zou's information, created hours of video footage
featuring Appian's trade secrets, and collaborated with Zou on multiple occasions. For instance,

---

[19]  PLT 196.

[20]  4/27/22 Trial Tr. at 6388:21-25.

Baril "spent two days with [Zou]" at Pegasystems' headquarters, "watching [Zou]" navigate the Appian platform, "asking [Zou] questions throughout the process and taking a ScreenCam [video recording] for review at a later date."[21] Baril circulated to colleagues the footage he and Zou captured within Appian's platform. Baril also co-wrote Pegasystems' formal Project Crush memorandum in 2014. Among other things, the Project Crush memorandum listed various "Action Item[s]" to guide Pegasystems moving forward based on its learnings from Project Crush. *Id.* One "Action Item" was to "[o]pen a dialogue with Product Management leadership to give them feedback," which task was already "[u]nderway" as "John ha[d] setup recurring meetings with Product Management including Alan." *Id.* Another "Action Item" was to "[g]ive feedback to product about the development experience, and suggestions on how it can be better," which was also "[u]nderway." *Id.* A third "Action Item" was to "[d]iscuss potential improvements to data modeling with [Product Management]," which project had been "[c]ompleted [such that] Data Modeling [was] a large target for [version] 7.2." *Id.* Baril is a citizen of Canada.

72.     Defendants Jones, Stillwell, Trefler, Leon, Scherman, Akgonul, and Baril are collectively referred to herein as the "Officer Defendants."

73.     Defendants Stillwell and Trefler are collectively referred to herein as the "Securities Class Action Defendants."

74.     Defendants referenced in paragraphs 57 through 71 are herein referred to as the "Individual Defendants."

75.     The following chart identifies the Individual Defendants, their associated references herein, and other relevant information discussed in more detail below:

---

[21] PLT 775.

| Defendants | Director Defendants | Officer Defendants | Audit Committee Defendants | Governance Committee Defendants | Securities Class Action Defendants |
|---|---|---|---|---|---|
| Gyenes | Mar. 2009-present | | June 2009-present | June 2009-present | |
| Jones | Nov. 2000-present); Chair Sept. 2002-July 2007 | President & COO, Oct. 1999-Sept. 2002 | | July 2011-present | |
| Lafond | Apr. 2019 to present | | Member, 2019; Chair, 2020-present | 2019-present | |
| Ledingham | Sept. 2016-present | | | Jan. 2017-present | |
| Rowlands | Apr. 2016-present | | | Jan. 2017-present | |
| Stillwell | | CFO and COO, 2016-present | | | X |
| Trefler | Chair, 1983-present | Founder & CEO, 1983-present | | | X |
| Weber | Aug. 2012-present | | 2021-present | Member, May 2013-present; Chair Jan. 2015-present | |
| Leon | | Chief of Clients and Markets | | | |
| Schuerman | | CTO and VP Marketing & Strategy | | | |
| Akgonul | | CPO | | | |
| Baril | | Office of CTO | | | |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

76.     By reason of their positions as officers and/or directors of Pegasystems and because of their ability to control the business and corporate affairs of Pegasystems, the Individual Defendants owed Pegasystems and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Pegasystems in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Pegasystems and its shareholders.

77.     Each director and officer of the Company owes to Pegasystems and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

78.     Because of their positions of control and authority as directors and/or officers of Pegasystems, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

79.     To discharge their duties, the officers and directors of Pegasystems were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

80.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Pegasystems, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

81.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

82.     To discharge their duties, the officers and directors of Pegasystems were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Pegasystems were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Massachusetts, every other state in which it does business, and the United States, and pursuant to Pegasystems' own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Pegasystems conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Pegasystems and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Pegasystems's operations would comply with all applicable laws and Pegasystems's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

83.     Each of the Individual Defendants further owed to Pegasystems and the shareholders the duty of loyalty, requiring that each favor Pegasystems's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

84.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Pegasystems and were at all times acting within the course and scope of such agency.

85.    Because of their advisory, executive, managerial, and directorial positions with Pegasystems, each of the Individual Defendants had access to adverse, non-public information about the Company.

86.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein as well as the contents of the various public statements issued by Pegasystems.

## PEGASYSTEMS'S CODE OF CONDUCT

87.    Pegasystems's Code of Conduct provides as follows:

At Pega we are committed to extremely high standards of ethical and legal conduct. We strive to foster a culture where employees can perform at the highest levels, are empowered to make good and ethical decisions, and never have to compromise their personal integrity or the integrity of our Company. We have adopted this Code of Conduct (this "Code") in alignment with our Pega Values and Success Behaviors, which highlight the expectations we have of one another, the commitment we share with our clients, and above all the role each of us has in creating our culture, and to emphasize the ethical and legal standards we expect all Pega personnel to observe when dealing with Pega, colleagues, clients, partners, suppliers, and other important stakeholders. This Code applies to all our interactions in various areas of our shared professional lives including those of our officers, full and part-time employees, interns, all people retained as independent consultants, and members of the Board of Directors of Pega and its subsidiaries worldwide.

As Pega Employees, we commit to acting consistently with our Pega Values and Success Behaviors to:

Create a productive and safe workspace for the entire Pega community. We commit to comply with the letter and spirit of the laws and regulations applicable to our business;

Avoid actual or perceived conflicts of interest and prevent the creation of these conflicts through our choices outside the workplace;

Protect our corporate assets and information, including the confidential information of those with whom we do business;

Compete fairly, honestly, and vigorously; and

Maintain a culture that values and nurtures ethical conduct and fosters transparency and honesty by being fair and trustworthy in all our interactions with each other, our clients, and our partners.

We are all responsible for Pega. Individually and as members of the Pega team, each of us is responsible for acting with integrity and honesty every day. This commitment from each of us to uphold these principles makes this Code a shared responsibility and an individual requirement.

It is expected that we all commit to responsibly embody these core principles and the specific policies of this Code. We want our team to be supportive of each other and hold each other accountable to these principles. We will not tolerate any deviation from our Code. Consult your People Talent Advisor, the People team, or an officer of the Company for guidance if you are not clear on how to uphold this Code.

88.     The Code of Conduct requires Pegasystems' officers, directors, and employees to be "committed to complying with all applicable local, state and federal laws and regulations, both domestic and international," providing as follows:

We are required under U.S. federal securities laws to provide the public with periodic disclosure regarding our business and financial condition (such as quarterly and annual reports and materials for our annual shareholders' meeting). We provide additional disclosures to the public through our quarterly earnings calls and press releases.

We have created disclosure controls and procedures which are designed to ensure that all public disclosures are accurate, complete, and timely. We have also created a Disclosure Committee to ensure compliance with the disclosure controls and procedures and to evaluate the effectiveness of those controls and procedures on a regular basis.

We commit to:

Participate in the preparation or dissemination of any Pega public disclosures or provide information that we know may be used in the preparation of those disclosures. We commit to ensure that the content of the disclosures is accurate, complete, and timely.

Immediately report to a member of the Disclosure Committee if we are or become aware that Pega's public disclosures are not accurate, complete and timely, or we become aware of a transaction or development that we believe may require disclosure. Disclosure Committee includes our Vice President of Finance, our Corporate Controller, our Vice President and General Counsel, and certain other appointed people.

Never disclose outside of Pega material, non-public information about Pega until such information has been publicly disclosed in our SEC filings, earnings releases, analyst conferences or through other authorized disclosure channels.

89.     The Code of Conduct concludes with the following:

Pega's policy is to take prompt action to enforce this Code and all of Pega's other policies. Depending on the seriousness of the violation and the other relevant circumstances, violations of this Code may result in a formal or informal warning or reprimand, demotion, suspension, dismissal, or other disciplinary action.

Certain violations of this Code may require Pega to refer the matter to the appropriate governmental authorities for criminal prosecution. Moreover, any supervisor who directs or approves of any conduct in violation of this Code, or who has knowledge of such conduct and does not immediately report it, also will be subject to disciplinary action, which may include suspension or termination of employment.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

90.     Pegasystems provides a low-code development platform that allows its customers to build applications targeted to their needs. The Company operates in the competitive BPM software market. Appian is one of Pegasystems' main competitors in the market. As one Pegasystems employee admitted internally on October 4, 2019, "Alan [Trefler] and [his brother] Leon are very focused on destroying Appian [–] [l]ike making it go away for good."[22]

91.     Defendants adopted various measures and restrictions to protect its trade secrets, and Defendants knew that Appian closely guarded its trade secrets. As one Pegasystems employee testified, "it was a known thing that Appian . . . was very black box about giving out trials . . . [i]t

---

[22] PLT 649.

was common [knowledge] that it's impossible to get an Appian trial."[23] Another Pegasystems employee, Mayran Snir Barak ("Barak"), Pegasystems' Director of Data & Integration, complained in a November 14, 2017 internal chat message that she could not "get any sort of access to [A]ppian" because Pega was "not a 'qualified business' for the free trial."[24] Defendant Baril echoed this sentiment in an October 1, 2019 email to Trefler, stating that "Appian is very tightly controlled about who has access to their trial environments."[25] And on October 28, 2019, Baril emailed himself a copy of Appian's "Terms and Conditions" which prohibited, among other things, the "use" of Appian's service by "competitor[s]," as well as users' "provid[ing] information about the [Appian] Cloud Offering to a competitor of Appian."[26]

92.    Starting as early as 2012, the Company started to misappropriate Appian's confidential information and trade secrets, which Pega then used to train its sales employees, improve its software, and compete with Appian.

93.    To accomplish this, Pegasystems hired KForce to recruit an experienced Appian developer who would be willing to misappropriate Appian's trade secrets for the Company, indicating to KForce that the candidate could not be loyal to Appian. Pegasystems told KForce it needed "an Appian Developer" with "several years of experience working specifically with Appian" and that "[a]ccess to the Appian BPM tool is a must."[27] Pegasystems emphasized to KForce that the developer "should not have worked directly with Appian" and could not be "loyal" to Appian because Pegasystems did not want its scheme "getting back to Appian."[28]

---

[23] 1/21/22 Davis Depo. Tr. at 169, 175.

[24] PLT 816.

[25] PLT 632.

[26] PLT 665.

[27] PLT 180.

[28] PLT 4; 7/28/21 Cerrito Depo. Tr. at 20-21.

94.     In February 2012, KForce introduced the Company to Zou, who worked for United States government contractors utilizing Appian's platform to build software applications. Zou's employment provided him with access to Appian's software and information. Zou testified that "[d]uring the entire 2012 to 2014 time period," he "worked as an Appian consultant for Pegasystems" and "use[d] [his] Serco laptop to do that work."[29]

95.     Petronio helped the Company retain Zou in early 2012 and worked closely with him until September 2014. Petronio communicated regularly with Zou and arranged and attended meetings between Company employees and Zou. Baril helped Petronio hire Zou and also worked closely with Zou and the others in the Project Crush scheme. The Project Crush team also included Kim and Steve Bixby ("Bixby"), Vice President of Product Management.

96.     Between February 2012 and September 2014, Zou used his Appian credentials to access Appian's trade secrets and sell them to Pegasystems in exchange for payments from the Company funneled to Zou through KForce.[30] Pegasystems ended its arrangement with Zou in or about September 2014 after Zou "switched to another project" with his employer and, as a result, lost his access to Appian's platform.[31]

97.     Among other things, Zou secretly downloaded Appian's confidential information, recorded videos and took screenshots of Appian's platform, showed Pegasystems how to use Appian's platform, and provided the Company with insight into Appian's software.

