UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY LARKIN and DAG SAGFORS, Derivatively on Behalf of Nominal Defendant PEGASYSTEMS INC., <br><br> Plaintiffs, <br><br> v. <br><br> ALAN TREFLER, PETER GYENES, RICHARD JONES, CHRISTOPHER LAFOND, DIANNE LEDINGHAM, SHARON ROWLANDS, LEON TREFLER, LARRY WEBER, KENNETH STILLWELL, DON SCHUERMAN, KERIM AKGONUL, and BENJAMIN BARIL, <br><br> Defendants, <br><br> and <br><br> PEGASYSTEMS INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-10303 <br><br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT BY THE DEMAND REVIEW COMMITTEE, ON BEHALF OF NOMINAL DEFENDANT PEGASYSTEMS**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..............................................................................1

FACTUAL BACKGROUND ...............................................................................3

ARGUMENT ...........................................................................................................7

I.     The Independent DRC's Post-Investigation Decision Not to Pursue Plaintiffs'
Claims Requires Dismissal of the Action ..........................................................7

     A.     Plaintiffs Have Not Sufficiently Challenged the DRC's Independence ................. 8

     B.     Plaintiffs Have Not Sufficiently Pled That the DRC Failed to Act in Good
Faith After a Reasonable Investigation................................................................ 12

          1.    The DRC Investigation Was Reasonable and Conducted in Good Faith ....... 13

          2.    Plaintiffs Have Failed to Rebut the Presumption of the Good Faith and
Reasonableness of the DRC's Investigation .................................................... 15

CONCLUSION....................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   267 F.3d 30 (1st Cir. 2001) ............................................................................................2

*Appian Corp. v. Pegasystems Inc.*,
   No. 2020-07216 (Va. Cir. Ct. Fairfax Cnty.) ...............................................................4

*Ark. Tchr. Ret. Sys. v. Alsop*,
   2007 WL 7069609 (D. Mass. Sept. 22, 2007) ...............................................................2

*Averbuch v. Arch*,
   2013 WL 5531396 (Mass. Super. Ct. Aug. 27, 2013) ............................................ *passim*

*Blake v. Friendly Ice Cream Corp.*,
   2006 WL 1579596 (Mass. Super. Ct. May 24, 2006), *reconsideration denied*,
   2006 WL 2714976 (Mass. Super. Ct. Aug. 24, 2006) ................................................8, 9

*Cerundulo v. 222 Friends, Inc.*,
   2023 WL 3173132 (Mass. Super. Ct. Apr. 21, 2023) ....................................................8

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
   No. 22-cv-11220 (D. Mass.) ..........................................................................................5

*Dwyer v. Trefler*,
   No. 2484CV01734-BLS1 (Mass. Super. Ct.) ................................................................5

*Halebian v. Berv*,
   457 Mass. 620 (2010) ...............................................................................................1, 17

*Halebian v. Berv*,
   869 F. Supp. 2d 420 (S.D.N.Y. 2012) ..........................................................................13

*Harhen v. Brown*,
   431 Mass. 838 (2000) .....................................................................................................8

*Larkin v. Gyenes*,
   No. 22-cv-11985 (D. Mass.) ...........................................................................................5

*Lewis v. Graves*,
   701 F.2d 245 (2d Cir. 1983), *abrogated on other grounds by Espinoza ex rel.*
   *JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015) .................................12

*Operative Plasterers' & Cement Masons' Loc. Union Officers' & Emps.' Pension Fund v. Hooley*,
2013 WL 5442366 (D. Mass. Sept. 30, 2013), *appeal dismissed*, 2015 WL 13926885 (1st Cir. Jan. 23, 2015) ......................................................................10, 12, 15, 20

*Pegasystems Inc. v. Appian Corp.*,
81 Va. App. 433 (Va. Ct. App. 2024), *appeal granted*, No. 240736 (Va. Mar. 7, 2025) ............................................................................................................5, 6, 18

*Pegasystems Inc. v. Appian Corp.*,
No. 15-1229-BLS1 (Mass. Super. Ct.) ...............................................................3

*Pegasystems Inc. v. Appian Corp.*,
No. 19-cv-11461 (D. Mass.) .............................................................................3

*Pinchuck v. State St. Corp.*,
2011 WL 477315 (Mass. Super. Ct. Jan. 19, 2011) .......................................8, 11

*Sagfors v. Gyenes*,
No. 23-cv-10933 (D. Mass.) ..............................................................................5

*Stegall v. Ladner*,
394 F. Supp. 2d 358 (D. Mass. 2005) ...............................................................10

**Statutes**

Mass. Gen. Laws ch. 156D § 7.42 .............................................................................1

Mass. Gen. Laws ch. 156D § 7.44 ..................................................................... *passim*

Mass. Gen. Laws ch. 156D § 8.01 .............................................................................1

**Other Authorities**

Press Release, SEC, *SEC Announces Record Enforcement Actions Brought in First Quarter of Fiscal Year 2025* (Jan. 17, 2025) ...............................................12

Lydia Beyoud & Nicola M. White, *Trump Picks Atkins, Ex-SEC Commissioner, to Succeed Gensler*, Bloomberg (Dec. 4, 2024).........................................................12

Nominal Defendant Pegasystems Inc. ("Pegasystems" or the "Company"), by the Demand Review Committee (the "DRC") of the Company's Board of Directors (the "Board"), consisting of Defendants Christopher Lafond, Dianne Ledingham, and Sharon Rowlands, respectfully submits this memorandum of law in support of its motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

The Massachusetts Business Corporation Act and Massachusetts common law direct that derivative litigation claims (*i.e.*, claims on a corporation's behalf) are assets that belong to the corporation and thus are controlled by the corporation's board of directors. *See* Mass. Gen. Laws ch.156D (the "MBCA") §§ 7.42, 7.44(a), 8.01(b); *Halebian v. Berv*, 457 Mass. 620, 625-26 (2010). While the shareholders of a Massachusetts corporation are permitted to make demands on a board requesting that the board investigate and consider whether to bring derivative claims against officers, directors, or third-parties (*see* MBCA § 7.42), courts must respect a demand review committee's decision ***not*** to pursue such derivative claims, provided that the demand review committee both (a) consisted of independent directors and (b) conducted a reasonable investigation in good faith. *See Halebian*, 457 Mass. at 626-27 (citing MBCA § 7.44).