98.     During this time period, Zou met and collaborated with Pegasystems' officers, senior executives, engineers, and managers, visiting Pegasystems' headquarters a number of times.

---

[29] Trial Tr. at 4329:22-4240:6, 4240:13-23.

[30] Trial Tr., 3/30/22 at 1528.

[31] PLT 007.

99.    For example, one such meeting took place on January 29, 2013. In advance of the meeting, Petronio informed Defendants Trefler, Leon, Schuerman, and other Company employees that "Zou . . . will give demonstrations of building an application in Appian . . . [and] will be at Pega for the day."[32]

100.    Defendants Trefler, Leon, Schuerman, and others attended the meeting with Zou at the Company's headquarters. During the meeting, Zou logged into Appian's platform and demonstrated it for the Company employees in attendance, who discussed with Zou how to utilize Appian's trade secrets against it.

101.    On January 30, 2013, Petronio emailed Trefler to "[t]hank [him] for [his] time yesterday" and to advise him that the Company was "updating the competitive brief, attack plan, and Appian scalability whitepaper" following the meeting with Zou.[33]

102.    Trefler and Company executives also received and reviewed materials that the Company created utilizing the information from Zou. For example, in February 2014, Trefler and other Company executives received more than two hundred presentation slides that included information on Appian obtained from Zou.

103.    Appian's misappropriated information was extremely useful to Pegasystems and was used until at least 2020. The Company utilized the information throughout its organization, distributing it to more than two hundred executives and employees.

104.    As one whistleblower testified in early 2022, Zou's information was "hugely useful in that it gave us a level of insight . . . we didn't have before" – it gave Pega "access to the black box."[34] Leon also stated that the misappropriated information "was useful" and "assisted

---

[32]  Trial Tr., 3/24/22 at 765.

[33]  Trial Tr., 3/24/22 at 779-80.

[34]  9/20/21 Bearden Depo. Tr. at 34, 42.

Pegasystems in its marketing efforts to compete against Appian."[35] Another Pegasystems executive admitted that the misappropriated information provided Pegasystems "great ammunition to help [it] compete and win against [Appian]."[36]

105.    Among the materials Pegasystems amassed were dozens of hours of video footage of Zou's accessing and working within Appian's platform. Malcolm Ross ("Ross"), Appian's Vice President of Product Strategy and Deputy CTO, testified about such footage during the 2022 trial:[37]

> Q. Now, during this trial, we've seen numerous videos of Mr. Zou developing the Appian software platform. Did you see those videos?
>
> A. Many videos.
>
> . . .
>
> Q. In those videos, Mr. Zou was sharing his access to Appian software with Pegasystems, correct?
>
> A. In detail, yes.
>
> Q. And he was answering questions posed by Pegasystems' employees, correct?
>
> A. Yes, and they were directing him where to navigate.
>
> Q. And Mr. Zou was explaining features and functionality of Appian software?
>
> A. Correct.
>
> . . .
>
> Q. Now, since your deposition, have you had an opportunity to review the videos of
>
> Mr. Zou working in Appian's software platform sharing his access with
>
> Pegasystems?
>
> A. Yes.

---

[35]  PLTD-010.20.

[36]  10/14/21 Van Wess Depo. Tr. at 183.

[37]  4/27/22 Trial Tr. at 6124:21-6127:24

Q. About how many hours of videos have you watched?

A. In total, I've watched approximately 33 hours. Mr. Zou was a subset of that, so I think it was maybe 20 to 24 hours, Mr. Zou's.

Q. And what other videos did you watch?

A. Mr. [Baril's], Mr. Peter [Bessman's], and Mr. Petronio's videos as I recall.

Q. Those were all Pegasystems employees at the time; is that correct?

A. Yes

106.    In addition to video footage, Pegasystems' "war chest of materials"[38] also included sales and marketing aids for Pegasystems' "Solutions Consultants" and other members of Pegasystems' salesforce, training materials, screenshots of Appian's platform, "technical briefs," "competitive briefs," "battle cards," PowerPoint presentations, and "kill points" for competing against Appian. Ross addressed one such "technical brief" at the 2022 trial, the "Understanding Appian" brief Pegasystems developed using Zou's information:[39]

> Q. Did your review of the videos that were prepared by Mr. Zou for Pegasystems and the other Pegasystems videos help you better understand the meaning of the statements that appeared in this Pegasystems sales document that we've marked Defendants' Exhibit 688 ["Understanding Appian" document dated Jul. 2, 2013, or what Mr. Petronio referred to as the Appian technical brief] and where the information was derived from?
>
> A Yes, I've described this as a derivative of their knowledge. And this was after reviewing the videos, it was very clear exactly how that went from Mr. Zou into this derivative content from the preceding Appian documents.

107.    Ross also addressed specific portions of Pegasystems' "Understanding Appian" brief as well as other sales and tactical documents Pegasystems generated using Zou's information. He explained that "[t]he level of detail [of information contained in the documents] . . . represent not only access to our [Appian] documentation but also testing that occurred to understand the

---

[38]  PLT 248.

[39]  4/27/22 Trial Tr. at 6130:8-21.

behavior of the architecture [of Appian's systems]"[40] and had required "a comprehensive review of the entire documentation of the software"[41] and "direct access to software"[42]– documentation and software that contained trade secrets and for which access was highly restricted. As Ross explained, "this entire ['Understanding Appian' document] is derivative of trade secrets through access to our software documentation"[43] or, put another way, is "entirely derived with access to our trade secrets."[44]

108.    As Pega was actively meeting with the U.S. Census Bureau in 2015, Pegasystems' sales lead on the U.S. Census Bureau opportunity, Thomas Oleksiak ("Oleksiak"), accessed technical briefs Pegasystems had generated using Zou's information, sharing them with his boss and others at Pegasystems and describing them as an "interesting war chest of materials" to use against Appian on the 2020 Census competition. As Oleksiak later testified, he accessed the materials in connection with the U.S. Census Bureau competition, finding them "directionally helpful."[45] Pegasystems was awarded the 2020 Census contract over Appian.

109.    In connection with Pegasystems and Appian's competition over the customer Rabobank, Trefler asked Petronio for a "prop" that Trefler could leave behind with Rabobank to "help blow this up" for Appian.[46] On another deal, Pegasystems supplied the customer with

---

[40] 4/27/22 Trial Tr. at 6132:19-24.

[41] *Id*. at 6134:21-6135:4.

[42] *Id*. at 6138:6-16.

[43] *Id*. at 6190:22-25.

[44] *Id*. at 6197:21-25.

[45] 4/25/22 Trial Tr. at 5614:23-5624:17; id. at 5674:24-5676:4.

[46] PLT 227.

documents containing Appian's trade secrets, asking them not to share them because "we are under NDA."[47]

110.    At trial in the *Appian* Action, Appian presented reams of evidence demonstrating that Pega had used Appian's trade secrets to improve Pegasystems' inferior product. For instance, Pegasystems' CPO (Akgonul) was deeply involved in Project Crush and showed tremendous interest in using Zou's information to Pegasystems' advantage. On one occasion, after an hour-long "session" with Zou analyzing Appian's capabilities, Akgonul sent Pegasystems' CTO, Vice President of Product Management, and other colleagues several screenshots he had captured from his "[A]ppian session" with Zou.[48] Appian also demonstrated to the jury that, "immediately after attending a session where Mr. Zou walked [Pega] through Appian's Tempo social/mobile product," Pegasystems' Head of Social Product (Agya Garg) recommended "Pega add it into the next version of Pega's platform."[49] A confidential memorandum Pegasystems wrote two years into Project Crush also indicated that Pegasystems was leveraging Zou's information to execute "improvements to data modeling," which was a "large target for" future versions of Pegasystems' software.[50]

111.    As Baril testified in 2022, Pegasystems' initial plan involved "hir[ing] an independent Appian contractor to help [Pegasystems] get some of the details about [Appian's] methodology and potential software weaknesses"[51] as well as purchase an Appian license for Pega. Leon Trefler supported Pegasystems' plan, remarking in a February 13, 2019 internal email that

---

[47] PLT 1120.

[48] PLT 188.

[49] 4/19/22 Trial Tr. at 5088.

[50] PLT 775.

[51] *Id.* at 206.

"BP3," an outside contractor, "would be a great one to hire to do some diligence for us" on Appian, adding that he was "sure" an outside contractor could obtain a free trial of Appian's platform so that Pega could "do a side by side compare around different builds."[52] Pegasystems continued to develop its plan in March 2019 as Defendants Trefler, Schuerman, Leon, Akgonul, as well as non-party Bixby, and other executives discussed a "consulting engagement to deep dive Appian's product, training, methodology (all aspects of the client journey)."[53] Despite its efforts, Pegasystems could not find a contractor willing to misappropriate Appian's information on Pegasystems' terms, so Pegasystems decided to spy on Appian itself.

112.    Schuerman advised Baril around August 19, 2019, that Baril was to "work on a critical CI [competitive intelligence] Brief for Alan [Trefler] due 8/30/19."[54]

113.    On or around September 8, 2019, Baril sent Leon a draft of the Appian "full teardown and competitive" brief that Baril, Schuerman, and others at Pegasystems were developing under Trefler's direction.[55]

114.    In an internal email dated September 21, 2019, Trefler told Baril he was "thrilled to have you in this role" and reminded Baril, Schuerman, Akgonul, and then-CMO Tom Libretto ("Libretto") that Trefler wanted a "write up [o]n everything we think is an ap[p]ian weakness," and wanted "to spend an hour on a[n Appian] demo."[56]

115.    On September 25, 2019, Baril wrote to Schuerman and Jennifer Gill, Pegasystems' Senior Director of Product Marketing ("Gill"): "FYI – Alan [Trefler] asked for an hour long demo

---

[52] PLT 752.

[53] 1/10/22 Baril Depo. Tr. at 293.

[54] 4/28/22 Trial Tr. at 6433; PLT 660.

[55] *Id*. at 308.

[56] PLT 622.

of Appian. This is currently impossible. My trial ended and the other system I was using is no longer accessible. I'll work on finding another one of [sic] getting another trial (involves registering a domain, email etc."[57]

116.    On September 27, 2019, Baril boasted to Schuerman and Gill: "My spies have managed to get me another 15 day instance" of Appian's platform "[l]ikely up on Monday."[58] On or about the same day, Baril also informed Schuerman that Barak had recorded a "fabulous" hour-long demo of the Appian platform, and Baril provided Schuerman a link to the video.[59] Responding to Baril, Schuerman expressed how he was pleased that Trefler's "mission" was on track,: "Awesome. So we have some stuff we can show Alan . . . ."[60]

117.    On or about September 27, 2019, Baril also informed Schuerman that a Pegasystems "spy," Pega Solutions Consultant Nguyen Le ("Le"), was posing to Appian as a "small independent business" in order to obtain an Appian license for Pegasystems, telling Schuerman "[m]y spy also got a quote for Appian."[61] In response to Schuerman's inquiry regarding "how many users" could use the license Pegasystems' "spy" was seeking, Baril responded the "quote" "was for a small independent business so I imagine a handful at most."[62] Baril further informed Schuerman that the "small independent business" actually belonged to Le's wife: "It's an [Solutions Consultant] whose wife owns a small business . . . [in] the beauty industry."[63]

---

[57]  1/10/22 Baril Depo. Tr. at 65; PLT 631-A.

[58]  1/10/22 Baril Depo. Tr. at 81; PLT 631-A.