Mary Larkin and Dag Sagfors ("Plaintiffs") have filed the instant lawsuit challenging a decision by the DRC not to pursue derivative claims alleged in demands that Plaintiffs sent to the Board. Plaintiffs' claims relate to events arising from the litigation *Appian Corp. v. Pegasystems Inc.*, No. 2020-07216 (Va. Cir. Ct. Fairfax Cnty.) (the "Virginia Litigation"), brought by Appian Corp. ("Appian") against Pegasystems for alleged corporate espionage and trade secret theft. In May 2022, a jury returned a $2.04 billion verdict against Pegasystems, which verdict was subsequently vacated by a unanimous panel of the Virginia Court of Appeals ("Virginia COA") in July 2024. Following the original jury verdict, in November 2022 and April 2023, respectively, Plaintiffs—*before* making demands on the Board—prematurely filed derivative complaints (the

"Original Complaints") alleging claims against certain Pegasystems directors and officers based on their purported involvement in the underlying matters at issue in, and the Company's public disclosures and accounting treatment relating to, the Virginia Litigation. In the Spring of 2023, Plaintiffs belatedly sent demands (the "Demands") requesting the Board investigate their claims. *See* ECF Nos. 1-3, 1-4.[1]

In April 2023, the Board formed the DRC, consisting of three independent directors, and delegated to the DRC the ***full authority*** of the Board to investigate and address potential claims in whatever manner the DRC believed to be in the Company's best interests. In October 2024, the DRC finished its extensive investigation, issued a 116-page report (the "Report"),[2] and informed Plaintiffs that the DRC had concluded that it would not be in the Company's best interests to pursue the Demands or to bring derivative claims against the Company's directors or officers. The DRC's own analysis was reinforced by (a) the Virginia COA's decision vacating the jury's verdict in the Virginia Litigation and (b) a determination by the U.S. Securities and Exchange Commission (the "SEC"), following the SEC's own investigation, ***not*** to pursue any action against the Company or its directors or officers, based on allegations of accounting and disclosure irregularities concerning the Virginia Litigation that were similar to those raised by Plaintiffs.

On December 4, 2024, the DRC moved to dismiss the Original Complaints on the basis of, among other things, the Report. Plaintiffs voluntarily withdrew their Original Complaints and, on

---

[1] Citations to "¶ __" are to the Verified Shareholder Derivative Complaint filed in *Larkin v. Gyenes*, No. 25-cv-10303 (D. Mass. Feb. 7, 2025) (the "Action") (ECF No. 1) (the "Complaint" or "Compl."). Unless noted, all alterations are added and internal citations and quotation marks are omitted. This Memorandum cites to documents that are incorporated by reference into the Complaint, central to Plaintiffs' claims, publicly available, or required to be filed by statute. *See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001); *Ark. Tchr. Ret. Sys. v. Alsop*, 2007 WL 7069609, at *1 (D. Mass. Sept. 22, 2007); MBCA § 7.44(d).

[2] The Report is attached as Exhibit 1 to the Declaration of Ilan T. Graff, dated April 28, 2025 (the "Graff Decl.").

February 7, 2025, filed this Complaint challenging the DRC's conclusions.  Massachusetts law requires dismissal of the Complaint because the DRC (a) consists solely of duly authorized independent directors and (b) has determined in good faith, after a reasonable investigation, that pursuing Plaintiffs' claims would not be in the Company's best interests.

## FACTUAL BACKGROUND

Pegasystems is a software company specializing in customer relationship management and business process management software.  ¶¶ 2, 90.  Appian competes in certain of these markets (¶¶ 3, 90), and the Company and Appian have a lengthy history of contentious litigation.[3]  Starting in February 2012, Pegasystems worked indirectly (through a consulting firm) with Youyong Zou, an independent consultant employed by a contractor that licensed Appian software, to learn more about Appian's product.  ¶¶ 5, 93-94.  Mr. Zou was hired and supervised by John Petronio, the Company's then-Director of Product Marketing.  ¶ 95.  In September 2014, Mr. Zou stopped working with Pegasystems.  ¶¶ 6, 96.  In 2019, several Pegasystems employees, including Ben Baril, a director in Pegasystems' Office of the Chief Technology Officer, engaged in competitive intelligence activities, including registering for Appian free trials using aliases.  ¶¶ 71, 123.

In January 2020, Mr. Petronio, who the Company had terminated in 2015 and who began consulting for Appian in 2016 (and working for Appian full-time in 2019), along with another

---

[3] For example, in 2015, Pegasystems sued Appian and an Appian employee who previously worked at Pegasystems, alleging that the employee took non-public Pegasystems information and accessed it while working for Appian.  *See* Stipulation of Dismissal at 1, *Pegasystems Inc. v. Appian Corp.*, No. 15-1229-BLS1 (Mass. Super. Ct. Dec. 5, 2018).  The court preliminarily enjoined the employee from working for Appian and ordered the return of the Company's confidential information, and the case later settled.  *Id.* at 1-2.  In 2019, Pegasystems brought unfair competition and false advertising claims against Appian and Business Process Management, Inc.  *See* Compl. ¶¶ 1, 18-30, *Pegasystems Inc. v. Appian Corp.*, No. 19-cv-11461 (D. Mass. July 3, 2019) (the "BPM Litigation"), ECF No. 1.  Pegasystems viewed the Virginia and BPM Litigations as related and sought to settle them together.  Pegasystems' Mot. to Continue Mediation at 1, *Pegasystems Inc. v. Appian Corp.*, No. 19-cv-11461 (D. Mass. Nov. 24, 2020), ECF No. 193.