[59]  4/28/22 Trial Tr. at 6427.

[60]  *Id*. at 6428:8-12.

[61]  4/28/22 Trial Tr. at 6429:18-21.

[62]  *Id.* at 6429:25-6430:8; 1/10/22 Baril Depo. Tr. at 354.

[63]  4/28/22 Trial Tr. at 6430:4-6431:3.

118.    In an internal email dated October 1, 2019, Baril cautioned Defendant Trefler (as well as Schuerman, and non-parties Gill, and Libretto) that "Appian is very tightly controlled about who has access to their trial environments" while assuring them that he was "working to get a new instance so that I can record some videos of their environment for you."[64] Three days later, on October 4, 2019, Baril admitted to Pegasystems' Director of Solutions Consulting that "Alan [Trefler] and Leon are very focused on destroying Appian" [–] "[l]ike making it go away for good."[65]

119.    Baril updated Leon, Schuerman, and Gill in an October 5, 2019 email[66] and described his latest efforts to dive deep into Appian's software to find Appian's weaknesses so that Pega could better attack Appian:

> Alan [Trefler] has been asking Don [Schuerman], Jenn [Gill] and I to dig deep into Appian's technology in order to find more compelling weaknesses to form a more targeted and damning attack. To that end, I've been spending much of my time over the last few weeks diving deep into Appian's software, including taking some videos of various features and functionality and documenting everything I can find. You saw an iteration of that work a few weeks ago, the latest technical document can be found here.

120.    Leon responded to Baril later that day by asking him to "[p]lease set up a call for next week," noting that his "mission [was] urgent" and he was "understaffed" and encouraging him to "to think aggressively." Leon added he would devote "more resources" to this "mission."[67]

121.    After advising Schuerman in an October 17, 2019 internal chat message that Baril had "[l]ost access to [Appian's] trial system last night," Baril pointedly asked Schuerman, "[w]ho

---

[64]  1/10/22 Baril Depo. Tr. at 71; PLT 632.

[65]  PLT 649.

[66]  PLT 759; 1/10/22 Baril Depo. Tr. at 188.

[67]  1/10/22 Baril Depo. Tr. at 191; PLT 760.

can I ping about legality of using [Appian's] system?"[68] Baril's concerns over the illegality of Pegasystems' actions were well justified. Moreover, the Code of Conduct expressly prohibited employees from using "illegal or questionable means" or "misrepresenting your identity in hopes of obtaining confidential information" – precisely what Pegasystems' executives were doing.

122.    Starting in approximately 2019, Pegasystems also began using false names and companies to infiltrate Appian's platform and gain further access to its trade secrets. This new scheme was implemented by and/or at the direction of Defendants Trefler, Leon, Schuerman, and Baril, as well as other Pegasystems executives, including non-party Bixby.

123.    In or around August 2019, Baril concocted multiple fake names, including "Andrew Powers" and "Emily Gold" to misappropriate Appian's trade secrets.[69] Baril also created a fictitious consulting firm, "Andrew Powers Consulting" (complete with its own unique web domain), which he used to gain access to Appian's platform.[70] Baril informed Schuerman on August 17, 2019, that Baril had obtained access to Appian's platform. During this time period, the Company utilized a network of "spies" and other resources to misappropriate Appian's trade secrets. For example, in August 2019, Baril created a number of false names to misappropriate Appian's trade secrets. He also created a fictitious consulting firm that he used to gain access to Appian's platform. Additionally, several Company employees obtained trials of Appian's software by falsely representing themselves to Appian as potential customers and shared the credentials with other Company employees to use to further the scheme.

124.    In September 2019, Baril enlisted Le to help Pegasystems misappropriate Appian's information by obtaining a 15-day trial of Appian's software. In addition to working at

---

[68] PLT 643-A.

[69] 1/10/22 Baril Depo. Tr. at 79-80.

[70] *Id.* at 79-80.

Pegasystems, Le co-owned a salon business, Organic Living and Wellness, with his wife.[71] At Baril's behest, Le obtained a 15-day trial of Appian's platform by falsely representing himself to Appian as a potential "customer" named "Organic Living and Wellness." On October 2, 2019, Le provided Baril with login credentials Appian had issued to "Organic Living and Wellness." Baril – posing as "Organic Living and Wellness" – accessed Appian's platform using Le's credentials, telling Le: "Thanks so much! [Over] 15 days to make magic happen. . . . [T]his system . . . is extremely helpful."[72]

125.    Baril recruited Michael Fine ("Fine"), a Solutions Consulting Manager at Pegasystems, to assist with Pegasystems' teardown. In addition to working at Pegasystems, Fine co-owned a business space rental company, Palencia Business Center, with his wife.[73] Baril asked Fine to obtain a trial of Appian's platform for Baril, cautioning Fine not to disclose his affiliation with Pegasystems when seeking the trial from Appian. Fine carried out Baril's request and obtained a free trial of Appian in October 2019 by falsely posing as a potential "customer" called "Palencia Business Center." Fine then provided Baril the login credentials Appian had issued to "Palencia Business Center." Fine also set up a new email account for Baril, using Fine's palenciabusinesscenter.com web domain, to facilitate Baril's access to Appian's platform. Posing as "Palencia Business Center," Baril used Fine's credentials to access Appian's platform.

126.    In October 2019, Baril enlisted Peter Bessman ("Bessman"), a Pegasystems Solutions Engineer, to assist with the teardown. On October 10, 2019, Baril explained to a senior employee that he was "looking to pull Peter [Bessman] into the Appian CI [competitive

---

[71]  12/3/21 Le Depo. Tr. at 73.

[72]  1/10/22 Baril Depo. Tr. at 340; PLT 629.

[73]  12/1/21 Fine Depo. Tr. at 26.

intelligence] project starting immediately until the end of the year" and that the "overall goal" of the work Bessman would be doing was "to steal 4 deals from Appian in Q4 and Q1 2020."[74]

127.    On or about May 12, 2020, Baril accessed an Appian conference by registering under one of his personas, "Andrew Powers." Upon infiltrating Appian's conference, Baril quickly alerted Schuerman via instant message that he had used a fake name ("Andrew Powers," Baril's self-proclaimed "incognito self") to break into the conference.[75] Baril and Schuerman then communicated about the conference via instant messaging. In addition to inquiring of Baril specific technical questions about Appian's conference, including its broadcast technology, Schuerman asked him to "export the customer list" and "send [Schuerman] some screenshots of the overall experience."[76]

128.    On or about May 28, 2020, Baril discussed gaining access to an Appian trial in order to "create a side-by-side comparison of the Appian flow versus Pega flow" with Pegasystems Solutions Consulting Manager Aaron Fromm.[77]

129.    Pegasystems failed to discipline employees that participated in Pegasystems' scheme, encouraging them to continue spying on Appian and using Appian's trade secrets to win business.

130.    Pegasystems ensured that Appian's valuable trade secrets were provided to Pegasystems' officers and other senior executives as well as other employees. Employees routinely emailed one another documents containing Appian's trade secrets. For instance, on March 25, 2013, Kim emailed Leon and others two of Pegasystems' competitive briefs on Appian, declaring

---

[74] PLT 651.

[75] 4/28/22 Trial Tr. at 6442-43.

[76] *Id*. at 6445:2-7.

[77] 1/10/22 Baril Depo. Tr. at 73.

"[i]f we use these two docs carefully – we will win EVERY TIME."[78] As another example, on December 4, 2019, Baril sent an email to various Pegasystems employees in which Baril "included links to some videos" that "give insight into some of the woes of creating applications in Appian," while cautioning the "videos are STRICTLY INTERNAL."[79] On another occasion, Baril emailed Bixby to inform him that Baril had an "Appian trial system for a few more days and wanted to know if anyone [from Pegasystems' product management group] would like to get any specific intel/demos before it expires."[80] In response, Bixby provided Baril with three employee "listserv" addresses, including pxmanagement@pega.com (Bixby's "direct reports") and pxall@pega.com (Bixby's "entire organization of about 500 people").[81]

131.    Pegasystems awarded extra compensation to employees for completing management-based objectives ("MBO"), one of which required employees to obtain and internally present information regarding competing platforms. For example, Bessman (one of Pegasystems' "spies") internally circulated a presentation on Appian as "homework or proof to receive his MBO credit."[82] Meanwhile, Fine and Le – the Pegasystems employees who posed as small businesses to obtain Appian credentials in the third quarter of 2021 – both received cash bonuses for their competitive intelligence on Appian during that quarter.[83]

132.    The Company ensured that Appian's trade secrets were provided to the Company's officers and other senior executives as well as other employees.

---

[78] PLT 721.

[79] PLT 761.

[80] 1/10/22 Baril Depo. Tr. at 211.

[81] *Id.* at 211-12.

[82] 9/23/21 Baril Depo. Tr. at 122.

[83] 1/10/22 Baril Depo. Tr. at 352-54.

133.    Pegasystems closely guarded its scheme to spy on its chief competitor and wrongfully acquire Appian's trade secrets. Pegasystems did not disclose those activities to investors, leaving investors with the misimpression that Pegasystems' business was driven by its own innovation and its products' competitiveness in the marketplace. In reality, Pegasystems' business was driven by unlawful means of competing with Appian. Likewise, Pegasystems did not disclose the potentially massive liabilities associated with such an unlawful business plan. Indeed, even when those liabilities materialized into a lawsuit by Appian, Pegasystems kept investors in the dark.

134.    In January and February 2020, two former Pegasystems employees (Petronio, who joined Appian in 2019, and Shawn Bearden) disclosed the Company's scheme to Appian.

135.    Petronio was directly responsible for helping create Board packages, including those reviewed by members of the DRC.

136.    Following his termination from Pegasystems in early 2020, Bearden came across a thumb drive containing a cache of Appian documentation that Zou had misappropriated for Pegasystems. Bearden wrote to Pegasystems' Human Resources ("HR") division on February 15, 2020 to report that he had discovered a "USB drive containing Appian documentation that Pegasystems acquired back in 2014 from an Appian consultant [Zou] who our marketing team hired."[84] Bearden explained to Pegasystems' HR that the documents "clearly are not [Pegasystems'] IP, but [Pega] did pay for them" and requested Pegasystems' HR to please let him know if it "would like the documents returned . . . or whether [he] should return them to Appian."[85]

---

[84] PLT 242.

[85] *Id.* at 243.

137.    In response, Pegasystems asked Bearden to return the documents, and Bearden did so. Shortly thereafter, Pegasystems asked Bearden to confirm if he still had the documents in his possession and if he had notified anybody that he had had the documents.[86] As Bearden later testified, he was "troubled" by Pegasystems' request for confirmation that he had told no one else about the Appian documents.[87] It was a "turning point" for Bearden.[88] He reached out to Appian's general counsel a day or two later to inform Appian of Pegasystems' illicit scheme.

138.    Shortly thereafter, on May 29, 2020, Appian filed the *Appian* Action against Pegasystems. The *Appian* Action Complaint sought, among other things, recovery of Appian's actual losses, the recoupment of funds received by Pegasystems as a result of its illegal scheme, punitive damages, treble damages, and an award of attorneys' fees and costs for the above-referenced misconduct. It also alleged that Trefler, Akgonul, Bixby, and Schuerman were intimately involved in the scheme:

> Many of Pegasystems' senior-most executives were aware of and condoned the illicit training materials, which were reviewed during meetings including Alan Trefler (Pegasystems' CEO), Kerim Akgonul (Pegasystems' Senior Vice President of Products), Stephen Bixby (Pegasystems' Vice President of Product Development), and Don Schuerman (Pegasystems' current Chief Technology Officer).