former Company employee who had been terminated, disclosed the Company's competitive intelligence practices to Appian. ¶¶ 12, 134; Report at 39. On May 29, 2020, Appian commenced the Virginia Litigation, initially seeking $90 million in damages. ¶ 138; Compl. ¶ 68, *Appian Corp. v. Pegasystems Inc.*, No. 2020-07216 (Va. Cir. Ct. May 29, 2020). The Company did not believe the Virginia Litigation to be material and thus did not specifically disclose it in the Company's financial reports filed with the SEC during the period from the filing of the Virginia Litigation until February 2022, as described immediately below. ¶¶ 162-63.

On January 28, 2022, nearly 20 months after filing the Virginia Litigation, Appian moved to amend its complaint to increase its damages claim from $90 million to $3 billion, which motion was granted on February 11, 2022. *See* Second Am. Compl. ¶ 89, *Appian Corp. v. Pegasystems Inc.*, No. 2020-07216 (Va. Cir. Ct. Feb. 11, 2022). Five days later, on February 16, 2022, Pegasystems publicly disclosed the Virginia Litigation in its 2021 10-K filing, which stated, among other things, that Appian's claims were "without merit," "that the Company ha[d] strong defenses to these claims," and that the Company believed "any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause." ¶ 163.

On May 9, 2022, a jury found that the Company had misappropriated Appian's trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA") and had violated the Virginia Computer Crimes Act ("VCCA"). ¶¶ 18, 142; Pegasystems Inc., Current Report (Form 8-K) (May 9, 2022). The jury awarded Appian more than $2 billion in damages on the VUTSA claim and $1 of damages on the VCCA claim. ¶ 142; Pegasystems Inc., Current Report (Form 8-K) (May 9, 2022). The Company's subsequent SEC filings maintained the Company's view that Appian's claims and the jury's verdict were "not supported by the facts." ¶ 143. Pegasystems appealed the VUTSA verdict (which appeal has since resulted in that verdict being vacated, as

discussed *infra*); Pegasystems did not appeal the VCCA verdict because it was immaterial.  *See Pegasystems Inc. v. Appian Corp.* (*Appian II*), 81 Va. App. 433, 448-49, 507-08 (Va. Ct. App. 2024) (the "Virginia Appellate Decision"), *appeal granted*, No. 240736 (Va. Mar. 7, 2025).[4]

On November 21, 2022 and April 28, 2023, Plaintiffs filed the Original Complaints alleging that certain directors and officers of the Company breached their fiduciary duties and caused the Company to issue false and misleading statements in connection with the Virginia Litigation and the underlying conduct at issue.  *See* Verified S'holder Deriv. Compl., *Larkin v. Gyenes*, No. 22-cv-11985 (D. Mass. Nov. 21, 2022), ECF No. 1; Verified S'holder Deriv. Compl., *Sagfors v. Gyenes*, No. 23-cv-10933 (D. Mass. Apr. 28, 2023).  After the DRC pointed out that Plaintiffs had not complied with Massachusetts' universal demand rule, Larkin and Sagfors belatedly sent their Demands to the Board on March 24 and May 5, 2023, respectively, asking the Board to bring the same claims alleged in the Original Complaints.  *See* ECF Nos. 1-3, 1-4.[5]

On April 12, 2023, in response to the Demands, the Board (all members of which, other than Mr. Trefler, are independent) met, with Mr. Trefler recusing himself, and adopted resolutions (the "DRC Resolutions") creating the DRC, fully empowering it to, among other things:

> [R]eview, analyze, and investigate the matters raised in the Demand Letters and the matters set forth therein, and . . . have the exclusive authority (with the full authority of the Board) to determine in good faith what actions (if any) are reasonably believed to be appropriate

---

[4] In May 2022, a shareholder commenced a securities class action, *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc.*, No. 22-cv-11220 (D. Mass. May 19, 2022) (the "Securities Class Action") in this Court, against certain officers and directors related to Pegasystems' public filings during the Virginia Litigation.  ¶ 22.  This Court approved a settlement of the Securities Class Action in September 2024.  ¶ 36.

[5] The Board received similar demands from five other purported shareholders, four of whom (the "State Court Plaintiffs") filed a consolidated amended derivative complaint in Massachusetts Superior Court on March 18, 2025.  *See Dwyer v. Trefler*, No. 2484CV01734-BLS1 (Mass. Super. Ct.).  The court has scheduled a hearing for September 4, 2025, to address the DRC's forthcoming motion to dismiss that complaint.

> under similar circumstances and reasonably believed to be in the
> best interests of the Corporation in response to the Demand Letters.

Report at Ex. 8 (DRC Resolutions), at 1; *see* Graff Decl. ¶ 4; Report at 3, 20-23, 27-28.  The DRC

Resolutions also authorize the DRC to, among other things, access "all information and documents

of the [Company] (including confidential information and documents)" and "conduct interviews

with any employee, officer, director, agent, or advisor of the [Company], or any other person, as

the [DRC] may determine to be appropriate…."  Report at Ex. 8 (DRC Resolutions), at 2.