139.    Despite knowing this information or being reckless in disregarding it, the Board did not establish an independent committee to investigate the claims asserted in the *Appian* Action. The Board also chose not to disclose the *Appian* Action to investors when it was filed or for nearly two years thereafter. Instead, the lawsuit proceeded toward trial for 19 months before Pegasystems first informed investors of its existence via a Form 10-K filed with the SEC on February 16, 2022.

---

[86] *Id.* at 245.

[87] *Id.* at 245-46.

[88] *Id.* at 245.

However, in making this material disclosure, the Company falsely downplayed its significance, even stating that Appian's claims were "without merit," that the Company had "strong defenses to the[] claims," and that "any alleged damages claimed by Appian [were] not supported by the necessary legal standard." Despite specifically addressing the *Appian* Action, Defendants failed to disclose the Company's year-long mission to misappropriate Appian's trade secrets, the evidence of which Appian was in the process of discovering through that litigation.

140.    In truth, Appian's claims had tremendous merit: as the Individual Defendants knew or recklessly disregarded, Pegasystems had engaged in willful and malicious conduct aimed at misappropriating Appian's information and using it to benefit Pegasystems for years. Trefler's cadre of executives were themselves participants in the scheme and had fully supported Trefler's mission to "destroy[] Appian."[89] Meanwhile, Pegasystems' purportedly "strong defenses" had been proven hollow as the case steadily marched towards trial.

141.    Appian's potential damages were real liabilities for Pegasystems. Presented with overwhelming evidence that Pegasystems stole Appian's trade secrets to improve Pegasystems' software, and despite facing over $3 billion in claimed damages, Pegasystems' own expert "accept[ed] the premise that all of [Pegasystems'] sales [from 4Q13 to 3Q21]" were tainted by misappropriation.[90] Pegasystems' expert also conceded that Appian's damages from the 201 opportunities for which Appian and Pegasystems directly competed from the fourth quarter of 2013 to the third quarter of 2021 were upwards of $187 million if Pegasystems was found liable for misappropriation.

---

[89]  1/10/22 Baril Depo. Tr. at 238-39.

[90]  5/3/22 Trial Tr. at 7508.

142.    On May 9, 2022, following a seven-week trial, the jury in the *Appian* Action rendered a unanimous verdict in Appian's favor. It concluded that the Company and Zou misappropriated Appian's trade secrets and awarded compensatory damages of $2,036,860,045 before interest to Appian. Because the jury also found that the Company acted willfully and maliciously in misappropriating Appian's trade secrets, Appian was able to seek $26.8 million in attorneys' fees and costs.

143.    On May 12, 2022, Defendants stated that "the claims and the recent verdict" were "not supported by the facts of the case," and they disputed the "implication" that Defendant Trefler "accessed any Appian free trials," calling it "categorically false."

144.    During a call with analysts on May 18, 2022, Defendant Stillwell stated that the verdict was "ridiculous" and that there were no "facts of any wrongdoing" and "certainly no damages that would ever suggest a dollar amount."

145.    On September 16, 2022, the Company announced that the court in the *Appian* Action entered a judgment in favor of Appian and ordered the Company to pay Appian over $2 billion in damages, over $25 million in attorneys' fees and costs, and post-judgment interest of approximately $122 million per year.

146.    Thereafter, the SEC began investigating Pegasystems in connection with its accounting treatment of the *Appian* Action and other issues raised by the verdict. Pega disclosed this investigation via an April 26, 2023 quarterly report, filed on Form 10-Q with the SEC, reported that, "[b]eginning in March 2023, the SEC ha[d] requested certain information relating to, among other things, the accounting treatment of the Company's above-described litigation with Appian Corporation" and that "[t]he Company is fully cooperating with the SEC's requests."

**Defendants' Materially False and Misleading Statements and Omissions**

147.    Defendants made false and misleading statements and omitted material facts
necessary to make the statements not false or misleading. As set forth in greater detail below,
Defendants' false and misleading statements and omissions (i) touted the Company's competition
and sales and marketing practices while failing to disclose that the Defendants and others were
orchestrating the above-referenced scheme to gain a competitive advantage; (ii) addressed
competitors' intellectual property rights, noting that infringement claims by unnamed competitors
could arise at some unspecified point while concealing the existence of the *Appian* Action and
evidence of the Company's scheme to misappropriate Appian's trade secrets; (iii) represented that
Appian's claims lacked merit and that any damages were not supported while failing to disclose
that Appian's liability and damages claims were well-supported; (iv) discussed the Company's
Code of Conduct and ethical practices while failing to disclose the rampant violations of those
guidelines involved in the Company's scheme; and (v) failed to disclose that the Company's Forms
10-K and 10-Q were materially misleading and contained false financial statements.

**The Company's Competition and Sales and Marketing Practices**

148.    On June 16, 2020, the Company held a conference call with investors and analysts.
When one analyst asked about "the competitive landscape" and how the Company
"differentiate[d]" itself from "competitors," Defendant Stillwell responded by falsely attributing
the Company's success to its client-centric approach without mentioning its illicit scheme to
misappropriate trade secret from Appian:

> *Our key is to sell our differentiator to help our clients augment their environments
> and to make sure we operate well with all of the different application providers that
> are out there.* We don't – we believe in open environments so that all of us can kind
> of work together is actually much better for our clients, because at the end of the
> day, nobody's going to buy just one application across their entire infrastructure.
> And I think that, that's important for all of us to continue to work together. *Even*

> *though we do compete fiercely, we also need to stop and help our clients when they need to integrate us with each other.*

(Emphasis added).

149.    Also, when asked "how you were able to win [the business of the U.S. Census Bureau] versus some of your competitors in the RFP," Stillwell referenced the Company's "best-in-class" reputation while concealing that its misappropriation of Appian's trade secrets was the true source of its success in this regard:

> Sure. So as you can imagine, most of these larger campaigns really try to do a proof of concept or a benchmark on the technology against the problem. And so I think that *the fact that we won that against 29 vendors and we actually got down selected down to us and another vendor* and we actually had to compete against the internal development inside of the agency, as you can imagine, that's a fairly competitive environment. *So I think the fact that we won that and also our recent win with the IRS really kind of highlights the fact that we're really viewed as a solution that has – that is best-in-class that can actually drive very significant transformations.*

(Emphasis added).

150.    On July 28, 2020, the Company held its second quarter 2020 earnings call. During the call, Trefler likewise commented on the Company's ability to "show very well competitively" in winning business:

> *Sure. So look, we're working in a highly competitive world. So every piece of business we're winning, somebody else is losing. So that's just the way it goes. And we show very well competitively*, particularly in the sweet spots, which I think our view on low-code goes all the way back to our original vision of being a model-driven platform.

(Emphasis added).

151.    During the same call, Stillwell highlighted the Company's "credib[ility]" with customers in the public sector, including the United States government:

> So I think that, that's what's exciting is we have so much opportunity with our existing installed base, or our existing client base. *And then we have these verticals, like a federal vertical, that's just one country*. It's just one buyer really, within that country. And I think there's just a tremendous amount of opportunity. Our wins at defenses, our wins at IRS, *really just demonstrating how credible we are in that*

*space, even with being relatively – that being a relatively less mature vertical in terms of the growth rate.*

(Emphasis added).

152.    In response to an analyst's question at the Fortieth Annual Canaccord Genuity Growth Conference on August 13, 2020, about the Company's U.S. Census Bureau and other government customers, Stillwell responded by highlighting the Company's "credibility" with the United States government:

> David E. Hynes Canaccord Genuity Corp., Research Division – Analyst: Yes. Yes, makes sense. Public sector, I think, has been an exciting part of the business. *You guys won an IRS deal, I think, that followed a U.S. Census win*. Maybe just talk about what you're seeing in the public sector. Q3 is typically a seasonally important quarter there. *Why are you guys winning in the public sector?*

> Kenneth R. Stillwell Pegasystems Inc. – Senior VP, Chief Administrative Officer & CFO: . . . *I think that the thing with public sector really becomes as soon as you get credibility of winning a handful of larger agencies, really there's a lot of kind of momentum that comes from that. And I think that our census win really just opened our eyes and quite frankly, the market size on, wow, like this is a great opportunity for Pega*, and governments are going through digital transformation at a much faster clip actually than even commercial is.

(Emphasis added).

153.    During the Barclays Global Technology, Media, and Telecommunications Conference on December 10, 2020, Stillwell discussed with investors and analysts the Company's product portfolio and positioning in the BPM market. At the conference, an analyst asked how the Company "differentiate[d]" itself in the BPM market:

> So we have also seen that BPM market evolve a bit. So it was BPM, and now we hear low-code a whole lot more. And then you – your portfolio acquisition business, digital process automation certified offering. So help us understand how you're positioned in that market? Obviously, you were one of the pioneers in BPM. But given the market evolution, how you're positioned now and what differentiates in that market?

While failing to disclose the *Appian* Action or the fact that the Company had misappropriated Appian's trade secrets and used that information to its benefit, Stillwell responded by discussing

Appian in particular:

> *Appian is a company that we've competed with in some verticals that has low-code. Pega has low-code*. There are other low-code providers that are – I would call it more the technology of low-code. So there are some other companies that have built very, very simple tools to be able to build simple workflows, like something like I want to check the badge of an employee when they check-in. That application isn't going to expand into something more than that, but you can build it really fast and you can do it with non-developers. That's what I would call the low-code, the product.

(Emphasis added).

154. On February 17, 2021, the Company filed a Form 10-K (the "February 17, 2021 Form 10-K") with the SEC. It misleadingly discussed the Company's competitive differentiators and sales and marketing tactics while failing to disclose the *Appian* Action or the Company's misappropriation of Appian's confidential information that the Company used to gain an unfair competitive advantage over Appian. For example, the February 17, 2021 Form 10-K represented that the Company "competitively differentiated [Pegasystems] from [its] competitors" and "compete[d] favorably" against companies such as Appian through legitimate means:

> Competition:
>
> *The markets for our offerings are intensely competitive*, rapidly changing, and highly fragmented, as current competitors expand their product offerings and new companies enter the market. . . .
>
> We have been most successful in competing for clients whose businesses are characterized by a high degree of change, complexity, or regulation.
>
> *We believe we are competitively differentiated from our competitors* because our unified Pega Platform is designed to allow client business and IT staff, using a single, intuitive user interface, to build and evolve enterprise applications in a fraction of the time it would take with disjointed architectures and tools offered by many of our competitors. *We believe we compete favorably due to our expertise in our target industries and our long-standing client relationships*.

(Emphasis added).

155.    The February 17, 2021 Form 10-K also discussed the Company's "Sales and Marketing" techniques without disclosing that the Company's "efforts" in this regard included its illicit scheme to misappropriate Appian's  trade secrets:

> To support our sales efforts, we conduct a broad range of marketing programs, including awareness advertising, client and industry-targeted solution campaigns, trade shows, including our PegaWorld iNspire user conference, solution seminars and webinars, industry analyst and press relations, web and digital marketing, community development, social media presence, and *other direct and indirect marketing efforts*.

(Emphasis added).