The Board appointed independent directors Christopher Lafond, Dianne Ledingham, and

Sharon Rowlands to serve on the DRC.  Report at 21-23.  The DRC retained its own counsel (Fried

Frank) and began the robust investigation detailed below.  *Id.* at 23-24; *see infra* Section I.B.  As

the DRC's work neared completion, two significant developments reinforced the DRC's own

extensive and independent analysis:

- On July 30, 2024, a unanimous panel of the Virginia COA vacated the jury's VUTSA verdict, citing several errors that deprived Pegasystems of a fair trial, including wrongly excluding evidence that supported that the information at issue did not constitute trade secrets and was, in any event, not used to improve the Company's product, wrongly depriving the Company of the ability to introduce key evidence to disprove damages, and wrongly imposing on the Company the burden to prove damages.[6]  *See Appian II*, 81 Va. App. at 448-49, 476-508.[7]

- On September 9, 2024, the SEC staff notified the Company that they had concluded their own investigation of the Company's accounting and disclosure decisions related to the Virginia Litigation without taking any action against the Company or its directors or officers.  Pegasystems Inc., Current Report (Form 8-K) (Sept. 10, 2024).

On October 7, 2024, the DRC unanimously voted to reject the demands.  *See* Report at 4.

The 116-page Report describes, among other things, the formation of the DRC and selection of its

---

[6] Despite basing the entire Complaint on the original jury verdict, Plaintiffs dedicate only six paragraphs to its reversal.  ¶¶ 38, 182-86.

[7] The Supreme Court of Virginia has agreed to hear Appian's appeal from, along with Pegasystems' assignments of cross-error relating to, the Virginia Appellate Decision.

members (*id.* at 20-23); the selection and qualifications of the DRC's outside counsel (*id.* at 23-24); the scope of its investigation (*id.* at 24-31); the DRC's factual findings (*id.* at 31-69); the DRC's evaluation of potential legal claims and reasons for not pursuing them (*id.* at 69-112); and enhancements the DRC has mandated the Company make (*id.* at 112-14).

On October 15, 2024, the DRC sent Plaintiffs letters rejecting the Demands, enclosing the Report, and requesting that they voluntarily dismiss the Original Complaints to avoid unnecessary motion practice. *See* ECF Nos. 1-6, 1-7. Plaintiffs declined to do so, thereby necessitating that the DRC file motions to dismiss the Original Complaints. Only after the DRC filed those motions, Plaintiffs voluntarily dismissed the Original Complaints without prejudice.

On February 7, 2025, Plaintiffs filed the Complaint, alleging, yet again, breaches of fiduciary duty, violations of the Exchange Act, and unjust enrichment premised on the same underlying conduct alleged in the Original Complaints, except Plaintiffs added certain members of management as defendants and have challenged the adequacy of the Report. Faced with Massachusetts law's clear deference to an independent committee's conclusions following a reasonable investigation, Plaintiffs now allege that the Board's purported "substantial likelihood of personal liability from the [alleged] claims" undercuts the DRC's independence and that supposed gaps in the DRC's work rendered the DRC's extensive investigation and thoroughly developed conclusions somehow unreasonable. These allegations fail as a matter of law and logic.

## ARGUMENT

### I.    The Independent DRC's Post-Investigation Decision Not to Pursue Plaintiffs' Claims Requires Dismissal of the Action

Section 7.44 of the MBCA ("Section 7.44") directs that, if a shareholder initiates a derivative lawsuit, a corporation's board can compel dismissal if "a committee consisting of 2 or more independent directors" determines "in good faith after conducting a reasonable inquiry . . .

that the maintenance of the derivative proceeding is not in the best interests of the corporation…." MBCA § 7.44(a) & (b)(2); *see also Cerundulo v. 222 Friends, Inc.*, 2023 WL 3173132, at *1 n.2 (Mass. Super. Ct. Apr. 21, 2023).  When a committee of independent directors determines that a derivative action is not in the corporation's best interests, that decision is presumed to be a valid exercise of business judgment.  *See* MBCA § 7.44(d) & cmt. 2; *Cerundulo*, 2023 WL 3173132, at *1 n.1 (board may delegate "the power to decide whether a given derivative suit is in the corporation's best interest" to a committee of independent, disinterested directors); *see also Harhen v. Brown*, 431 Mass. 838, 847 (2000).

A motion to dismiss a shareholder derivative complaint pursuant to Section 7.44 must be granted unless the plaintiff "plead[s] and prove[s] that the directors making the determination were not independent or did not act in good faith after reasonable inquiry."  MBCA § 7.44 cmt. 2. Plaintiffs have failed to meet their burden, and the Complaint therefore should be dismissed.

## A.    Plaintiffs Have Not Sufficiently Challenged the DRC's Independence

Massachusetts law presumes that a director is independent for purposes of Section 7.44 if he or she "can exercise [his or her] business judgment in the best interest of the corporation, free from significant contrary personal interest and apart from the domination and control of those who are alleged to have participated in the wrongdoing."  *Averbuch v. Arch*, 2013 WL 5531396, at *4 (Mass. Super. Ct. Aug. 27, 2013); *see also* MBCA § 7.44 cmt. 1; *Cerundulo*, 2023 WL 3173132, at *2; *Pinchuck v. State St. Corp.*, 2011 WL 477315, at *11 (Mass. Super. Ct. Jan. 19, 2011).

When evaluating whether the members of a demand review committee are independent under Massachusetts law, courts apply a totality of the circumstances test.  *Blake v. Friendly Ice Cream Corp.*, 2006 WL 1579596, at *13 (Mass. Super. Ct. May 24, 2006), *reconsideration denied*, 2006 WL 2714976 (Mass. Super. Ct. Aug. 24, 2006).  Relevant factors include: (1) a committee member's status as a defendant and the nature and scope of the potential liability, (2) whether the

"member's participation in or approval of the alleged wrongdoing was substantial or the result of innocent or pro forma involvement or affiliations," (3) a "member's past or present business dealings with the corporation," (4) a "member's past or present business or social dealings with individual defendants," (5) the number of directors on the committee, and (6) any structural bias of the committee, including assessment of the manner in which the committee was appointed.  *Id*. No single factor is dispositive, and a director (i) having been selected to the board by a named defendant, (ii) being named as a defendant, or (iii) having approved the challenged conduct cannot alone cause that director to be considered not independent.  *Id*. at *12; *see* MBCA § 7.44(c).