156.    On September 15, 2021, the Company held a conference call with investors and analysts. During the conference call, an analyst asked whether Hayden Stafford, the Company's new President of Global Client Engagement was "driving new playbooks as well, or . . . using some of the same playbooks that you've historically had and he's just refining some of those." Stillwell responded as follows:

> *So we've done a lot of work on the playbooks over the last 3 or 4 years. I would say – I would characterize it as more refining the plays that we run and making sure that we have the right profile of the salesperson, the right level of enablement, and that we're targeting the right organizations with the right message, right?*

> Those – if you have really good salespeople that don't get enabled, that's a failure. If you have really good salespeople that are enabled, but they're on the wrong organizations that they want to buy your product, that's a failure. So it's a connection between those 3 pieces.

(Emphasis added).

157.    The statements above in ¶¶ 148-56 were materially false and misleading when made for the following reasons: (i) rather than compete fairly and honestly in the BPM market and differentiate itself from its competitors using legitimate means as represented by Defendants, the Company was engaging in a malicious and willful scheme to misappropriate Appian's trade secrets, thereby exposing the Company to substantial financial and reputational harm; (ii) in truth,

the Company's sales and marketing practices included the use of paid agents, fictitious names, and/or fictitious companies to infiltrate Appian's software platforms, misappropriate its trade secrets, and use them to the Company's advantage; (iii) the Defendants' statements that the Company "show[s] very well competitively" and "compete[s] favorably due to [its] expertise" failed to disclose that the Company owed its competitive success to its scheme and materials it gathered by misappropriating Appian's trade secrets; (iv) Defendants' representations that the Company was "best-in-class" and "credible" failed to disclose that the Company engaged in a malicious and willful scheme to misappropriate Appian's trade secrets; (v) Defendants' statements touting the Company's "wins" with public sector agencies including the U.S. Census Bureau failed to disclose that the Company spied on Appian using fictitious names, fictitious companies, and other unethical methods, and subsequently leveraged the confidential information and trade secrets to win hundreds of contracts competing directly against Appian; (vi) Defendants' statements touting the Company's success and "credibility" with the U.S. Census Bureau and other government agencies were misleading because the Company concealed its misconduct from the government, including its collaboration with Zou, and packed its sales team with employees that were involved in the scheme; (vii) the Company paid its employees compensation in exchange for helping the Company obtain Appian's proprietary information; (viii) Defendants' statements, including that in the February 17, 2021 Form 10-K, failed to disclose that the Company's "broad range of marketing programs . . . [and] marketing efforts" included its use of spies and other dishonest practices to learn Appian's trade secrets and other confidential information; and (ix) Defendants failed to disclose the *Appian* Action and corresponding potential loss exposure.

### *The Company's and Appian's Intellectual Property*

158.    On July 28 and October 28, 2020, the Company filed Forms 10-Q with the SEC, both of which were signed by Stillwell. The Forms 10-Q failed to disclose the *Appian* Action or

the Company's misappropriation of Appian's confidential information. Rather, they both referred to statements in the Company's 2019 Form 10-K misrepresenting to investors that "intellectual property rights claims" against the Company "could" occur. Defendants failed to disclose that the Company had engaged in its scheme to misappropriate Appian's intellectual property, had been sued by Appian in the *Appian* Action, and, thus, faced substantial financial and reputational risk. The statements incorporated by reference into the Forms 10-Q included the following:

- "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, could require us to pay significant damages, and *could* limit our ability to use certain technologies."

- "There can be *no assurance that third parties, including clients, will not claim infringement* by us with respect to current or future products."

- "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. *Any such claims*, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. These claims could also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights."

- "We have received, and may in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims.*"

(Emphasis added). Defendants knew or recklessly disregarded that these statements were false and misleading by failing to disclose the *Appian* Action or the illicit scheme that gave rise to it.

159. As noted, the Company filed its 2020 Form 10-K with the SEC on February 17, 2021. It was signed by Defendants Stillwell and Trefler. By that time, the *Appian* Action had been pending for nearly nine months. However, the February 17, 2021 Form 10-K repeated the same materially false and misleading statements as 2019's Form 10-K:

- "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, *could* require us to pay significant damages, and *could* limit our ability to use certain technologies."

- "There can be *no assurance that third parties*, including clients, *will not claim infringement* by us with respect to current or future products."

- "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights."

- "We have received, and may in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims*."

(Emphasis added).

160.    On April 28, July 28, and October 27, 2021, the Company filed Forms 10-Q with the SEC for the first, second, and third fiscal quarters of 2021, respectively, that were signed by Stillwell. The Forms 10-Q again incorporated by reference the same materially false and misleading statements from the Company's 2020 Form 10-K discussed above, and once again, Defendants failed to disclose the *Appian* Action and the Company's illegal scheme.

161.    The statements above in ¶¶ 158-60 were materially false and misleading when made: (i) Defendants' statements that the Company "may be subject to intellectual property rights claims," that it "may in the future receive notices that claim we have misappropriated, misused, or infringed other parties' intellectual property rights," that "[t]here can be no assurance that third parties . . . will not claim infringement by [Pegasystems]," and that "software product developers will increasingly be subject to infringement claims" were misleading because Defendants failed to

also disclose that the Company engaged in the willful and malicious misappropriation of Appian's trade secrets and other confidential information, was involved in the ongoing and costly *Appian* Action, and faced meritorious claims that Trefler and other Company executives had orchestrated the scheme; (ii) Defendants' statements that "intellectual property rights claims . . . could limit our ability to use certain technologies" misleadingly concealed the fact that, up until November 2021, the Company faced the threat of an injunction in the *Appian* Action that would have prevented it from selling tainted software or using tainted sales processes; and (iii) Defendants failed to disclose that the Company had engaged in similar misconduct against other companies, including IBM, Salesforce, and ServiceNow.

**The Appian Action**

162.    Defendants failed to disclose the Company's misconduct and potential loss exposure represented by the *Appian* Action, rendering statements in the Company's Forms 10-K and Forms 10-Q filed between July 28, 2020 and October 27, 2021 materially false and misleading.

163.    On February 16, 2022, the Company filed its 2021 Form 10-K signed by Defendants Stillwell and Trefler (the "February 16, 2022 Form 10-K"). It belatedly disclosed the existence of the *Appian* Action and falsely stated that Appian's claims were "without merit," that the Company had "strong defenses to the[] claims," and that "any alleged damages claimed by Appian [were] not supported by the necessary legal standard." Specifically, the February 16, 2022 Form 10-K stated as follows:

ITEM 3. LEGAL PROCEEDINGS

In addition to the matters below, the Company is, or may become, involved in a variety of claims, demands, suits, investigations, and proceedings that arise from time to time relating to matters incidental to the ordinary course of the Company's business, including actions with respect to contracts, intellectual property, employment, benefits, and securities matters. Regardless of the outcome, legal disputes can have a material effect on the Company because of defense and settlement costs, diversion of management resources, and other factors. . . .

*Appian Corp. v. Pegasystems Inc. & Youyong Zou*

On May 29, 2020, Appian sued the Company and an individual, Youyong Zou, in the Circuit Court of Fairfax County, Virginia in a matter titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The complaint filed by Appian on May 29, 2020 (the "2020 Complaint") alleges that Mr. Zou was an employee of an Appian business partner, Serco Inc. ("Serco"); that, as a result, Mr. Zou had access to Appian trade secrets which Mr. Zou was required to keep confidential; and that in approximately 2013, while Mr. Zou was employed by Serco, the Company engaged Mr. Zou through an intermediary to provide the Company with Appian trade secrets and confidential information, which the Company is then claimed to have used to compete against Appian. The 2020 Complaint sets forth claims for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, violation of the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and statutory and common law conspiracy. On July 24, 2020, the Company filed a plea in bar, seeking to have the claims asserted against the Company in the 2020 Complaint barred, in whole or in part, by the applicable statutes of limitations. Before the original plea in bar could be heard, Appian filed an amended complaint which the court allowed on November 4, 2021 (the "2021 Amended Complaint"), alleging that, in the 2019 time frame, employees of the Company accessed free Appian product trials under false pretenses. The 2021 Amended Complaint withdrew the claim for tortious interference with contract. After Appian filed the 2021 Amended Complaint, the Company successfully moved to dismiss Appian's conspiracy claims, which are no longer a part of the case. The Company also re-filed a plea in bar on November 29, 2021 seeking to have the claims asserted against the Company in the 2021 Amended Complaint barred, in whole or in part, by the applicable statutes of limitations. A jury hearing on the plea in bar commenced on January 31, 2022. On February 9, 2022, the judge determined that he could decide the plea in bar without the jury and, on February 10, 2022, the judge entered a verdict granting the relief sought by the Company's plea in bar motion with respect to the Virginia Computer Crimes Act, meaning the allegations asserted against the Company in the 2021 Amended Complaint with respect to the Virginia Computer Crimes Act are barred by the applicable statutes of limitations for conduct on or prior to May 29, 2015, while the claims made with respect to misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act are not similarly barred. Appian's claim for tortious interference with business expectancy was not a subject of the plea in bar. On February 11, 2022, the court allowed Appian's motion to further amend the 2021 Amended Complaint to assert a damages claim of approximately $3 billion, seeking all of the Company's revenues less estimated direct costs from the sale of all of the Company's products and services in the period from the fourth quarter of 2013 through the third quarter of 2021. Virginia law requires that the plaintiff establish proximate cause between any alleged use of the alleged trade secrets and damages incurred by the plaintiff, and also requires plaintiffs seeking damages to allege a specific damages amount, prohibiting recovery beyond that amount.

*In addition to disputing the validity of Appian's claims against the Company, the Company believes that any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause.* In addition, following the February 10, 2022 ruling on the Company's plea in bar, the ongoing claim under the Virginia Computer Crimes Act is time limited to acts occurring after May 29, 2015. A jury trial with respect to the merits of the dispute is scheduled to begin on March 21, 2022. *The Company believes the claims brought by Appian against the Company are without merit, that the Company has strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause.* The Company is unable to reasonably estimate possible damages or a range of possible damages given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard and due to the uncertainty as to how a jury may rule.

(Emphasis added).

164.    On April 28, 2022, the Company filed a Form 10-Q for the first quarter of 2022 that

had been signed by Stillwell. The Form 10-Q stated the following:

As previously reported, the Company is a defendant in litigation brought by Appian that is currently being tried in Virginia (the "Court") titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The jury trial began on March 21, 2022. On April 13, 2022, Appian withdrew its claim against the Company for tortious interference with business expectancy. On that same day, in the course of making determinations on various motions, the Court stated that if the jury finds that the Company misappropriated information that constituted Appian trade secrets and finds that the Company incorporated those trade secrets into the Company's products or the Company's marketing materials, the burden will then shift to the Company to prove that the sales Appian seeks as damages were not the result of the alleged misappropriation and use of the alleged trade secrets. This legal standard has not previously been adopted by the Virginia courts. *The Company continues to believe that its sales of the products at issue were not caused by, or the result of, the alleged misappropriation of trade secrets, and is submitting evidence to the jury to that effect.* The Company is unable to reasonably estimate possible damages because, among other things, of the uncertainty as to how a jury may decide and the parties' existing grounds for appeal based on rulings to date in the proceeding.

(Emphasis added).

165.    The statements above in ¶¶ 162-64 were materially false and misleading when

made: (i) Defendants knew that Appian's claims in the *Appian* Action were meritorious and were

well supported by extensive evidence; (ii) Trefler knew of and directly participated in the scheme; (iii) Appian's "claim[s]" and "alleg[ations]" that Defendants falsely characterized as "without merit" and subject to "strong defenses" in the 2021 Form 10-K were, in truth, legally and factually supported; and (iv) the Company acted willfully and maliciously in misappropriating Appian's trade secrets and other confidential information.