The Report considered all of these factors, including that none of the DRC members are involved in Pegasystems management, none of the DRC members have had material past or present dealings with Pegasystems (other than in their role as director) nor personal relationships with any of the Defendants that could influence their decision-making, and that each of the DRC members has been deemed independent within the meaning of Pegasystems' corporate governance guidelines and under NASDAQ listing standards.  *See* Report at 24; *see also* Pegasystems Inc., Definitive Proxy Statement, at 18 (Sched. 14A) (Apr. 26, 2024).  These factors strengthen the presumption under Massachusetts law that each DRC member is in fact independent, disinterested, and capable of making decisions in Pegasystems' best interests.

Plaintiffs ignore these inconvenient facts and instead simply assert, without any support, that the Board appointed the DRC "without any meaningful evaluation of their independence" and that the DRC members face a substantial likelihood of liability.  ¶¶ 200, 205-09.  These allegations are conclusory, false, contrary to Massachusetts law, and wholly insufficient to meet Plaintiffs' burden to rebut the DRC members' presumption of independence.

*First*, Plaintiffs offer no basis to support their conclusory allegation that there was no "meaningful evaluation" of the DRC members' independence (¶ 200) and Massachusetts courts "need not credit bald assertions" or "unsupportable conclusions." *Stegall v. Ladner*, 394 F. Supp. 2d 358, 360 (D. Mass. 2005). Moreover, as the Report explains, at the outset of its engagement, Fried Frank met with the individual DRC members to confirm whether each was independent and disinterested. Report at 24. During these meetings, counsel discussed the meaning of and need for independence and disinterestedness under Massachusetts law and reviewed a checklist of questions to determine whether there were any relationships that could undermine independence and disinterestedness. *Id.* Counsel and the Board concluded that each member of the DRC was independent and disinterested for purposes of investigating and analyzing the matters raised in the Demands. *Id.* This process was entirely consistent with Massachusetts practice. *See Operative Plasterers' & Cement Masons' Loc. Union Officers' & Emps.' Pension Fund v. Hooley*, 2013 WL 5442366, at *4 (D. Mass. Sept. 30, 2013) (directors deemed independent based, in part, on each director's completion of a questionnaire prepared by counsel, which was "designed to identify any potential lack of independence"), *appeal dismissed*, 2015 WL 13926885 (1st Cir. Jan. 23, 2015).

*Second*, the Complaint lacks any particularized allegations to support its conclusory assertions that the DRC members (or the Board members who selected them) were somehow implicated or involved in the challenged conduct such that they face a substantial likelihood of liability. *See Hooley*, 2013 WL 5442366, at *5-6 (rejecting plaintiff's "conclusory" allegations that the directors "approved and oversaw an illicit business strategy" and "fail[ed] to implement risk management policies and internal controls," because without more particularized facts, these allegations "are well short of a showing of a substantial likelihood of liability that is necessary to rebut the directors' initial showing of independence"). Plaintiffs' primary argument is that, by

virtue of their involvement with the Board's Audit and Governance committees, the DRC members "must have known or were reckless in not knowing" that the Company issued purportedly false and misleading statements and lacked internal controls to prevent the dissemination of such alleged misstatements, and thus face a substantial likelihood of liability such that they were unable to objectively evaluate Plaintiffs' claims.  ¶¶ 206-09, 213-29.

But mere membership on the Board or a committee thereof, without anything more, is not enough to establish that any director faces a substantial likelihood of liability or lacked the requisite independence.  *See Pinchuck*, 2011 WL 477315, at *12 (plaintiffs failed to cite any particularized facts demonstrating board committee membership rendered special litigation committee members biased); *see also* MBCA § 7.44(c).  And despite devoting nearly 30 paragraphs in the Complaint to trying to rebut the DRC members' presumed independence, the Complaint contains no individualized or specific allegations establishing what each DRC member, or any of the directors that nominated them, *actually* knew or did in connection with the challenged conduct.[8]

Moreover, Plaintiffs ignore two critical realities in suggesting that the DRC members face a substantial likelihood of liability.  First, the Report contains a ***21-page analysis*** of why claims relating to SEC disclosures or accounting are without merit.  Report at 85-105.  Second, and perhaps most telling, Plaintiffs ignore the fact that the SEC concluded its investigation without taking action against the Company or its directors or officers.  *Id.* at 64-65.  And the SEC decided

---

[8] Plaintiffs' additional claims that (i) the directors face a substantial likelihood of liability because they were named as Defendants in this Action and (ii) signed Pegasystems' SEC filings that allegedly contained false and misleading statements, are similarly insufficient to rebut the directors' presumption of independence.  Section 7.44 explicitly states, and case law interpreting the statute affirms, that neither of these allegations undercut a director's independence.  MBCA § 7.44(c); *see also id*., cmt. 1 ("the mere fact that a director has been named as a defendant or approved the action being challenged does not cause the director to be considered not independent"); *Averbuch*, 2013 WL 5531396, at *4 (directors being named as defendants in a derivative lawsuit "is not a valid reason to regard [them] as anything less than independent").

not to pursue claims during a period when SEC leadership "rolled out one of the most aggressive SEC agendas in recent memory." *See* Lydia Beyoud & Nicola M. White, *Trump Picks Atkins, Ex-SEC Commissioner, to Succeed Gensler*, Bloomberg (Dec. 4, 2024), https://news.bloomberglaw.com/us-law-week/trump-names-paul-atkins-as-sec-chair; Press Release, SEC, *SEC Announces Record Enforcement Actions Brought in First Quarter of Fiscal Year 2025* (Jan. 17, 2025), https://www.sec.gov/newsroom/press-releases/2025-26 (SEC filed 200 enforcement actions in last three months of 2024, "the most actions filed in [that]…period[] since at least 2000").