### The Company's Code of Conduct

166.    The Company's Forms 10-K for 2020 and 2021 informed investors that Pegasystems had "adopted a written code of conduct that applies to our Board of Directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, and persons performing similar functions." The Company's Code of Conduct was publicly available on the Company's website at all relevant times. Defendants specifically addressed the Code of Conduct in the Forms 10-K for 2020 and 2021, stating that "[a] copy of our code of conduct can be found on our website, www.pega.com," where it was "available . . . in the 'Governance' section."

167.    The Company made statements in its Code of Conduct that falsely indicated to investors that Pegasystems complied with the law, its employees were held to high ethical standards, and its officers and directors helped ensure compliance. For example, the Code of Conduct stated that it applied "to all our interactions in various areas of our shared professional lives including those of our officers, full and part-time employees, interns, all people retained as independent consultants, and members of the Board of Directors of Pega and its subsidiaries worldwide." According to the Code of Conduct, all were committed to "extremely high standards of ethical and legal conduct," "[c]ompet[ing] fairly, honestly, and vigorously," and "[m]aintain[ing] a culture that values and nurtures ethical conduct and fosters transparency and

honesty by being fair and trustworthy in all our interactions with each other, our clients, and our partners."

168.    The Code of Conduct included specific statements regarding the Company's treatment of its competitors' confidential information, noting that its "policy" was to "protect the confidential information of third parties with the same care that we use to protect our own confidential information."

169.    The Code of Conduct also stated that all at Pega committed to "[n]ever us[ing] illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as trespassing, burglary, wiretapping, bribery, stealing, seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information."

170.    Further, in a section titled "Compliance with the Code: If Issues or Questions Arise," the Code of Conduct provides that "[i]f any of [Pegasystems' employees] are asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer or our Chief Compliance Officer."

171.    Moreover, the Company assured investors that it would "not tolerate any deviation from [the] Code" and that it would "take prompt action to enforce this Code and all of Pegasystems' other policies," which action may involve "a formal or informal warning or reprimand, demotion, suspension, dismissal, or other disciplinary action."

172.    Additionally, according to the Code of Conduct, "any supervisor who directs or approves of any conduct in violation of this Code, or who has knowledge of such conduct and does

not immediately report it, also will be subject to disciplinary action, which may include suspension or termination of employment."

173.    The statements above in ¶¶ 166-72 were materially false and misleading when made: (i) instead of "[c]ompet[ing] fairly, [and] honestly" and "protect[ing] the confidential information of third parties," the Company regularly and knowingly competed unfairly and dishonestly by engaging in the malicious and willful scheme discussed herein since as early as 2012; (ii) Company officers and other employees used and/or knew their colleagues used "illegal or questionable means to acquire a competitor's trade secrets or other confidential information" by, among other things, collaborating with spies such as Zou to misappropriate Appian's trade secrets and using fictitious names, fictitious companies, and other unethical methods of competition; (iii) Trefler, who was responsible for providing "clarification and/or guidance as to the propriety of" employees' actions, actually orchestrated the Company's misconduct, knowing or recklessly disregarding that he and his employees repeatedly violated legal and ethical guidelines through their scheme to misappropriate Appian trade secrets, and his direct participation in and knowledge of the misconduct created a substantial conflict of interest that precluded him from offering objective "clarification and/or guidance" with respect to his employees' misconduct; (iv) Pega employees were unwilling and/or unable to seek his and/or the Chief Compliance Officer's "clarification and/or guidance as to the propriety of" the Company's conduct; and (v) Company management failed to discipline employees that knew of or participated in the scheme.

174.    Each of the Forms 10-Q and the February 17, 2021 Form 10-K referenced herein and filed during the Relevant Period were signed by Defendants Stillwell and/or Trefler, and they thereby certified as follows:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

175.    However, Defendants knew or recklessly disregarded facts indicating that these certifications were materially misleading because of the material false and misleading statements and omissions in the Company's Forms 10-Q and the February 17, 2021 Form 10-K discussed above and the false financial information they contained as discussed below.

176.    As a result of Defendants' concealing their misconduct and making material misstatements and omissions regarding the existence of and potential loss exposure from the *Appian* Action, the Company filed false financial statements, including the Forms 10-Q filed with the SEC on July 28, 2020, October 28, 2020, April 28, 2021, July 28, 2021, and October 27, 2021, and the Form 10-K filed with the SEC on February 17, 2021. The financial statements were materially misstated because, *inter alia*: (i) the Company failed to disclose the *Appian* Action as a material legal proceeding; and (ii) the Company failed to disclose the *Appian* Action as a loss contingency.

177.    Indeed, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects, by failing to disclose, *inter alia*, the following to investors: (i) that the Company was blatantly violating Pegasystems' Code of Conduct and ethical practices; (ii) that the Company's competition, sales, and marketing practices were based on unlawfully obtained trade secrets and other confidential information from one of the Company's biggest competitors to gain competitive advantage; (iii) that the *Appian* Action existed and represented a serious potential risk to the Company; (iv) that Appian's case against Pegasystems in the *Appian* Action had merit because of the existence of the

long-running scheme that precipitated it; (v) the Company's fault and the damages caused to Appian as a result of the Company's espionage on Appian; (vi) that, as a result of the Company's wrongdoing, a jury could potentially find Pegasystems liable for over $2 billion in damages to Appian; and (vii) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

***The Securities Class Action Settlement***

178.    On December 19, 2022, Defendants moved to dismiss the Securities Class Action. After extensive briefing, the Court denied Pegasystems' motion to dismiss with respect to the allegations concerning defendants Pegasystems and Trefler on July 24, 2023. Among other things, the Court held as follows:

> Based on the factual allegations in the complaint, the most compelling inference is that Trefler was aware of, participated in, and directed Pega's corporate espionage against Appian. . . . In addition, Pega did not discipline the authors of the conspiracy. Rather, it encouraged and rewarded their actions with cash bonuses. Therefore, Pega deceived investors. Therefore, Pega deceived investors when it promised them to "(n)ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information." Moreover, Pega and Trefler misled investors when they reassured them, on February 16, 2022, that Appian's claims against Pega were "without merit." Pega's and Trefler's misstatements are also causally connected to the significant decline in the value of Pega's stock on February 17 and May 10-11, 2022.

(Citations omitted).

179.    The Securities Class Action defendants answered the Consolidated Amended Complaint on June 30, 2023. On December 12, 2023, the Securities Class Action plaintiffs moved to certify the action as a class action and to appoint lead plaintiffs and class counsel. The Securities Class Action defendants filed their opposition to the motion on February 28, 2024, and the Securities Class Action plaintiffs filed their reply in support of their motion on March 3, 2024.

180.    The parties to the Securities Class Action agreed to mediation, and on March 5, 2024, the parties advised the Court that they had reached a settlement of the class action. As a result, on March 5, 2024, the Court dismissed the Securities Class Action with the right to reopen in a Settlement Order of Dismissal.

181.    The Settlement provided for the creation of a $35 million cash recovery payable by the Securities Class Action defendants and/or their insurance carriers on their behalf. On May 15, 2024, the Court preliminarily approved the settlement and certification of a settlement class. On September 25, 2024, the Court issued its order finally approving the settlement and award of attorneys' fees, authorizing the final settlement of the Securities Class Action.

***The Appian Action Appeal***

182.    On July 30, 2024, the Virginia Court of Appeals issued its decision *affirming in part* and *reversing in part* the judgment in favor of Appian. The court rejected Pegasystems' argument that Appian failed to establish the Company's misappropriation of any Appian trade secrets, but it found that certain of the trial court's evidentiary rulings were error and remanded the case for a new trial consistent with the court's opinion.

183.    The Court of Appeals recognized that "[t]he gist of th[e] dispute is that Appian contends that Pega misappropriated its trade secrets to copy and steal Appian's user-friendly features to enhance Pegasystems' appeal with a broader base of potential customers" and that "Appian further asserts that in the course of stealing its secrets, Pega illicitly obtained trade secrets regarding weaknesses in Appian's BPM platform and Pega used this ill-gotten knowledge for its own advantage."

184.    The Virginia Court of Appeals summarized its holding as follows:

A jury found Pegasystems, Inc. (Pega) used improper means to misappropriate trade secrets from Appian Corporation (Appian). On appeal, Pega asks this Court to reverse the jury verdict and enter judgment for Pega because it contends, as a

matter of law, there was insufficient evidence that Pega misappropriated any trade secrets. In the alternative, Pega seeks a new trial, arguing the trial court erred in excluding certain evidence and in granting flawed jury instructions (particularly with respect to proximate cause). We reject Pega's claim that it is entitled to judgment as a matter of law; however, we find that the trial court committed a series of errors that require us to reverse the judgment as to Appian's trade secret claim.

185.    Among other rulings, the Court of Appeals rejected Pegasystems' claims that Appian's trade secrets were "generally known" or left unprotected, finding that Appian provided considerable evidence that it took careful steps to safeguard its trade secrets and that the information was neither "generally known" nor readily ascertainable. After carefully reviewing the record, the Court of Appeals found that "[o]n this record, the trial court did not err in denying Pegasystems' motion to strike and to set aside the verdict as a matter of law."

186.    At the same time, the Court of Appeals found that the trial court committed a series of errors that required it to reverse the judgment as to Appian's trade secret claims. In the end, the Court of Appeals held that while "Appian took many legitimate steps to protect its secrets – and a reasonable jury certainly could find its actions sufficient to afford its information trade secret status" – "ultimately, in this case, that is a factual question; and here the trial court improperly removed a relevant factor from the jury's consideration." The court further held that "[t]his error denied Pega the opportunity to effectively argue that Appian forfeited its trade secret protection by broadly sharing the information with thousands. The case has now been remanded to the trial court, but the case has yet to be retried.

## WRONGFUL REFUSAL ALLEGATIONS

187.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

188.    Pegasystems is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

189.    Plaintiffs are current shareholders of Pegasystems and have been continuous shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

190.    As set forth above, before filing this derivative action, Plaintiffs first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against the Individual Defendants. Specifically, on March 24, 2023 and May 5, 2023, Plaintiffs made the Demands on the Board to investigate and address the misconduct and, if warranted, to commence litigation against one or more of the Individual Defendants. True and correct copies of Plaintiffs Larkin's and Sagfors' respective Demands are attached hereto as **Exhibit A** and **Exhibit B**, respectively**.**

191.    During the illegal and wrongful course of conduct described above and up to the present, the Board has consisted of Individual Defendants Gyenes, Jones, Lafond, Ledingham, Rowlands, Trefler, and Weber.

192.    Plaintiffs' Demands described how the Individual Defendants violated the core fiduciary principles discussed herein through the wrongful conduct recounted above, in the *Appian* Action, and the Securities Class Action. To redress these wrongs and prevent such wrongdoing from occurring again in the future, Plaintiffs demanded that the Board take action to recover the damages described in the Demands for the benefit of the Company and to correct the deficiencies in the Company's internal controls, ethics, and compliance procedures that allowed the misconduct to occur.

193.    In response to the *Larkin* Demand dated March 24, 2024, Plaintiffs' counsel received a letter one month later on April 26, 2023, from Fried Frank advising of the formation of the DRC in response to the *Larkin* Demand and its retention of Fried Frank as counsel. Fried Frank advised that the DRC had undertaken a review of the matters underlying the Demands and the litigation. A true and correct copy of the April 26, 2023 Letter is attached hereto as **Exhibit C.**

194.    Over the following months, Plaintiffs' counsel spoke several times on the telephone with counsel for the DRC regarding the DRC's progress investigating Plaintiffs' Demands.