Plaintiffs have not carried their burden to rebut the presumption of independence afforded to directors of Massachusetts corporations. To hold otherwise would vitiate the MBCA's expectation of board control of potential derivative litigation, because shareholder-plaintiffs could simply name all corporate directors in every demand or assert baseless claims against directors fulfilling their duties, which would eliminate any corporation's ability to form a demand review committee or conduct an investigation. *See* MBCA § 7.44 cmt. 1; *see also Lewis v. Graves*, 701 F.2d 245, 249 (2d Cir. 1983) ("To construe [directors' status as named defendants] as sufficient [to excuse a demand] would mean that plaintiffs could readily circumvent the demand requirement merely by naming as defendants all members of the derivative corporation's board."), *abrogated on other grounds by Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234-36 (2d Cir. 2015).

### B. Plaintiffs Have Not Sufficiently Pled That the DRC Failed to Act in Good Faith After a Reasonable Investigation

Plaintiffs likewise have failed to meet their burden to show that the DRC did not make its determinations in good faith after a reasonable inquiry. *Hooley*, 2013 WL 5442366, at *6.

      **1.**       **The DRC Investigation Was Reasonable and Conducted in Good Faith**

Whether a committee's investigation was "reasonable" is a fact-specific analysis, considering among other things, (i) whether independent counsel was retained to assist with the investigation; (ii) the materials reviewed; (iii) the witnesses interviewed; and (iv) the committee's involvement. *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 455 (S.D.N.Y. 2012) (reasonable inquiry presumed under Massachusetts law because the committee was "actively involved in the investigation through multiple meetings," outside counsel "conducted numerous interviews" with the defendant directors and others, and outside counsel "reviewed thousands of pages of relevant documents"), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (summary order).

The DRC's investigation undoubtedly satisfies and exceeds the test of reasonableness.

*First*, within weeks of receiving the first demand letter, the Board created the DRC and vested in it the full authority of the Board to investigate the allegations in the demand (and any subsequently received demand). Report at 20-23. The DRC promptly retained as its independent counsel Fried Frank, a firm with extensive experience and expertise in connection with internal investigations, demand review committee investigations, securities litigation, and derivative litigation. *Id.* at 23. The Fried Frank team was led by partners Scott B. Luftglass, Vice Chairman of the Firm and Co-Head of the Securities and Shareholder Litigation Practice, and Ilan T. Graff, who, prior to joining Fried Frank served for ten years in the United States Attorney's Office for the Southern District of New York, including as the Deputy United States Attorney. *Id.* at 23-24.

*Second*, the DRC and Fried Frank developed an investigative plan consisting of, among other things, collecting and reviewing relevant evidence, including the trial transcripts and exhibits from the Virginia Litigation and voluminous non-public documents and communications, conducting witness interviews, and evaluating the Demands' legal claims. Report at 24. The DRC and Fried Frank manually reviewed nearly 35,000 documents, interviewed 17 key witnesses, and

in addition to many informal communications, formally met 12 times to discuss the investigation and deliberate the DRC's factual findings and legal conclusions. *Id.* at 25-26. The witnesses the DRC interviewed included all of the Board members, members of senior management (including the Chief Executive Officer, the Chief Operating Officer and Chief Financial Officer, the Chief Accounting Officer, the Chief Product Officer, the Chief Technology Officer, the Chief of Clients and Markets, and the General Counsel and Chief Compliance Officer), and outside counsel to Pegasystems (including the Company's trial counsel in the Virginia Litigation, the Company's appellate counsel in the Virginia Litigation, and the Company's regular corporate counsel). *Id*. at 26-29. At least one member of the DRC actively participated in each interview. *Id.* at 26.

*Third*, the DRC, with the assistance of Fried Frank, actively engaged in fact finding and analyzing the evidence in light of applicable law. The DRC developed an extensive factual record relating to the underlying actions and inactions that formed the basis of the Demands. Report at 31-69. Having established the factual record, the DRC, assisted by Fried Frank, then evaluated whether it would support the pursuit of any viable legal claims. *Id.* at 69-110.

As the Report sets forth in exacting detail, the DRC considered a wide range of potential claims that could be brought against the Company's officers and directors, including (a) breach of fiduciary duties relating to the underlying conduct at issue in the Virginia Litigation and the way management and the Board handled the Virginia Litigation (*see* Report at 74-83); (b) aiding and abetting breach of fiduciary duty claims relating to the same issues (*see id.* at 84-85); (c) potential violations of the federal securities laws, including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, relating to the Company's public disclosures concerning the Virginia Litigation (*id.* at 85-97); (d) potential claims relating to the alleged failure to accrue and disclose a loss contingency relating to the Virginia Litigation (*id.* at 97-105); (e) corporate waste

(*id.* at 105-08); and (f) unjust enrichment (*id.* at 108-10).  For each potential claim, the DRC concluded that there was insufficient evidence to support a viable derivative action.

The DRC's investigation thus included the well-established hallmarks of reasonableness under Massachusetts law.  *See Hooley*, 2013 WL 5442366, at *6 (dismissing complaint based on reasonable inquiry where "committee met twenty-two times," outside "counsel billed nearly 1,000 hours for investigating…and advising the committee," and "committee conducted interviews, reviewed contracts, considered thousands of pages of documents, analyzed the investment portfolio, . . . investigated public disclosures[,]" and "evaluated the legal theories").