195.    On October 15, 2024, Plaintiffs' counsel received letters from counsel to Pegasystems rejecting the Demands (the previously defined "Refusal"). True and correct copies of these materially identical letters are attached hereto as **Exhibits D** and **E**. The Refusal states the following:

> As we advised you by letter dated May 8, 2023 (and subsequent correspondence), on April 12, 2023, the Board had created the DRC (comprised of independent directors Christopher Lafond, Dianne Ledingham, and Sharon Rowlands) and vested the DRC with the Board's full authority to review and analyze the Demands, investigate the potential claims set forth therein, among others, and to take whatever action (if any) the DRC in good faith deems appropriate.

> On October 7, 2024, following extensive investigation and legal analysis, the DRC concluded that none of the potential claims were viable and, for that reason and others, it would not be in the Company's best interests to bring claims against the directors and officers, as suggested in the Demands. Accordingly, the DRC unanimously voted to reject the Demands and issued the enclosed report detailing its investigation, factual findings, analysis, and conclusions (the "DRC Report").

> The DRC Report details, among other things, the formation of the DRC and selection of its members (pages 20-24); the selection and qualifications of the DRC's outside counsel (pages 23-24); the scope of its investigation (pages 24-31); the investigation's factual findings (pages 31- 69); the DRC's evaluation of potential legal claims and reasons for not pursuing them (pages 69-112); and certain enhancements the DRC has mandated the Company take in connection with lessons learned from the Appian Litigation (pages 112-14).

> We believe that the DRC Report addresses your client's Demand in full. In addition, in light of the DRC Report and controlling Massachusetts law, the DRC requests that you voluntarily dismiss the *Sagfors* Action, to avoid the unnecessary burden

and expense of, and the unnecessary expenditure of judicial time and resources on, motion practice under MBCA §§ 7.41, 7.42, and 7.44.

196.    The Board's Refusal of Plaintiffs' Demands constitutes a breach of the Director Defendants' fiduciary duties. As alleged herein and explained below, the Board wrongfully refused the Demands because the investigation lacked the necessary diligence and was conducted in bad faith and because the DRC lacked the requisite independence. The limited record indicates that the DRC always intended to vindicate the Defendants and that its members prejudged the ultimate question.

197.    The Refusal states that the "DRC's work on this Report was nearly complete when the Virginia Court of Appeals decided the Appian Appeal."[91] So, despite the Refusal's reliance on this decision – which in no way vindicated Pegasystems in the *Appian* Action – the DRC's conclusion would be no different than it would be if the appeal was still pending or the jury verdict had been affirmed. The Refusal claims that it was "not practicable for the DRC to wait until the Appian Litigation is completed to issue this Report."[92] Nonetheless, the DRC finds it necessary to "remain in place through the conclusion of the Appian Litigation to consider the impact of potential future factual or legal developments arising from the Appian Appeal and/or further proceedings in the Appian Litigation."[93] The DRC cannot have it both ways.

198.    Additionally, despite being members of the Board at all relevant times, no member of the DRC sought to investigate or redress the misconduct and resulting harm stemming from and underlying the *Appian* Action and the Securities Class Action.

---

[91] Refusal 7.

[92] *Id.* at 8.

[93] *Id.*

199.     Accordingly, the Refusal is not entitled to the protection of the business judgment rule, and accordingly, this action should proceed against the Individual Defendants to vindicate the Company's rights and secure the relief sought by this action.

***The Members of the Board and the DRC Could Not Exercise Independent Business Judgment in Considering the Demands, and the DRC's Refusal Was Done in Bad Faith and Lacks a Reasonable Basis***

200.     The Board's selection of Lafond, Ledingham, and Rowlands (collectively, the "DRC Members") as members of the DRC and their subsequent investigation demonstrate a coordinated effort to protect the Individual Defendants rather than to serve the Company's interests. These directors faced a substantial likelihood of personal liability from the claims in the Demands due to their roles on the Audit and Governance Committees during the relevant period and their approval of false and misleading statements to investors. The Board's decision to appoint them to investigate their own conduct – without any meaningful evaluation of their independence – shows the investigation's outcome was predetermined.

201.     The DRC's subsequent investigation confirmed this lack of independence through numerous actions demonstrating bad faith. The DRC ignored the Virginia Court of Appeals' affirmance of the jury's finding that Pegasystems misappropriated Appian's trade secrets, and disregarded extensive evidence of senior management's direct involvement in that scheme. It failed to investigate why the Individual Defendants concealed the *Appian* Action from investors for nearly two years while making contradictory statements about the Company's ethical standards. The DRC also dismissed the Securities Class Action court's detailed analysis finding that Trefler and the Company made materially false and misleading statements.

202.     Moreover, the DRC conducted no meaningful analysis of damages to the Company from the Individual Defendants' misconduct, including the substantial costs of defending and potentially paying damages in both the *Appian* Action and Securities Class Action. The DRC's

admission that its report was "nearly complete" before the Virginia Court of Appeals ruled reveals it had predetermined the outcome regardless of developments validating the underlying claims. This systematic failure to engage with evidence adverse to management while accepting their defenses at face value demonstrates the investigation served to protect the Individual Defendants rather than to evaluate the Demands' merits.

203.    The Refusal also lacks key information regarding the DRC's process, reasoning, and conclusions in conducting its investigation. Specifically, the Refusal fails to address the holdings by the District Court in the Securities Class Action regarding the claims against certain defendants and the Virginia Court of Appeals decision affirming the jury's verdict in part. The DRC also failed to investigate the alleged violation of SEC regulations and GAAP, including specifically Item 103 and ASC 450. The Refusal was an unreasonable decision as evidenced by the statement that "the DRC unanimously determined that it would not be in the Company's best interests to pursue litigation against any of the challenged directors and officers with respect to the matters raised in the Demands and that there are no valid claims against them." The Refusal fails to weigh the potential recovery from this proposed lawsuit in a way that would allow the Board to properly evaluate its potential costs. It also fails to consider the merits of the demanded action against any of the Individual Defendants named herein and identified in Plaintiffs' Demands or the fact that, without a lawsuit, the Company will remain responsible for its fiduciaries' misconduct.

204.    As detailed below, both the selection of the DRC members and their subsequent investigation evidence a broader scheme to avoid holding the Individual Defendants accountable for their misconduct, and the resulting Refusal was made in bad faith and lacks a reasonable basis.

***The Board Was Not Independent When It Selected Lafond, Ledingham, and Rowlands to Be
Members of the DRC, and that Decision Lacked a Reasonable Basis***

205.    The Board could not exercise independent business judgment in considering the

Demands and, thus, could not exercise independent business judgment in choosing the members

of the DRC and delegating the Board's authority to them. The Board could not exercise

independent business judgment because a majority of the Director Defendants – in fact, all of

them – faced a substantial likelihood of personal liability from the claims proposed in the Demands

for the reasons discussed herein.

206.    The Audit Committee Defendants on the Board were not independent at the time

the Board chose to select Lafond, Ledingham, and Rowlands as members of the DRC and delegate

to them the Board's authority over the Company's potential claims against the Individual

Defendants. Throughout the relevant time period, the purpose of the Audit Committee was to assist

the Company's directors with fulfilling their oversight responsibilities regarding, among other

things, accounting, legal, regulatory, and public disclosure requirements. As such, the Audit

Committee Defendants must have known or were reckless in not knowing that the Company's

public statements were false and misleading and that the Company's internal controls were

inadequate. They were therefore incapable of conducting an independent investigation into

Plaintiffs' Demands or determining who should conduct that investigation.

207.    The Governance Committee members of the Board were also not independent. The

purpose of the Governance Committee included overseeing the corporate governance policies and

procedures of the Company. The Governance Committee members failed to review regulatory

developments and governance best practices for the Company and allowed the dissemination of

material misinformation as set forth above.

208.    Indeed, all of the Director Defendants who ultimately rejected Plaintiffs' Demands are also implicated in the wrongdoing complained of herein for their role in allowing misleading statements and filings to be issued and disseminated and for allowing omissions to remain undisclosed, as alleged herein. The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

209.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements. Thus, they could not fairly and fully prosecute such a suit even if they instituted it.

210.    Upon information and belief, another reason that the Board and the DRC were interested in the decision whether to sue themselves and the other Individual Defendants was ensuring that the Company's directors and officers liability insurance ("D&O Insurance") continued to cover their own and other Individual Defendants' defense of this and other stockholder lawsuits and any ultimate judgment rendered against them. Pegasystems' officers and directors are protected by such insurance against personal liability for their breaches of fiduciary duties alleged in this Complaint. The Individual Defendants caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiffs reasonably believe that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Pegasystems against the Individual Defendants, known as the "insured-versus-insured exclusion."

211.    As a result, if the Director Defendants were to sue themselves or certain of the officers of Pegasystems, there would be no D&O Insurance coverage, and thus, this is a further reason why they have not and will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

212.    Accordingly, the Board's selection of Lafond, Ledingham, and Rowlands was made in bad faith and lacked a reasonable basis. The Refusal states that the Board selected the DRC members "after determining that each was independent and disinterested." The Refusal, however, says nothing about the Board's alleged inquiry and determination in that regard or who participated in it. The fact the Refusal's descriptions of these individuals were copied and pasted from the Company's proxy statement shows the Board's level of scrutiny in this respect.

213.    The Board's selection of the DRC members prejudiced the results of its investigation, and the Board had to be aware of this fact. These directors were incapable of exercising independent business judgment in considering the Demands as well as in the appointment of members of the DRC.

214.    The Board was aware of this fact when it selected Audit Committee Chair Lafond as chair of the DRC, knowing that his appointment would ensure its exculpation of Lafond, Trefler, and the other Individual Defendants. Indeed, Lafond and the other Audit Committee Defendants must have known or were reckless in not knowing that the Company's public statements were false and misleading and that the Company's internal controls were inadequate.

215.    As conceded by the Refusal, the Individual Defendants were made aware of the *Appian* Action soon after it was filed and were provided reports on its progress throughout the discovery process. On July 8, 2020, the Board held its first meeting following the filing of the *Appian* Action. As part of Mr. Cushing's[94] regular Board litigation update, the Board was informed of the *Appian* Action and the Company's intent to defend the matter. In the normal course, the Board received a written litigation update in advance of Board meetings, and at those meetings, Mr. Cushing delivered a verbal update. The Board received written and verbal litigation updates, which included an Appian Litigation update, during at least 10 Board meetings between July 2020 and May 2022.[95]

216.    Nonetheless, Lafond and the other members of the Audit Committee chose not to disclose the *Appian* Action to investors or the scheme to misappropriate Appian trade secrets uncovered through discovery in that case even though the Company was presenting an entirely different picture of its employees' ethical standards and legal compliance in Pega's public filings. To the extent these members were unaware of these material facts to investors, they were reckless for not knowing of them because of their responsibilities as members of the Board and the Audit Committee. As noted above, the very purpose of the Audit Committee was to assist the Company's directors in fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Accordingly, the Audit Committee Defendants, particularly Lafond as its chair, must have known or were reckless in not knowing that the Company's public statements were false and misleading and that the Company's internal controls were inadequate.

---

[94]  Matthew Cushing was Pegasystems' Vice President, Chief Commercial Officer & General Counsel during the relevant time period.