> **2.    Plaintiffs Have Failed to Rebut the Presumption of the Good Faith and Reasonableness of the DRC's Investigation**

Nevertheless, Plaintiffs attempt to rebut the presumption that the DRC's investigation was reasonable and in good faith by attempting to repackage their disagreement with the DRC's business judgment and conclusions as alleged deficiencies with the DRC's investigation.  In so doing, the Complaint includes an almost stunning number of hyperbolic, conclusory, and demonstrably false allegations.  For example, ignoring the review of nearly 35,000 documents and 17 interviews, Plaintiffs somehow allege that "despite being members of the Board at all relevant times, no member of the DRC sought to investigate or redress the misconduct and resulting harm stemming from and underlying the [Virginia Litigation] and the Securities Class Action."  ¶ 198.

Simply put, the question for this Court is not whether additional or different steps could have been taken.  Rather, Plaintiffs bear "the burden of demonstrating that the [DRC's] decision was in *bad faith* and made with a *lack* of investigation."  *Averbuch*, 2013 WL 5531396, at *4 (emphasis in original).  Plaintiffs have not done so, nor could they.

***First***, the Report confirms that the DRC, in fact, took steps that Plaintiffs falsely claim the DRC failed to pursue.  Plaintiffs claim, for instance, that the DRC "failed to investigate" the

Company's non-disclosure of the Virginia Litigation, including purported violations of Item 103 and ASC 450, which dictate when a company is required to disclose, and accrue a loss contingency for, a pending litigation.  ¶¶ 203, 233.  But the DRC meticulously developed a factual record around those very issues.  As reflected in its more than 20-page analysis of potential violations of Section 10(b) of the Exchange Act and Rule 10b-5, the DRC scrutinized that factual record to determine whether: (i) Item 103 required the Company to disclose the Virginia Litigation prior to filing its 2021 Form 10-K (Report at 88-93), or (ii) ASC 450 required the Company to accrue and disclose a loss contingency in connection with the Virginia Litigation between May 2020 and the dates of the Demands (*id.* at 97-105), and concluded that the Company's judgments with respect to the foregoing were reasonable.  *Id.* at 92, 103, 105.

Similarly, Plaintiffs' allegation that the DRC "ignored extensive evidence" of senior management's purported involvement in and awareness of the supposed misappropriation of Appian's trade secrets itself ignores the DRC's explicit factual development and analysis of senior management's (i) role, if any, in the Company's engagement of and interactions with Mr. Zou, and (ii) knowledge of certain Pegasystems employees' use of aliases to access Appian's free trial. Report at 74-81.  But the DRC specifically investigated whether members of senior management and the Board breached their fiduciary duties in connection with Pegasystems' work with Mr. Zou (*id.* at 34-39) and Company employees' use of aliases to access Appian's free trial (*id.* at 41-44). Plaintiffs have not identified any evidence that the DRC should have considered but did not consider.  *See Averbuch*, 2013 WL 5531396, at *5 (allegation that committee "fail[ed] to interview certain individuals" and "review [select] documents … did not negate" committee's consideration of the information that "[that] evidence was meant to highlight").  Instead, Plaintiffs' claim amounts to second-guessing how the DRC ***weighed*** the voluminous evidence it collected and

considered, which Massachusetts law specifically does not permit Plaintiffs to do. *See Halebian*, 457 Mass. at 626-27. That is the very nature of deferring to a director's business judgment.

**Second**, Plaintiffs claim the DRC "disregarded" this Court's purported finding in the Securities Class Action "that [Alan] Trefler and the Company made materially false and misleading statements about the [Virginia] Litigation." ¶ 234. Not so. The Report squarely addressed the DRC's consideration of this Court's decision alongside all the other available evidence. *See, e.g.*, Report at 65-66. The Report noted that this Court's ruling was a pleading stage decision, and thus there was no factual determination that Mr. Trefler or the Company made materially false or misleading statements. *Id.* at 86. Instead, as noted in the Report, drawing all reasonable inferences in favor of the Securities Class Action plaintiffs, this Court found that those plaintiffs had sufficiently pled allegations to avoid dismissal. *See id.* at 65 (citing *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 128-29, 137 (D. Mass. 2023)). Plaintiffs' allegation plainly ignores the degree to which the DRC's analysis benefited from its review of voluminous non-public materials and witness interviews that were not available to the Court when it considered the Securities Class Action claims at the pleading stage. Report at 86. In Plaintiffs' view, a defendant could never lose a motion to dismiss (on the pleadings) and then prevail at trial (on a fully developed evidentiary record).

**Third**, Plaintiffs allege that the DRC failed to meaningfully address the Virginia Appellate Decision's supposed affirmance of the finding that Pegasystems misappropriated Appian's trade secrets. ¶¶ 43, 197, 201, 203, 231. As an initial matter, Plaintiffs' argument mischaracterizes both the Virginia Appellate Decision and the DRC's consideration of it. The Virginia COA did *not* find that any trade secrets were, in fact, misappropriated. Rather, on deferential review, accepting all evidence favorable to Appian as true and drawing all reasonable inferences in its favor, the Virginia

- 17 -

COA merely concluded that "we cannot say, as a matter of law, that Appian failed to prove the existence of any trade secrets," and therefore declined to direct a verdict in Pegasystems' favor. *Appian II*, 81 Va. App. at 470.  Moreover, the DRC *did* consider the Virginia COA's findings with respect to the trade secret misappropriation claim.  *See, e.g.*, Report at 76-77 & n.41.  As the Report explains, the DRC found the overall evidence (including evidence that the Virginia COA held the trial court had erred by precluding at trial) supported its conclusion that the material at issue did not constitute trade secrets.  *See id.*  Notably, in vacating the jury verdict, the Virginia COA focused on how important the improperly excluded evidence (including evidence the DRC ultimately reviewed) was to a proper determination of the legal claims in the Virginia Litigation.[9]