[95]  Refusal 50.

217.    Accordingly, Lafond (and the other members of the Audit Committee) faced a substantial likelihood of personal liability from the DRC investigation into his own and the rest of the Individual Defendants' misconduct. As noted, the Refusal provides no meaningful discussion of how the Board selected Lafond for membership on the DRC, and that is for good reason – there was no reasonable basis for the selection of Lafond, and his selection represents a bad-faith determination to exculpate Lafond and the rest of the Board members.

218.    Likewise, the Board's selection of Lafond was in bad faith and lacked a reasonable basis because he faced a substantial likelihood of personal liability as a member of the Governance Committee like the two other DRC Members, Ledingham and Rowlands. These Governance Committee members were incapable of exercising independent business judgment in considering the Demands because they face a substantial likelihood of personal liability for the damages done to the Company because of the misconduct alleged herein.

219.    As the Board knew when selecting Lafond, Ledingham, and Rowlands to the DRC that the purpose of the Governance Committee included overseeing the corporate governance policies and procedures of the Company. The Governance Committee members failed to review regulatory developments and governance best practices for the Company and allowed the dissemination of material misinformation as set forth above. Accordingly, its members faced a substantial likelihood of personal liability at the time the Board appointed them to the DRC and throughout its investigation up to the present.

220.    Therefore, their selection as members of the DRC predetermined the exculpatory results of its investigation and, therefore, represents a bad faith determination by the Board that lacked any reasonable basis.

221.    Indeed, Plaintiffs' Demands and their lawsuits identified these Individual Defendants as directors who breached their fiduciary duties to the Company by authorizing the false and misleading statements at issue in this case and/or by completely failing to discharge their designated duties and responsibilities. At the time the Board chose Lafond, Ledingham, and Rowlands to be members of the DRC, it was aware the *Larkin* Action had named them as Individual Defendants and detailed their responsibilities as members of their respective committees.

222.    The Board's selection of the DRC's three members – each of whom served the Board at all relevant times and stand accused of failing to conduct adequate oversight and making or allowing others to make false and misleading statements in violation of the law – predetermined its ultimate outcome before the investigation began as shown by the fact that the investigation had all but concluded before the Court of Appeals of Virginia issued its decision on Pegasystems' appeal of the jury verdict in the *Appian* Action.

223.    Like the other Director Defendants and Defendant Stillwell, the members of the DRC signed the Company's annual Forms 10-K filed with the SEC. Those reports contained the materially false or misleading information regarding the quality and effectiveness of the Company's internal controls and other matters detailed above. They all failed to disclose how the Company's illegal means of competition artificially inflated Pegasystems' revenues. Another undisclosed and bad faith reason behind the Board's selection of Lafond, Ledingham, and Rowlands as members of the DRC was ensuring that the Company's D&O Insurance continued to cover their defense of the stockholder lawsuits and any judgment rendered against them, coverage that would not exist if the Company sued the Individual Defendants by virtue of the insured-versus-insured exclusion it is reasonably likely to contain as discussed in more detail above.

224.    Obviously, the selection of the DRC's members would prejudice the results of its purported investigation because of its members' direct involvement in the wrongdoing that they were supposed to investigate. As shown by their status as targets of the Demands' proposed litigation, the DRC's selected members could not make an unbiased decision in determining whether to initiate legal action against themselves or any of the other Individual Defendants. Indeed, their vote to initiate litigation would vastly increase the likelihood that they would be held personally liable for the Company's potential claims against them. Both common sense and human nature suggest that this factor might have weighed on these directors' minds in determining whether to initiate legal action. At the very least, the overhang of this potential liability exposure prevents the DRC from carrying its burden on independence.

***Lafond, Ledingham, and Rowlands Lacked Independence at All Relevant Times***

225.    For the reasons discussed above in greater detail, the DRC members have lacked independence since the issuance of the false and misleading statements at issue in this. Each of these directors have faced a substantial likelihood of personal liability that compromised their independence prior to and during their tenure on the DRC.

226.    As discussed above in more detail, as a member of the Audit Committee, Lafond's duty to oversee the Company's financial reporting and public disclosures made him directly responsible for the nearly two-year concealment of the *Appian* Action while the Company continued making false and misleading statements about employee ethical standards and legal compliance that were contradicted by Appian's detailed allegations.

227.    Similarly, as stated above, the Governance Committee members, Lafond, Ledingham, and Rowlands face significant liability exposure for allowing the Company to tout its

Code of Conduct and ethical standards in public filings while deliberately concealing a major lawsuit alleging systematic corporate espionage by senior management.

228.    All three directors signed Forms 10-K that failed to disclose the *Appian* Action while making statements about the Company's high ethical standards that were materially undermined by the conduct alleged in that litigation.

229.    Their material personal interests in avoiding liability for these disclosure violations and oversight failures prevented these directors from exercising the independent judgment required to evaluate the Demands' allegations against themselves and their fellow directors.

### The DRC's Decision Not to Bring Suit Against Any of the Individual Defendants Was Made in Bad Faith and Lacked a Reasonable Basis

230.    The Refusal fails to provide information regarding the scope of the investigation and does not explain what criteria the DRC used to evaluate the Company's business practices, reporting procedures, oversight, and internal controls. In addition to the fact that the DRC members lacked independence, the DRC's bad faith is further demonstrated by numerous aspects of its investigation and conclusions.

231.    First, the DRC failed to meaningfully investigate or address the Virginia Court of Appeals' affirmance of the jury's finding that Pegasystems misappropriated Appian's trade secrets. Rather than grappling with this judicial validation of Appian's core allegations, the DRC summarily dismissed the significance of both the jury verdict and appellate ruling.

232.    Second, the DRC ignored extensive evidence of senior management's direct involvement in and knowledge of the scheme to misappropriate Appian's trade secrets. The DRC accepted at face value management's self-serving denials despite contemporaneous documents and sworn testimony establishing that Trefler and other executives orchestrated and directed the illegal conduct.

233. Third, the DRC failed to investigate why the Individual Defendants concealed the *Appian* Action from investors for nearly two years while making statements about the Company's ethical standards and legal compliance that were undermined by the conduct alleged in that lawsuit. The DRC conducted no meaningful analysis of how the Individual Defendants could reasonably conclude this material litigation need not be disclosed, particularly in light of the repeated false statements boasting about the high ethical and legal standards of the Company employees.

234. Fourth, the DRC disregarded the Securities Class Action court's detailed analysis finding that Trefler and the Company made materially false and misleading statements about the *Appian* Action. The DRC offered no reasonable basis for reaching contrary conclusions about these disclosure violations.

235. Fifth, the DRC failed to assess or quantify the damages to the Company from the Individual Defendants' misconduct, including the costs of defending and potentially paying damages in the *Appian* Action and Securities Class Action. Without analyzing the scope of harm to the Company, the DRC could not reasonably conclude that pursuing claims against the responsible parties would not serve the Company's interests.

236. Sixth, the DRC appears to have prejudged the outcome, as evidenced by its admission that its report was nearly complete before the Virginia Court of Appeals ruled – suggesting the appellate decision affirming misappropriation would not have altered its conclusions.

237. Seventh, the DRC failed to address a critical conflict affecting its analysis: how initiating litigation against the Individual Defendants would impact D&O Insurance coverage. As discussed above and upon information and belief, the Company's D&O Insurance policies contain standard insured-versus-insured exclusions that would eliminate coverage for claims brought

directly by Pegasystems against its officers and directors. The DRC's refusal to acknowledge or analyze this coverage issue in its decision-making process suggests its members were more focused on preserving insurance protection for themselves and the other Individual Defendants than on evaluating whether litigation would serve the Company's interests. This omission is particularly telling given that the D&O Insurance was purchased with corporate funds specifically to protect the Individual Defendants, and the DRC's decision ensures that protection remains intact.

238.    Eighth, the DRC failed to address a fundamental breach of duty by the Board: its failure to investigate the *Appian* Action's allegations when first filed despite their serious implications for the Company's public statements. The Refusal does not analyze whether the Board conducted any contemporaneous investigation into the scheme's scope or senior executives' involvement when it learned of the *Appian* Action even though Appian's complaint directly contradicted the Company's public statements about its Code of Conduct and ethical business practices. This initial failure to investigate – at a time when the Individual Defendants continued to make statements about employee's high ethical and legal standards and their compliance with the Code of Conduct – exposed the Company to increased liability and damaged its credibility with investors. Yet the DRC entirely ignored this crucial period, failing to examine either the allegedly false and misleading statements themselves or how the Board's inaction in the face of the *Appian* Action allegations contributed to the Company's exposure. This omission is particularly significant given that the Board's failure to investigate at the time it learned of the *Appian* Action creates personal liability for its members.

239.    The DRC's failure to conduct a good faith investigation of these critical issues demonstrates that its decision was predetermined to protect the Individual Defendants rather than to serve the Company's interests. The DRC's wholesale adoption of management's positions

without meaningful independent analysis further confirms it did not exercise genuine business judgment in refusing the Demands. Accordingly, Plaintiffs' pre-suit Demands on the Board were wrongfully refused for the reasons explained above.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

240.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

241.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

242.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

244.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Pegasystems were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated

to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

245.    The Individual Defendants – by virtue of their receipt of information reflecting the true facts of Pegasystems, their control over, and/or receipt and/or modification of Pegasystems's allegedly materially misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Pegasystems – participated in the fraudulent scheme alleged herein.

246.    As a result of the foregoing, the market price of Pegasystems common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Pegasystems common stock in purchasing Pegasystems common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

247.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

248.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

249.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

250.    The Director Defendants and the Officer Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

251.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

252.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

253.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the *Appian* Action and the Securities Class Action, exposing the Company to billions of dollars in damages in the *Appian* Action, exposing the Company to millions of dollars in potential class-

wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

254.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

255.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Pegasystems.

256.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Pegasystems that was tied to the performance or artificially inflated valuation of Pegasystems or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

257.    Plaintiffs, as shareholders and representatives of Pegasystems, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

258.    Plaintiffs on behalf of Pegasystems have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that the Refusal was wrongful and that the Individual Defendants breached their fiduciary duties;

B.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions

complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

C.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.      Implementing appropriate governance reforms to prevent a recurrence of the alleged misconduct; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: February _, 2025                    **MATORIN LAW OFFICE, LLC**

By:   */s/ Mitchell J. Matorin*

**OF COUNSEL:**                            Mitchell J. Matorin (BBO# 649304)
                                           18 Grove Street, Suite 5
**RIGRODSKY LAW, P.A.**                    Wellesley, Massachusetts 02482
Seth D. Rigrodsky                          (781) 453-0100
Timothy J. MacFall                         mmatorin@matorinlawoffice.com
Vincent A. Licata
825 East Gate Boulevard, Suite 300         *Attorneys for Plaintiff Mary Larkin*
Garden City, New York 11530
(516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

**ANDREWS DeVALERIO LLP**

By:  */s/ Daryl Andrews*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Marion Passmore
810 Seventh Avenue, Suite 620
New York, New York 10019
(212) 308-5858
eagel@bespc.com
passmore@bespc.com

Badge Humphries
2113 Middle Street, Suite 305
Sullivan's Island, South Carolina 29482
(843) 883-7424
humphries@bespc.com

Glen DeValerio (BBO #122010)
Daryl Andrews (BBO# 568523)
P.O. Box 67101
Chestnut Hill, Massachusetts 02467
(617) 999-6473
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

*Attorneys for Plaintiff Dag Sagfors*