Plaintiffs further allege that the DRC prejudged its decision to reject the Demands by claiming its work was "nearly complete" before the Virginia Appellate Decision had been issued, but then purportedly relied on that decision in its Report.  ¶ 237.  As clearly stated in the Report, however, the DRC's findings did not rise or fall based on the Virginia Appellate Decision.  *See* Report at 7 ("The analysis set forth in the Virginia Appellate Decision is consistent with and reinforced the DRC's reasoning and conclusions.").  The Report painstakingly details the extensive evidence and testimony that supported its independent factual and legal conclusions.[10]

---

[9] For example, the Virginia COA noted that "[i]n a technical case where a multi-billion-dollar claim turned on whether and how Pega copied Appian's functions, the trial court . . . deprived Pega of evidence that could show that functions it was accused of stealing actually pre-dated Zou or differed from Appian's."  *Appian II*, 81 Va. App. at 496.  The Virginia COA further noted that the trial court errors "significantly hampered Pega's liability defense," *id.* at 501, and "exponentially increased the likelihood of a runaway damages verdict that had no correlation to proximate cause," *id.* at 492.

[10] The Report explains that the DRC's work and the Virginia Litigation concerned different legal issues, and thus "it would be possible for a Virginia jury to find the Company liable to Appian while the DRC (or a court) finds no viable claims against the Fiduciaries."  Report at 114-15.

*Fourth*, Plaintiffs attempt to challenge the scope of the DRC's investigation, claiming that the DRC should have weighed additional considerations.  For example, Plaintiffs take issue with the DRC not investigating the Board's "failure" to form a committee or otherwise investigate Appian's allegations when the Virginia Litigation was filed in 2020, or in 2022, when the Securities Class Action was filed.  ¶ 198.  Notably, neither of the Demands even asked the Board to investigate this supposed failure.  In any event, the Report expressly addresses the reasonable approach of the Board to the litigation based on the facts as the directors (all but one of whom are independent) then understood them: when the Virginia Litigation was filed the Board and senior management reasonably considered it to be "a largely retaliatory, normal course litigation, which was consistent with the view of in-house counsel, outside trial counsel, and management."  Report at 90.  Thereafter, the Board was routinely updated on the facts developed by outside counsel in the Virginia Litigation and the Company's legal exposure, including after the Securities Class Action was filed.  *Id.* at 50 (the Board received written and verbal litigation updates on the Virginia Litigation during at least ten Board meetings starting approximately one month after that Litigation was filed until May 2022).  Plaintiffs expressly "concede[]" this fact.  ¶ 215.

Plaintiffs also cite the DRC's purported failures to assess or quantify damages associated with the claims it analyzed or to address the Company's D&O liability insurance, which Plaintiffs allege does not cover direct claims pursued by the Company.[11]  However, even viewing that allegation in the light most favorable to Plaintiffs, given the DRC's conclusion that Plaintiffs' claims lack merit, it is both reasonable and unsurprising that the DRC did not engage in the purely

---

[11] Plaintiffs allege that the DRC conducted no meaningful analysis of the costs of defending and potentially paying damages in the Virginia Litigation and the Securities Class Action.  ¶ 202.  Not so.  The DRC evaluated (i) potential breaches of fiduciary duty in connection with the Company's handling of the Virginia Litigation, and (ii) allegations of corporate waste in connection with costs associated with the Securities Class Action.  Report at 81-83, 105-07.

hypothetical exercise of calculating notional damages or available insurance coverage. Nor is the DRC aware of any caselaw suggesting that declining to do so would constitute bad faith.

*Fifth*, the Complaint simply ignores the DRC's (a) consideration and recognition, in the Report, of the remedial and deterrent effects of certain measures the Company undertook before the DRC's work was completed to ensure the Company's competitive intelligence practices are professional, ethical, and legal; and (b) direction that the Company adopt a series of additional enhancements to further strengthen the Company's compliance and governance framework. Report at 44-46, 110-14. The Complaint also ignores that the DRC has concluded that it will remain constituted, through the completion of the Virginia Litigation, to monitor those proceedings and consider any new evidence, facts, or testimony that are developed (though, at this advanced stage of fact development in the Virginia Litigation, that seems highly unlikely). *Id.* at 114-16.

Simply put, Plaintiffs' purported challenges to the DRC's investigation are nothing more than a thinly veiled disagreement with the DRC's ultimate conclusions and exercise of its business judgment. Plaintiffs have "not shown that the [DRC's] investigation was inadequate or incomplete, not done in good faith, or that the conclusions, measured against the business judgment rule, were unreasonable." *See Hooley*, 2013 WL 5442366, at *6; *see also Averbuch*, 2013 WL 5531396, at *5 ("[T]he [committee's] reports bear none of the hallmarks of bad faith or suggest the 'whitewash' that plaintiff claims."). The DRC conducted a reasonable investigation in good faith, considering all of the available evidence, and determined that it was in the best interests of the Company to reject Plaintiffs' demands. Under controlling Massachusetts law, the DRC's decision must be respected, and the Complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Pegasystems, by its duly delegated DRC, respectfully requests that the Court grant its motion to dismiss the Action with prejudice.

Respectfully submitted,

Date: April 28, 2025

/s/ Ilan T. Graff

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Scott B. Luftglass
(*pro hac vice* application pending)
Ilan T. Graff (BBO# 675630)
One New York Plaza
New York, New York 10004
(212) 859-8000
scott.luftglass@friedfrank.com
ilan.graff@friedfrank.com

*Attorneys for Defendants Christopher Lafond,*
*Dianne Ledingham, and Sharon Rowlands*

## <u>CERTIFICATE OF SERVICE</u>

I, Ilan T. Graff, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to those indicated as non-registered participants on April 28, 2025.

*/s/ Ilan T. Graff*
Ilan T. Graff (BBO# 675630)