# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**                                                    **SUPERIOR COURT**

**Civil No. 24-1734-BLS1**

**JOHN DWYER, & another**[1]
**Plaintiffs**

**vs.**

**ALAN TREFLER, & others**[2]
**Defendants**
_____

**CONSOLIDATED WITH**
**Civil No. 24-3076-BLS1**

**JAYNE BIRCH, & another**[3]
**Plaintiffs**

**vs.**

**ALAN TREFLER, & others**[4]
**Defendant**[5]


**<u>VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

---

[1] Ray Gerber.

[2] Peter Gyenes, Richard Jones, Christopher Lafond, Dianne Ledingham, Sharon Rowlands, Larry Weber, Leon Trefler, Don Schuerman, Kerim Akgonul, and Benjamin Baril. Pegasystems, Inc. is named as a nominal defendant.

[3] Robert Garfield.

[4] Peter Gyenes, Richard Jones, Christopher Lafond, Dianne Ledingham, Sharon Rowlands, Larry Weber, Leon Trefler, Don Schuerman, Kerim Akgonul, Benjamin Baril, and Kenneth Stillwell. Pegasystems, Inc. is named as a nominal defendant.

[5] Five individuals who were previously listed as parties in the *Birch* action (24-3076-BLS1)— Steven Kaplan, James O'Halloran, William Wyman, Douglas Kim and John Petronio—are not parties in the consolidated action.

Plaintiffs John Dwyer, Ray Gerber, Jayne Birch, and Robert Garfield (together, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Pegasystems, Inc. ("Pegasystems," "Pega," or the "Company") against current and/or former members of Pegasystems' Board of Directors (the "Board"), including Alan Trefler ("A. Trefler"), Peter Gyenes ("Gyenes"), Richard Jones ("Jones"), Christopher Lafond ("Lafond"), Dianne Ledingham ("Ledingham"), Sharon Rowlands ("Rowlands"), and Larry Weber ("Weber") (collectively, the "Director Defendants") and certain current and former Pegasystems officers, including Kerim Akgonul ("Akgonul"), Don Schuerman ("Schuerman"), Leon Trefler ("L. Trefler"), Benjamin Baril ("Baril") (collectively and with A. Trefler, the "Officer Defendants") and Kenneth Stillwell ("Stillwell" or the "CFO" and together with the Director Defendants and the Officer Defendants, the "Defendants"). Through this Complaint, Plaintiffs seek to remedy the Defendants' breaches of fiduciary duties.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the pre-suit investigations conducted by and through their attorneys, as well as continued investigation by and through their attorneys since the initiation of the above-captioned derivative litigation. These investigation efforts have included, *inter alia*: (i) requests for inspection of certain non-public corporate books and records of Pegasystems pursuant to Mass. Gen. Laws Pt. I, Title XXII, ch. 156D § 16.02 ("Section 16.02") and subsequent review and analysis of such books and records, (ii) review and analysis of public statements made by the Company and the Defendants, (iii) review and analysis of court filings, transcripts, exhibits and related materials in a lawsuit filed against Pegasystems in the Circuit Court of Fairfax County, Virginia captioned *Appian Corp. v.*

*Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (the "Virginia Action" or the "Appian Litigation"); (iv) review and analysis of court filings in a securities fraud class action lawsuit filed against Pegasystems in the U.S. District Court for the District of Massachusetts captioned *City of Fort Lauderdale Police and Firefighters' Ret. Sys. v. Pegasystems Inc., et al.*, Case No. 1:22-cv-11220-WGY (the "Securities Action"); (v) review and analysis of the Company's U.S. Securities and Exchange Commission ("SEC") filings, (vi) review and analysis of wire and press releases published by and regarding Pegasystems, (vii) review and analysis of news reports regarding Pegasystems, (viii) review and analysis of securities analysts' reports regarding Pegasystems, (ix) review and analysis of the Report of the Demand Review Committee of the Pegasystems Board of Directors (the "DRC") on its Investigation of Confidential Demand Letters dated October 7, 2024 (the "Report"), (ix) review and analysis of information readily obtainable on the Internet, and (x) an interview of non-party John Petronio ("Petronio"), the Company's former Director of Product Marketing. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    Pegasystems, a Massachusetts corporation headquartered in Cambridge, Massachusetts, operates in the intensely competitive Business Process Management ("BPM") industry, providing customers a platform to build customized workflow-based applications. As alleged in detail herein, Defendant A. Trefler, Pega's longtime Chairman, Chief Executive Officer ("CEO"), founder, and controlling shareholder, was determined to "destroy" Appian Corporation ("Appian"), Pega's primary competitor in the BPM industry. The Officer Defendants resorted to illegal and unethical means to achieve that goal in breach of their fiduciary duties, which the Board failed to detect because it had abdicated its oversight obligations.

2.    Beginning as early as 2012, the Officer Defendants directed Pega to engage in a

systematic, willful, and malicious scheme to misappropriate and profit from Appian's trade secrets and confidential information in violation of Virginia law (the "Illegal Scheme"). Internally, Pega employees referred to the Illegal Scheme as "Project Crush." At its inception, Project Crush involved Pega hiring a third-party spy, Youyong Zou ("Zou"), to assist in the theft, who was paid for his services through a middleman company, KForce Inc. ("KForce"). Later and through 2021, the Officer Defendants (and multiple Pegasystems employees at their direction) used false identities to surreptitiously access Appian's proprietary software to collect non-public information, which Pega used to compete against Appian. The Officer Defendants concealed the Illegal Scheme from stockholders for many years as well as the Virginia Action, which Appian filed against the Company in May 2020, alleging that Pega had misappropriated its trade secrets. The Virginia Action eventually resulted in a judgment against Pega for over $2 billion, which is currently on appeal.

3.        The Illegal Scheme to "destroy" Appian and pursue profits was perpetrated in violation of both Pega's own charter and Massachusetts law. Massachusetts corporations, like Pega, may engage only in "*lawful* business." Mass. Gen. Laws Ann. ch. 156D § 3.01 (West 2004) (emphasis added). That statutory mandate is reflected in Pega's Restated Articles of Organization, Article II, which states that "[t]he corporation may engage in any lawful business." The Officer Defendants knowingly violated the law, thereby breaching their fiduciary duties, by directing and participating in the Illegal Scheme.

4.        While the Officer Defendants caused the Company to engage in the Illegal Scheme, the members of the Board—which included Officer Defendant A. Trefler—also breached their fiduciary duties by completely failing to implement and monitor a system of corporate controls sufficient to oversee Pega's intellectual property compliance and competitive intelligence

3

activities.  The Director Defendants' utter lack of oversight of Pega's competitive intelligence practices fostered a corporate culture that encouraged and protected illegal activity and unethical conduct in pursuit of profits.

5.      Additionally, the Director Defendants further breached their fiduciary duties by failing to monitor and oversee the Company's public disclosures, and ensure that those statements were accurate with respect to Pega's purported compliance with the law, its internal Code, and litigation risks.  As a result, the Company, Defendant A. Trefler, and Defendant Stillwell were sued by Pegasystems investors for violations of the securities laws.  The Company paid $32.4 million of its own (*i.e.*, stockholders') funds to settle the Securities Action in June 2024, but its litigation costs continue to mount with multiple investors rejecting the settlement as inadequate.

6.      To investigate wrongdoing at Pega, Plaintiffs requested books and records from the Company pursuant to Section 16.02.  The books and records produced by Pega show that the Director Defendants breached their fiduciary duties by failing to (i) implement any system of controls to oversee the Company's intellectual property compliance and competitive intelligence activities, and/or (ii) take any affirmative steps to investigate the Illegal Scheme or any related misconduct until 2023, long after the Appian Litigation commenced.  The Company's own Board-level books and records show that until then, the Director Defendants deferred to fellow Board member A. Trefler, the Company's controlling stockholder, who failed to raise the Illegal Scheme with the Board in breach of his fiduciary duties as a corporate officer.

7.      Beginning in March 2023, Plaintiffs issued pre-suit litigation demands on the Board pursuant to Mass. Gen. Laws ch. 156D, § 7.42 ("Section 7.42"), demanding that the Board independently investigate these events and the allegations set forth therein in good faith, determine whether any or all of the Defendants breached their fiduciary duties to Pega and its stockholders,

and if so, hold any such individuals to account for the damages their fiduciary failures caused the Company (together, the "Demands").

8.      The Board did not respond to any of the Demands within ninety (90) days, but instead appointed the DRC to investigate. The DRC was comprised of Defendants Lafond, Ledingham, and Rowlands (the "DRC Defendants").  On October 7, 2024, the DRC issued its Report, wrongfully rejecting the Demands in their entirety.

9.      The DRC's Report does not support dismissal or termination of this Action.  The Board and DRC were not independent, and the DRC failed to perform a reasonable investigation of the Demands, thereby neutering its conclusion to reject the Demands.

10.      The Board and members of the DRC (*i.e.*, the Director Defendants) are not independent for two primary reasons. *First*, the Director Defendants face a substantial likelihood of liability for their failure to implement and monitor a system of corporate controls sufficient to oversee Pega's intellectual property compliance and competitive intelligence activities.  Board-level internal documents produced by the Company in response to Plaintiffs' pre-litigation Section 16.02 books and records requests confirm the Director Defendants' liability.  Pega purportedly produced all Board minutes and related meeting materials containing any reference to the Appian Litigation and its underlying allegations between 2012 and the date of the verdict, which Pega's counsel confirmed for Plaintiffs.  None of those Board-level documents reference any oversight of Pega's intellectual property compliance and competitive intelligence practices whatsoever.  Indeed, the DRC's Report confirms that (i) the Director Defendants received no such reporting, and (ii) there were no applicable Board-level controls in place until after the DRC issued its Report.  In short, because the Director Defendants breached their fiduciary duties by failing to establish any oversight controls, they could not and cannot independently consider the Demands.

5

11.     *Second*, the Director Defendants lack independence because they are named as individual defendants in multiple derivative lawsuits in this Court and the U.S. District Court for the District of Massachusetts. It is unreasonable to expect that the Director Defendant can render an independent decision on whether they should be sued for the very same allegations of wrongdoing they are charged with independently and objectively investigating.

12.     *Third*, the Director Defendants are beholden to A. Trefler. As the Company's controlling stockholder, A. Trefler has controlled and continues to control who is nominated and elected to the Board, as well as who is removed from the Board—a point the Company itself concedes.  Indeed, Pega's most recent Annual Report on SEC Form 10-K, filed on February 12, 2025—signed by each current member of the Board—admits that A. Trefler "***is our largest stockholder…[a]s a result, he has the ability to exert significant influence over all matters submitted to our stockholders for approval, including the election and removal of directors***…" Accordingly, the Director Defendants' positions as Pega directors and their compensation of millions in fees and stock awards has at all times been and remains tied directly to the continued favor of A. Trefler—who directed the Illegal Scheme and whose conduct the Director Defendants were charged with investigating.

13.     Given the Director Defendants' lack of independence, they unsurprisingly failed to perform a reasonable investigation of the serious allegations and matters raised in the Demands. In particular, there are gaping holes in the scope of the DRC's investigation.  For example, the DRC:

- Made conclusory determinations about the DRC's independence without providing support or attempting to explain the process by which the DRC members were determined to be independent for purposes of investigating, evaluating or responding to the Demands, particularly given the unusual circumstance where A. Trefler controlled and continues to control who is nominated and elected to the Board, as well as who is removed from the Board;

6

- Made conclusory determinations about the full Board's independence without providing support or attempting to explain the process by which the Board was determined to be independent in the unusual circumstance where A. Trefler has controlled and continues to control who is nominated and elected to the Board, as well as who is removed from the Board;

- Failed to examine Board materials from prior to 2020, *i.e.*, pre-dating the initiation of the Appian Litigation against Pegasystems, which is the critical time period during which the Illegal Scheme was actively perpetrated and is highly relevant to the Board's and DRC's awareness of and/or involvement in the Illegal Scheme – in sharp contrast, Plaintiffs demanded production of these documents from Pega via Section 16.02, and those documents along with the Company's representations in connection with the responsive documents produced, support claims for liability against the Director Defendants;

- Failed to conduct witness interviews under oath which is particularly important given conflicting sworn testimony adduced at trial in the Appian Litigation; and

- Failed to examine many of the key witnesses involved in the misconduct giving rise to the Demands, including certain principal actors directly involved in the Illegal Scheme whose testimony in the Virginia Action contradicts the DRC's findings.

14.    Inexcusably, the DRC did not even attempt to interview the two individuals it blames for the Illegal Scheme.  One of those individuals, Defendant Baril, still works at Pega and would have been obligated to sit for an interview if the DRC had requested one.  Meanwhile, the DRC did not bother to ask for an interview of the other individual, Petronio.  In sharp contrast, Plaintiffs interviewed Petronio and his version of events flatly contradicts the DRC's conclusions.  Presumably, Defendant Baril's testimony would similarly contradict the DRC's conclusions, otherwise the DRC would have sought an interview from him.

15.    In addition, the DRC's substantive conclusions in the Report are unsupported. For example, the DRC:

- Failed to substantively address the critical issue of whether the Company and the Board had implemented any internal controls to oversee the Company's intellectual property compliance and competitive intelligence activities but, rather, narrowly focused its investigation on whether the Director Defendants or Officer Defendants knew of or believed that Pega was misappropriating Appian's trade secrets.

7

- Relied on a conclusory "factual" record without specific references or quotes from any relevant internal documents and, instead, relied heavily on unsworn witness interviews of co-defendants;

- Failed to consider or summarily dismissed sworn testimony and record evidence from the Virginia Action that is contrary to the "unsworn" hearsay statements from interviews of biased and potentially culpable witnesses;

- Failed to consider the harm occasioned from over $80 million in legal fees alone related to the Virginia Action, the Securities Action and other matters which stemmed from the Illegal Scheme and ongoing substantial costs to the Company;

- Failed to consider the harm resulting from the Company paying $32.4 million to settle the Securities Action;

- Failed to consider the corporate culture at Pega driving the multi-year Illegal Scheme to obtain an illegal competitive advantage intended to destroy Appian; and

- Failed to address whether the Company had adequate internal controls and oversight mechanisms in place to monitor intellectual property compliance and competitive intelligence activities during the relevant period.

16.     Moreover, the DRC's failings above are even more glaring in light of the fact that its purportedly "independent" counsel, Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") represented one of the wrongdoers identified by Plaintiffs in the Demands, defendant Rowlands ("Rowlands"), in a lawsuit alleging breaches of fiduciary duties, captioned *Corporate Risk Holdings, LLC v. Rowlands,* Case No. 1:17-cv-05225 (S.D.N.Y.) (the "Rowlands Matter"). The Report does not disclose this pre-existing attorney-client relationship between Fried Frank and Defendant Rowlands, let alone describe any process by which the DRC determined that Fried Frank could serve as independent counsel to the DRC and objectively investigate potential wrongdoing by its own client Rowlands. Nor does the Report describe how the DRC determined that Fried Frank could (i) inform the DRC of all relevant, reasonably available information regarding Rowlands, given Fried Frank's existing and continuing ethical and professional obligations of confidentiality to her, and/or (ii) provide the DRC with unbiased legal advice regarding her conduct.

8

17.     Because the Report does not justify the DRC's blanket refusal of the Demands, Plaintiffs have commenced this derivative litigation to protect the Company, rectify the wrongs detailed herein, and hold Defendants accountable for the substantial damages they have caused to Pega.

## II.    JURISDICTION AND VENUE

18.     Pegasystems is incorporated in Massachusetts and maintains its corporate headquarters in Cambridge, Massachusetts.  This Court has personal jurisdiction over each of the Defendants pursuant to Massachusetts law because they conduct business in, reside in, or are citizens of the Commonwealth of Massachusetts.

19.     Venue is proper in the Business Litigation Session, and this case is appropriate for acceptance into the Business Litigation Session, pursuant to sections a.1 ("claims relating to the governance and conduct of internal affairs of entities"), a.3 ("claims relating to liability of shareholders, directors, officers, partners, etc."), b.1 ("shareholder derivative claims"), and e.1 ("claims involving breaches of contract or fiduciary duties, fraud, misrepresentation, business torts or other violations involving business relationships") of Superior Court Administrative Directive No. 09-1.

20.     Moreover, Pega's corporate bylaws designate "the Business Litigation [Session] of the Superior Court of Suffolk County, Massachusetts (the 'BLS')" as the "sole and exclusive forum for…any derivative action or proceeding brought on behalf of the Corporation…[and] any action asserting any claim for breach of fiduciary duty owed by any director, officer, or other employee of the Corporation to the Corporation or the Corporation's shareholders."

## III.    THE PARTIES

### A.    <u>Plaintiffs</u>

21.     Plaintiff Birch is a current holder of Pegasystems common stock and has

continuously held Pegasystems common stock since at least June 2020.

22.     Plaintiff Garfield is a current holder of Pegasystems common stock and has continuously held Pegasystems common stock since May 2016.

23.     Plaintiff Dwyer is a current holder of Pegasystems common stock and has continuously held Pegasystems common stock since at least August 2023.

24.     Plaintiff Gerber is a current holder of Pegasystems common stock and has continuously held Pegasystems common stock since at least May 2020.

### B.    Nominal Defendant

25.     Nominal defendant Pegasystems is a Massachusetts corporation headquartered in Cambridge, Massachusetts.  According to its public filings, Pega operates in the intensely competitive BPM industry, providing a "low-code" development platform that allows customers to build customized workflow-based applications for their business needs.  The Company's common stock trades on the NASDAQ Stock Exchange under the ticker symbol "PEGA."

### C.    Officer Defendants

26.     Defendant A. Trefler is the Company's founder and has served as its CEO and as Chairman of the Board since 1983.  Per the Company's Annual Report on SEC Form 10-K filed on February 15, 2023, at or around the time that the first of the Plaintiffs' Demands was issued to the Board in March 2023, A. Trefler owned approximately 48% of the Company's outstanding stock.  At present, A. Trefler owns approximately 46% of Pega's outstanding shares. During the course of the long-running Illegal Scheme, A. Trefler's executive compensation increased exponentially as reflected in the chart below:

| Year | Salary ($) | Bonus ($) (1) | Stock Awards ($) (2) | Option Awards ($) (3) | Non-Equity Incentive Plan Compensation ($) (4) | All Other Compensation ($) (5) | Total ($) |
|------|-----------|---------------|----------------------|-----------------------|------------------------------------------------|--------------------------------|-----------|
| 2023 | 495,000   | —             | —                    | 4,550,006             | 495,000                                        | 9,900                          | 5,549,906 |
| 2022 | 495,500   | —             | —                    | 6,499,058             | 445,500                                        | 9,150                          | 7,448,708 |

10

| | | | | | | |
|---|---|---|---|---|---|---|
| 2021 | 495,000 | — | 3,541,415 | 3,250,033 | 222,750 | 8,700 | 7,517,898 |
| 2020 | 495,000 | — | 2,500,057 | 2,500,022 | 395,938 | 12,630 | 5,903,647 |
| 2019 | 485,000 | — | 2,500,006 | 2,500,018 | 436,500 | 12,300 | 5,933,824 |
| 2018 | 485,000 | — | — | — | 485,000 | 11,250 | 981,250 |
| 2017 | 470,000 | — | — | — | 399,500 | 10,800 | 880,300 |
| 2016 | 450,000 | — | — | — | 356,400 | 10,650 | 817,050 |
| 2015 | 456,000 | — | — | — | 410,677 | 22,230 | 888,907 |
| 2014 | 419,000 | — | — | — | 309,600 | 22,926 | 751,526 |
| 2013 | 400,000 | — | — | — | 323,813 | 22,952 | 746,765 |

In 2013, A. Trefler's total compensation was $746,765.  Beginning in 2019, and continuing through 2023, A. Trefler's compensation exceeded $5 million every year with two of those years (2021 and 2022) exceeding $7 million.

27.     The Company's own public filings have repeatedly acknowledged Defendant A. Trefler's extensive control over all aspects of Pega's business, as well as the selection and removal of members of the Board.  For example, the Company's SEC filings, including Pega's most recent Annual Report on SEC Form 10-K filed on February 12, 2025, admit that as a result of his voting control, A. Trefler has "the ability to exert significant influence over" who is nominated to, elected to, and removed from the Board, as well as all major corporate decisions requiring stockholder approval.  In the Company's SEC Form 10-K for the year ended December 31, 2022, issued on February 15, 2023, shortly before the first of the Plaintiffs' Demands was issued to the Board in March 2023, as well as the Company's most recent SEC Form 10-K for the year ended December 31, 2024, which was filed on February 12, 2025 and signed by all of the Director Defendants, the Company stated:

> ***Our Chief Executive Officer is our largest stockholder and can exert significant influence over matters submitted to our stockholders, which could materially adversely affect our other stockholders.***

28.     Defendant Akgonul joined the Company in 1992 and has served as its Chief Product Officer ("CPO") since April 2021.  Prior to serving as CPO, defendant Akgonul held several executive positions at Pegasystems, including Senior Vice President from 2014 until April 2021, and Vice President, Product Management from 2007 to 2014.

29.     Defendant Schuerman joined the Company in 1997 and has served as its Chief Technology Officer ("CTO") and Vice President of Product Strategy and Marketing since 2014. Prior to serving as CTO and Vice President of Product Strategy and Marketing, defendant Schuerman held several positions at Pegasystems, including Senior Director, Solutions Architecture from 2012 to 2014.

30.     Defendant L. Trefler, the brother of defendant A. Trefler, has served as the Company's Chief of Clients and Markets since October 2021. Previously, from 1998 until October 2021, defendant L. Trefler served as the Company's Senior Vice President of Global Client Success.

31.     Defendant Baril joined the Company in 2005 and has served as Director, Solutions Consulting/Client Technology Officer since July 2023. Previously, defendant Baril held several positions at Pegasystems, including Solutions Engineering Manager from 2012 to 2015, Senior Solutions Consulting Manager from 2016 to 2018, and Director, Office of the CTO from 2020 to July 2023.

32.     Defendant Stillwell has served as the Company's Chief Financial Officer ("CFO") since June 2016, and as its COO since April 2021. Previously, defendant Stillwell also served as Senior Vice President of the Company from June 2016 to April 2021.

### D.     Director Defendants

33.     The Director Defendants include A. Trefler and the following members of the Board:

34.     Defendant Gyenes has served as a member of the Board since 2009, and currently serves as a member of the Board's Audit Committee. In addition to annual compensation he receives as a Board and Audit Committee member, Gyenes holds approximately 31,464 shares or RSUs of Pega currently valued at over $2.28 million.

35.      Defendant Jones has served as a member of the Board since 2000, and currently serves as a member of the Board's Compensation Committee.  Previously, Defendant Jones served as Vice Chairman of the Board from 2002 to 2007.  Defendant Jones also served as the Company's President and Chief Operating Officer ("COO") from 1999 to 2002, and was a part-time employee of the Company from 2002 to 2007.  In addition to annual compensation he receives as a Board and Compensation Committee member, Jones holds approximately 582,662 shares or RSUs of Pega currently valued at over $42.27 million.

36.      Defendant Lafond has served as a member of the Board since 2019 and also serves as Chair of the Audit Committee.  Defendant Lafond was and remains a member of the DRC.   In addition to annual compensation he receives as a Board and Audit Committee Chair, Lafond holds approximately 28,945 shares or RSUs of Pega currently valued at approximately $2.1 million.

37.      Defendant Ledingham has served as a member of the Board since 2016 and also serves as a member of the Compensation Committee.  Defendant Ledingham was and remains a member of the DRC. In addition to annual compensation he receives as a Board and Compensation Committee member, Ledingham holds approximately 36,311 shares or RSUs of Pega currently valued at over $2.6 million.

38.      Defendant Rowlands has served as a member of the Board since 2016 and serves as the Chair of the Compensation Committee.  Defendant Rowlands was and remains a member of the DRC.  In addition to annual compensation she receives as a Board and Compensation Committee Chair, Rowlands holds approximately 43,370 shares or RSUs of Pega currently valued at over $3.14 million.  As referenced herein, defendant Rowlands was represented by Fried Frank, the same firm that was retained to serve as purportedly "independent" counsel to the DRC, in the Rowlands Matter.

13

39.     Defendant Weber has served as a member of the Board since 2012.  Defendant Weber serves as the Chair of the Board's Nominating and Corporate Governance Committee, and also serves as a member of the Audit Committee and the Compensation Committee.  In addition to annual compensation he receives as a Board member and in his various committee roles, Weber holds approximately 30,051 shares or RSUs of Pega currently valued at over $2.18 million.

40.     Directors of the Company are paid $50,000 per year in cash and $200,000 annually in equity grants.  Audit Committee members receive an additional $15,000 annually, and the Audit Committee Chair (Defendant Lafond) receives $27,000.  Compensation Committee members receive $10,000 annually and the Compensation Committee Chair (Defendant Rowlands) receives $20,000.  The Nominating and Corporate Governance Committee Chair (Defendant Weber) receives $7,500 annually.

41.     As discussed above, Defendants A. Trefler, Akgonul, Schuerman, L. Trefler, and Baril are collectively referred to herein as the "Officer Defendants."  Defendants A. Trefler, Gyenes, Jones, Lafond, Ledingham, Rowlands, and Weber are collectively referred to herein as the "Director Defendants."  The Director Defendants and Officer Defendants with the CFO are collectively referred to as "Defendants."  Defendants Lafond, Ledingham, and Rowlands are also collectively referred to as the "DRC Defendants."

## E.    Relevant Non-Parties

42.     KForce is a Florida corporation headquartered in Tampa, Florida, which describes itself as a "provider of technology and finance and accounting talent solutions."

43.     Zou is a former government contractor who was recruited and introduced to the Company by KForce.

44.     Petronio joined the Company in 2003 and served as Director, Product Marketing from 2006 until he was terminated in January 2015.

14

45.    Douglas Kim ("Kim") joined the Company in 2002 and served as the Company's Head of Product Marketing from 2009 until he departed the Company in 2014.

46.    Stephen Bixby ("Bixby") joined the Company in 1999 and has served as Pega's Senior Vice President, Platform Product Engineering since 2024.  Previously, Bixby held several different positions at the Company, including Senior Director, Product Management in 2012 and 2013, Vice President, User Experience and Mobile Technology from 2014 to March 2017, and Vice President, Product Development from March 2017 until 2024.

47.    Shawn Bearden ("Bearden") was employed at Pegasystems for approximately twelve years before he was terminated in early 2020.

## IV.    DEFENDANTS' DUTIES

48.    By reason of their positions as directors, executives, and senior officers of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

49.    As directors, executives and senior officers of the Company, the Defendants, were, and are, required to act in the best interests of the Company and its shareholders at all times so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.

50.    Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

51.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, Defendants were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

g.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

## V.   SUBSTANTIVE FACTS[6]

### A.   The Officer Defendants Willfully Misappropriated Appian's Trade Secrets and Confidential Information In Violation of Virginia Law

#### 1.   Beginning in 2012, the Officer Defendants Directed Phase One of the Illegal Scheme: "Project Crush" Involving a "Spy" with Access to Appian's Trade Secrets

52.     Founded in 1999, Appian competes in the same BPM industry as Pega, providing a low-code development platform for customers to quickly develop business applications.  As analyst J.P. Morgan stated in August 2020, Appian's "strength lies in its low-code application development platform."  Appian generates revenue by licensing its software to customers and business partners.  An Appian license permits the licensee to develop custom, low-code applications using Appian's development environment and run them on Appian's platform.  An Appian license also permits the licensee to access Appian's documentation, which describes the technical features of Appian's software platform, and techniques that can be used to build applications on Appian's platform.

53.     Pega viewed Appian as a serious competitive threat and one of Pega's top competitors.  Defendant A. Trefler harbored particular ire against Appian.  As one Pega employee admitted internally on October 4, 2019, "Alan [Trefler] and [his brother] Leon [Trefler] are ***very focused on destroying Appian. Like making it go away for good***." PLT 649.

54.     Rather than compete fairly and lawfully against Appian, beginning as early as 2012, Pega secretly began misappropriating Appian's trade secrets and confidential information.  Pega then weaponized the misappropriated information by using it to train its salesforce, create internal materials to deploy in "head-to-head" competitions against Appian, and improve Pega's

---

[6]   References to "PLT", "PLTD", "Depo Tr.", and "Trial Tr." herein are to exhibits and/or transcripts in the Virginia Action. Emphasis is added throughout.

own software.

55.     The Officer Defendants directed and participated in Project Crush. As Bearden, one of the two whistleblowers who alerted Appian to Pega's scheme in 2020, later testified, "***Alan Trefler [and] all of these people obviously knew we were doing this.***"  9/20/21 Bearden Depo. Tr. at 246.

56.     Appian adopted various measures and restrictions to protect its trade secrets from competitors like Pega.  These measures included restricting access to its platform to licensed users, as well as utilizing terms of use, firewalls, multi-factor authentication with hardware tokens, encryption, user authentication, controls to restrict access to resources, password change requirements, monitoring email addresses of registrants, mechanisms to block access from competitor email addresses, information security personnel, and security awareness training for Appian employees.

57.     The Officer Defendants knew that Appian closely guarded its trade secrets.  As one Pega employee testified during his 2022 deposition, "it was a known thing that Appian . . . was very black box about giving out trials . . . [i]t was common [knowledge] that it's impossible to get an Appian trial." 1/21/22 Davis Depo. Tr. at 169, 175.  Another Pega employee (Mayran Snir Barak ("Barak"), Pega's Director of Data & Integration) complained in a November 14, 2017 internal chat message: "I can't get any sort of access to [A]ppian . . . we are not a 'qualified business' for the free trial."  PLT 816.  Defendant Baril echoed this sentiment in an October 1, 2019 email to defendant A. Trefler, stating "Appian is ***very tightly controlled about who has access to their trial environments***."  PLT 632.  And on October 28, 2019, defendant Baril emailed himself a copy of the "Appian Trial Terms and Conditions" which prohibited, among other things, the "use" of Appian's service by "competitor[s]," as well as users "provid[ing] information about

the [Appian] Cloud Offering to a competitor of Appian," and "mask[ing] your identify" when using the trial.  PLT 665.

58.     The Officer Defendants determined that if the Company was going to "destroy[] Appian," it needed someone with access to Appian's platform who was willing to sell Appian's closely guarded information.  Accordingly, a plot was hatched to enlist a developer with access to Appian's platform.

59.     To identify such a developer without drawing attention to itself, Pega hired KForce in February 2012. Pega told KForce it needed "an Appian Developer" with "several years of experience working specifically with Appian," and that "*[a]ccess to the Appian BPM tool is a must*." PLT 180. Pega emphasized to KForce that the developer "*should not have worked directly with Appian*" and *could not be "loyal" to Appian* because Pega did not want its scheme "*getting back to Appian*." PLT 4; 7/28/21 Cerrito Depo. Tr. at 20-21.

60.     In February 2012, KForce introduced Pega to Zou.  For years, Zou had worked for U.S. government contractors utilizing Appian's platform to build software applications.  Zou's employment with government contractors such as Serco Inc. ("Serco") in 2012 to 2014 provided Zou access to Appian's closely-guarded software and documentation.

61.     Zou fit the bill, and from around February 2012 to September 2014, Zou worked extensively with Pega to misappropriate Appian's trade secrets as part of "Project Crush."[7]  During this time period, Zou (among other things): (i) created videos of himself accessing Appian's platform; (ii) covertly downloaded enormous volumes of Appian's software documentation for Pega; (iii) showcased for Pega the functionality of Appian's platform; (iv) supplied Pega with

---

[7]    Pega's arrangement with Zou ended in or around September 2014 after Zou switched to another project with his employer, and as a result lost access to Appian's platform. PLT 007.

confidential information regarding the strengths and limitations of Appian's software; (v) demonstrated to Pega how to use and navigate Appian's platform; and (vi) answered Pega's detailed technical questions about Appian's platform.

62.    Zou also visited Pega's corporate headquarters in Cambridge, Massachusetts on multiple occasions.  During such visits, Zou collaborated with Pega employees, including the Officer Defendants, used Pega resources to access Appian's platform, and presented to Pega information Zou had secretly obtained from Appian. For example, in advance of one such meeting at Pega's headquarters on January 29, 2013, Petronio, the Company's then-Director of Product Marketing, informed defendants A. Trefler, L. Trefler, and Schuerman, and other Pega employees, that "Youyong Zou . . . will give demonstrations of building an application in Appian 7 . . . [and] will be at Pega for the day." PLT 191.

63.    Pega found Zou's information incredibly useful.  As one whistleblower testified, Zou's information was "***hugely useful in that it gave us a level of insight . . . we didn't have before***," ***it gave Pega "access to the black box***."  9/20/21 Bearden Depo. Tr. at 34, 42.  Defendant L. Trefler also admitted the misappropriated information "was useful" and "assisted Pega in its marketing efforts to compete against Appian." PLTD-010.20.  Another Pega executive admitted that the misappropriated information provided Pega "great ammunition to help [it] compete and win against [Appian]." 10/14/21 Van Wess Depo. Tr. at 183.  Appian's misappropriated information was so useful that Pega widely circulated and utilized it across Pega's organization, including (according to one count) to over 200 executives, salespersons, software engineers, product developers, and other employees.[8]  Pega used the information it obtained from Zou for many years, until at least 2020.

---

[8]    This included defendants A. Trefler, L. Trefler, Schuerman, and Akgonul.

64.     Among the materials Pega amassed were dozens of hours of video footage of Zou accessing and working within Appian's platform.[9]  Malcolm Ross ("Ross"), Appian's Vice President of Product Strategy and Deputy CTO, testified about such footage during the 2022 trial in the Virginia Action:

> Q. Now, during this trial, we've seen numerous videos of Mr. Zou developing the Appian software platform. Did you see those videos?
>
> A. Many videos.
>
> ***
>
> Q. In those videos, Mr. Zou was sharing his access to Appian software with Pegasystems, correct?
>
> A. In detail, yes.
>
> Q. And he was answering questions posed by Pegasystems' employees, correct? A. Yes, and they were directing him where to navigate.
>
> ***
>
> Q. And Mr. Zou was explaining features and functionality of Appian software?
>
> A. Correct.
>
> ***
>
> Q. Now, since your deposition, have you had an opportunity to review the videos of Mr. Zou working in Appian's software platform sharing his access with Pegasystems?
>
> A. Yes.
>
> Q. About how many hours of videos have you watched?
>
> A. In total, I've watched approximately 33 hours. Mr. Zou was a subset of that, so I think it was maybe 20 to 24 hours, Mr. Zou's.
>
> Q. And what other videos did you watch?

---

[9]    Pega ultimately amassed **_around 90 videos_** based on Zou's access to Appian's platform.

A. Mr. [Baril's], Mr. Peter [Bessman's], and Mr. Petronio's videos as I recall.

Q. Those were all Pegasystems employees at the time; is that correct?

A. Yes.[10]

65.     In addition to video footage, Pega's "war chest of materials" (PLT 248) also included sales and marketing aids for Pega's "Solutions Consultants"[11] and other members of Pega's salesforce, training materials, screenshots of Appian's platform, "technical briefs," "competitive briefs," "battle cards," PowerPoint presentations, and "kill points" for competing against Appian.  Ross addressed one such "technical brief" at the 2022 Virginia Action trial, the "Understanding Appian" brief Pega developed using Zou's information:

> Q. Did your review of the videos that were prepared by Mr. Zou for Pegasystems and the other Pegasystems videos help you better understand the meaning of the statements that appeared in this Pegasystems sales document that we've marked Defendants' Exhibit 688 ["Understanding Appian" document dated Jul. 2, 2013, or what Mr. Petronio referred to as the Appian technical brief] and where the information was derived from?
>
> A Yes, I've described this as a derivative of their knowledge. And this was after reviewing the videos, it was very clear exactly how that went from Mr. Zou into this derivative content from the preceding Appian documents.[12]

66.     Ross also addressed specific portions of Pega's "Understanding Appian" brief, as well as other sales and tactical documents Pega generated using Zou's information, explaining "[t]he level of detail [of information contained in the documents] . . . represent not only access to our [Appian] documentation but also testing that occurred to understand the behavior of the architecture [of Appian's systems]" (4/27/22 Trial Tr. at 6132:19-24) and required "a

---

[10]  4/27/22 Trial Tr. at 6124:21-6127:24.

[11]  Solutions Consultants worked with account executives at Pega on sales opportunities, and their responsibilities included communicating with, and demonstrating Pega's software to, prospective customers.

[12]  4/27/22 Trial Tr. at 6130:8-21.

comprehensive review of the entire documentation of the software" (*id*. at 6134:21-6135:4) and "direct access to software" (*id*. at 6138:6-16) – documentation and software that contained trade secrets and for which access was highly restricted. As Ross explained, "this entire ['Understanding Appian' document] is derivative of trade secrets through access to our software documentation" (*id*. at 6190:22-25) or, put another way, is "entirely derived with access to our trade secrets" (*id*. at 6197:21-25).

67.    Defendant Schuerman has admitted that Company materials, including Pega's "12 Challenges" document, incorporated Zou's information:

> Q. Mr. Schuerman, you're not denying to the jury, sir, that that 12 challenges document, a document that your company prepared and you helped edit and you continued to use from 2012 from many years later, that that document contains information provided by Mr. Zou that was not previously available to Pegasystems, correct?
>
> A. Correct, I'm not.[13]

68.    Pega widely used the above-mentioned "Understanding Appian" and "12 Challenges" documents, as well as other sales and marketing materials, to "set . . . traps" and "torpedo Appian" in "head-to-head interaction[s]."

69.    One example occurred during Pega's head-to-head competition with Appian in 2015 over the U.S. Census Bureau's contract for the 2020 Census.[14] As Pega was actively meeting with the U.S. Census Bureau in 2015, Pega's sales lead on the U.S. Census Bureau opportunity (Thomas Oleksiak ("Oleksiak")) accessed technical briefs Pega had generated using Zou's information, sharing them with his boss and others at Pega and describing them as an "interesting

---

[13]  4/27/22 Trial Tr. at 6378:2-11.

[14]  Of the 29 vendors that originally pursued the 2020 Census Bureau contract, "eventually it came down to Pega and Appian." 4/25/22 Trial Tr. at 5615:3-7.

war chest of materials" to use against Appian on the 2020 Census competition.[15]  As Oleksiak later

testified, he accessed the materials in connection with the U.S. Census Bureau competition, finding

them "directionally helpful."[16]  Pega was awarded the 2020 Census contract over Appian.

70.    Pega also embedded Zou's information into documents that Pega left behind with

customers and partners, while concealing Zou as the source of the information.  For instance, in

connection with Pega and Appian's competition over the customer Rabobank, A. Trefler asked

Petronio for a "prop" that A. Trefler could leave behind with Rabobank to "help blow this up" for

Appian. PLT 227.  On another deal, Pega supplied the customer with documents containing

Appian's trade secrets, reminding the client "we are under NDA, please do not share them." PLT

1120.

71.    At trial in the Virginia Action, Appian presented reams of evidence demonstrating

that Pega had used Appian's trade secrets to improve Pega's inferior product.  For instance, Pega's

CPO, defendant Akgonul, was deeply involved in Project Crush, and showed tremendous interest

in using Zou's information to Pega's advantage.[17]  On one occasion, after an hour-long "session"

with Zou analyzing Appian's capabilities, defendant Akgonul sent Pega's CTO, Vice President of

Product Management, and other colleagues several screenshots he had captured from his "[A]ppian

session" with Zou.[18] PLT 188.  Appian also demonstrated to the jury that, "immediately after

attending a session where Mr. Zou walked [Pega] through Appian's Tempo social/mobile

---

[15]  4/25/22 Trial Tr. at 5614:24-5624:17; PLT 248. The 2020 Census sales team included
multiple participants in Pega's espionage, such as defendant L. Trefler, Bixby, and Bearden.

[16]  4/25/22 Trial Tr. at 5614:23-5624:17; *id.* at 5674:24-5676:4.

[17]  As CPO, Akgonul was in charge of deciding what went into Pega's product. *See* 2/8/22
Trial Tr. at 1736:15-17.

[18]  Defendant Akgonul's role in Project Crush also included requesting Zou to obtain detailed
information on specific aspects of Appian's software.

product," Pega's Head of Social Product (Agya Garg) recommended "Pega add it into the next version of Pega's platform." 4/19/22 Trial Tr. at 5088. A confidential memorandum Pega wrote two years into Project Crush also indicated that Pega was leveraging Zou's information to execute "improvements to data modeling," which was a "large target for" future versions of Pega software. PLT 775.

72. The Officer Defendants knew the Company's conduct involving Zou was inappropriate and took various steps to conceal it. For instance, in addition to searching for and paying Zou through a middleman, only a small cohort of Pega employees (Defendant A. Trefler and other officers included) could know Zou's real name. Accordingly, internal documents were altered to "remove Youyong's name" (PLT 733), and Zou was assigned the generic pseudonym "Matt." *Id.* As a result, to most of Pega's employees, Zou was known as "Matt" or "'the other Matt'": "*[W]e're going to call him Matt (so that he isn't 'outed' as our spy)*." PLT 377; PLT 223. Pega's employees obliged: "My lips are sealed . . . [Zou] will now forever be known as Matt." PLT 377.

73. There is substantial evidence showing that the Officer Defendants directed and participated Project Crush, as set forth below.

74. *__A. Trefler__*: Defendant A. Trefler authorized and participated in the Illegal Scheme. Defendant A. Trefler attended a meeting with Zou at Pega's headquarters on January 29, 2013, during which Zou logged into Appian's platform and demonstrated it for Pega, and Pega employees and Zou "collaborat[ed] around [a] whiteboard" regarding ways to employ Appian's trade secrets against Appian. 3/30/22 Trial Tr. at 1678-80; 4/27/22 Trial Tr. at 6387-88. Petronio testified during the Appian Trial that A. Trefler attended this meeting. Trial Tr. 1675:14-1676:7. The day after the meeting, Petronio emailed A. Trefler to say "*[t]hank you for your time*

*yesterday*," and to advise A. Trefler that Pega was "updating the competitive brief, attack plan, and Appian scalability whitepaper" following Pega's meeting with Zou on January 29. PLT 194.

75.     Defendant A. Trefler also requested and received materials Pega created using Zou's information.  For example, on February 19, 2013, A. Trefler advised Petronio, defendant L. Trefler, and Kim that he was meeting "with Rabobank next week in *a head-to-head interaction against Appian. I would like a 'prop' I could leave with them that will help blow this up . . . I need some[thing] simple and winning by the end of this week*." PLT 227.  Petronio responded to A. Trefler: "Here is that draft of that updated competitive brief on Appian (for Rabo). I've included the new information we've learned." *Id*.  Pega then left the "competitive brief" with Rabobank, after which Pega won Rabobank's business over Appian.  As another example, on or about February 26, 2014, defendant A. Trefler and other Pega executives received over two hundred presentation slides featuring information on Appian (including actual screenshots of Appian's platform) Pega had obtained from Zou.

76.     Additionally, A. Trefler was personally involved in the process of incorporating the information learned from Zou into Pega's platform.  A report titled Project Crush Results & Next Steps, authored by Baril in 2014 (the "Project Crush Report"), explained that Pega hired Zou because the Company "wanted to understand why our prospects were stating that Appian was easier to use, or more intuitive."  The report's "Action Items" included "recurring meetings with Product Management *including Alan*."  PLT-775 at 1, 3-6 (emphasis added).

77.     **Schuerman**: Defendant Schuerman met with Zou and others at Pega's headquarters on January 29, 2013.  As defendant Schuerman testified, Zou showcased Appian's platform to Pega during this in-person meeting:

> Q. By the way, during that meeting [the January 29, 2013 meeting], Mr. Zou logged into Appian's platform and demonstrated it to Pegasystems' personnel, correct?

A. I believe so, yes.[19]

78.     During this meeting with Zou, Schuerman led a discussion intended to develop a list of questions that a customer could ask to challenge or question the capabilities of Appian's product, known as the "12 Challenges."  Trial Tr. 1678:4-18.  Following this discussion, a list of these "12 Challenge" was circulated at Pega.  PLT-734 at 1, 3.  Schuerman was identified as the senior point of contact.  L. Trefler instructed Pega management that if they were "competing against Appian anywhere please get in touch with either Don Schuerman or John Petronio ASAP to get a briefing on where you should attack Appian...."  PLT-196 at 1.

79.     Defendant Schuerman's involvement also included receiving progress updates on Project Crush, as well as reviewing internal documents and videos Pega created using Appian's trade secrets.  In addition, defendant Schuerman drafted specific technical questions he wanted Zou to answer for Pega, and helped Pega develop salesforce training materials using Appian's trade secrets. *See* paragraphs 82-93 below.  Schuerman also attended certain Board meetings.

80.     Schuerman admitted under oath in the Virginia Action that he knew that Appian would not have granted Pega a license to access its platform, and that was why Pega needed to hire Zou as a consultant.  Depo. Tr. (10/13/2021) 86:18-25.

81.     **_L. Trefler_**: Defendant L. Trefler also authorized and participated in Project Crush. In addition to helping arrange funding to hire Zou, and meeting with Zou at Pega's headquarters on January 29, 2013, L. Trefler also helped develop Pega's sales team and strategy, and in that role spurred Pega's salesforce to exploit Appian's misappropriated information.  For instance, in a February 2, 2013 internal email declaring ***Pega "should never lose against Appian,"*** L. Trefler

---

[19] 4/27/22 Trial Tr. at 6388:21-25.

advised Pega's management that "[i]f your team is competing against Appian anywhere, ***please get in touch with Don Schuerman or John Petronio ASAP to get a briefing on where you should attack Appian***. . . . [W]e know where and how to attack them.  The competitive materials on Appian are being revised to reflect what we have learned. . . . ***Get a hold of Don or John and let's get these attacks in the hands of our sales teams ASAP***." PLT 196.

82.    On March 25, 2013, Kim sent L. Trefler and other colleagues two "competitive briefs" Pega had created using Zou's information, boasting "***[i]f we use these two [documents] carefully – we will win EVERY TIME***." PLT 721.

83.    ***Akgonul***:  Defendant Akgonul actively participated in Project Crush and used information learned from Zou to improve Pega's product.  For example, around December 27, 2012, Akgonul attended a session with Zou to build an Appian application from scratch, which he described as "pretty good."  PLT-188 at 1.  And meeting notes from May 2013 state that Akgonul would "distribute 5-10 minute video of Appian developer experience since it excels in terms of ease of use and performance."  TLT-556 at 1-4.

84.    ***Baril***: Defendant Baril helped Petronio hire Zou in 2012 and worked closely with Zou as part of Project Crush.[20]  Defendant Baril also developed several internal documents using Zou's information, created hours of video footage featuring Appian's trade secrets, and collaborated with Zou on multiple occasions.  For instance, defendant Baril "spent two days with [Zou]" at Pega's headquarters, "watching [Zou]" navigate the Appian platform, "asking [Zou] questions throughout the process and taking a ScreenCam [video recording] for review at a later date." PLT 775.  Defendant Baril circulated to colleagues the footage he and Zou captured within Appian's platform.

---

[20]  Defendant Baril reported to, and communicated regularly with, defendant Schuerman.

85.     Defendant Baril also co-wrote Pega's formal Project Crush Report in 2014. Among other things, the Project Crush Report listed various "Action Item[s]" to guide Pega moving forward based on its learnings from Project Crush. *Id*.  One "Action Item" – "[o]pen a dialogue with Product Management leadership to give them feedback" – was already "*[u]nderway*" *as* "*John has setup recurring meetings with Product Management including Alan*." *Id*.  Another "Action Item" – "[g]ive feedback to product about the development experience, and suggestions on how it can be better – was also "[u]nderway." *Id*. A third "Action Item" – [d]iscuss potential improvements to data modeling with [Product Management]" – was designated "[c]ompleted . . . Data Modeling is a large target for [version] 7.2." *Id.*

## 2.     Beginning in 2019, the Officer Defendants Direct Phase Two of the Illegal Scheme to Directly Access Appian's Trade Secrets

86.     In 2019, there remained at Pega "a tremendous amount of interest in learning" about Appian's software. 1/10/22 Baril Depo. Tr. at 101; PLT 648.  Accordingly, the Officer Defendants directed another "teardown" of Appian's platform. Project Crush had proven a raging success and yielded a "war chest" of materials Pega employed for years to come. PLT 248.  The Officer Defendants sought to build on that success, by misappropriating Appian's information through an operation "similar" to "Project Crush" but "broader [in] scope." 1/10/22 Baril Depo. Tr. at 201, 299.

87.     Defendant L. Trefler proposed this plan, remarking in a February 13, 2019 internal email that "BP3," an outside contractor, "would be a great one to hire to do some diligence for us" on Appian, adding he was "sure" an outside contractor could obtain a free trial of Appian's platform so that Pega could "do a side by side compare around different builds." PLT 752.  The plan continued to develop in March 2019, as defendants A. Trefler, Schuerman, L. Trefler, Akgonul, and other executives discussed a "consulting engagement to deep dive Appian's product,

training, methodology (all aspects of the client journey)." 1/10/22 Baril Depo. Tr. at 293.

Defendant L. Trefler later remarked in late March 2019 that when he floated the idea of comparing

Appian and Pega capabilities he "didn't know whether folks would think it was something we

should do," but was "thrilled with the enthusiasm around [the] idea." PLT-619 at 1. He committed

to "help[ing] with the funding and staffing[.]" *Id.*

88.    The Officer Defendants initially plotted to again use an outside party for this new

teardown, similar to the way Zou had been used as a "spy" with Project Crush. As defendant Baril

testified in 2022, the initial plan involved "hir[ing] an independent Appian contractor to help

[Pega] get some of the details about [Appian's] methodology and potential software weaknesses"

(*id*. at 206), as well as purchase an Appian license for Pega. This time and despite their efforts,

however, the Officer Defendants could not find a contractor willing to misappropriate Appian's

information on Pega's terms, so they decided that Pega would spy on Appian itself.

89.    The Officer Defendants were a driving force behind this teardown, none more so

than A. Trefler. A. Trefler admitted at trial that he personally asked Baril to do an analysis of

Appian's product around June or July 2019. Trial Tr. 1038:22-1039:13. Schuerman confirmed

for Baril around August 19, 2019, that Baril was to "work on *a critical CI [competitive*

*intelligence] Brief for Alan [Trefler]* due 8/30/19." 4/28/22 Trial Tr. at 6433; PLT 660.

90.    Baril regularly discussed Pega's "teardown" with defendant Schuerman, including

"*several conversations about Alan [Trefler's] desire for [Pega] to have more technical – sort of*

*deeper dive technical details*" about Appian. 1/10/22 Baril Depo. Tr. at 100. L. Trefler also

remained informed regarding Pega's teardown. For instance, on or around September 8, 2019,

defendant Baril sent defendant L. Trefler a draft of the Appian "full teardown and competitive"

brief that defendants Baril, Schuerman, and others at Pega were developing under defendant A.

Trefler's direction. *Id*. at 308.

91.    Defendant A. Trefler followed up with defendant Baril and others regarding Pega's teardown.  For instance, in an internal email dated September 21, 2019, A. Trefler told Baril he was "***thrilled to have you in this role***," and reminded defendants Baril, Schuerman, and Akgonul, among others, that he wanted a "***write up [o]n everything we think is an ap[p]ian weakness***," and wanted "***to spend an hour on a[n Appian] demo***." PLT 622.

92.    Defendant Baril also updated Pega's executives regarding the efforts to gain access to Appian's platform.  For instance, on September 25, 2019, defendant Baril wrote to defendant Schuerman and Jennifer Gill ("Gill") (Pega's Senior Director of Product Marketing): "FYI – ***Alan [Trefler] asked for an hour long demo of Appian***.  This is currently impossible. My trial ended and the other system I was using is no longer accessible.  I'll work on finding another one of [sic] getting another trial (involves registering a domain, email etc." 1/10/22 Baril Depo. Tr. at 65; PLT 631-A.

93.    On September 27, 2019, defendant Baril boasted to Schuerman and Gill: "***My spies have managed to get me another 15 day instance***" of Appian's platform "[l]ikely up on Monday." 1/10/22 Baril Depo. Tr. at 81; PLT 631-A.  On or about the same day, defendant Baril also informed defendant Schuerman that Barak (a *director* in Pega's Product Management) had recorded a "fabulous" hour-long demo of the Appian platform, and Baril provided Schuerman a link to the video. 4/28/22 Trial Tr. at 6427.  Defendant Schuerman was pleased that A. Trefler's "mission" was on track, responding to Baril: "***Awesome. So we have some stuff we can show Alan . . . .***" *Id*. at 6428:8-12.

94.    On or about September 27, 2019, defendant Baril also informed defendant Schuerman that a Pega "spy" (Pega Solutions Consultant Nguyen Le ("Le")) was posing to Appian

as a "small independent business" in order to obtain an Appian license for Pega, telling Schuerman "[m]y spy also got a quote for Appian." 4/28/22 Trial Tr. at 6429:18-21.   In response to Schuerman's inquiry regarding "how many users" could use the license Pega's "spy" was seeking, Baril responded that the "quote" "was for a small independent business so I imagine a handful at most." *Id*. at 6429:25-6430:8; 1/10/22 Baril Depo. Tr. at 354.  Defendant Baril further informed defendant Schuerman that the "small independent business" actually belonged to Le's wife: "It's an [Solutions Consultant] whose wife owns a small business . . . [in] the beauty industry." 4/28/22 Trial Tr. at 6430:4-6431:3.

95.      Defendant A. Trefler knew his "teardown" depended on improperly obtaining access to Appian's platform, just as Project Crush had.  Indeed, in an internal email dated October 1, 2019, defendant Baril cautioned A. Trefler (and others, including defendant Schuerman) that "***Appian is very tightly controlled about who has access to their trial environments***," while assuring them that he was "***working to get a new instance so that I can record some videos of their environment for you***." 1/10/22 Baril Depo. Tr. at 71; PLT 632.  Three days later, on October 4, 2019, defendant Baril admitted to Pega's Director of Solutions Consulting that "Alan [Trefler] and Leon [Trefler] are very focused on destroying Appian. Like making it go away for good." PLT 649.

96.      Defendant Baril updated L. Trefler and Schuerman, in an October 5, 2019 email, writing:

> Alan [Trefler] has been asking Don [Schuerman], Jenn [Gill] and I to dig deep into Appian's technology in order to find more compelling weaknesses to form a more targeted and damning attack. . . . To that end, I've been spending much of my time over the last few weeks diving deep into Appian's software, including taking some videos of various features and functionality and documenting everything I can find. You saw an iteration of that work a few weeks ago, the latest technical document can be found here.

PLT 759; 1/10/22 Baril Depo. Tr. at 188.

97.    L. Trefler responded to defendant Baril later that day: "Please set up a call for next week. Your mission is urgent and you are understaffed. I want you to think aggressively."  L. Trefler added he would devote "more resources" to this "mission." 1/10/22 Baril Depo. Tr. at 191; PLT 760.

98.    In addition to having attended client meetings with A. Trefler, Baril also conferred one-on-one with A. Trefler regarding Pega's teardown.  For instance, A. Trefler met with Baril at least twice in late 2019 regarding the teardown (once in October 2019 and again in December 2019), including in A. Trefler's office.  During their meetings, A. Trefler discussed with Baril specific information Pega had obtained about Appian's platform.  A. Trefler also provided Baril with direction and feedback on Baril's ongoing efforts to spy on Appian, identified specific technical details about Appian's platform that A. Trefler wanted investigated, and listed questions and topics about Appian's platform that A. Trefler wanted Baril to look into.

99.    The Officer Defendants were determined to complete A. Trefler's mission at all costs, even if it violated the law.  For example, after advising Schuerman in an October 17, 2019 internal chat message that Baril had "[l]ost access to [Appian's] trial system last night," Baril pointedly asked Schuerman, "*[w]ho can I ping about legality of using [Appian's] system*?" PLT 643-A.  Defendant Baril's concerns over the illegality of Pega's actions were well justified.  Moreover, Pega's Code of Conduct (the "Code") expressly *prohibited* employees from using "illegal or questionable means" or "*misrepresenting your identity in hopes of obtaining confidential information*" – precisely what Pega was doing under the Defendants' direction and on their watch.[21]

---

[21] Pega's Code provided that employees agree that "[i]f any of [Pegasystems' employees] are

100.    Defendant Schuerman knew that A. Trefler was driving the teardown, and that Pega's "mission" required continued access to Appian's platform.  Accordingly, instead of directing defendant Baril to seek "guidance as to the propriety of [Pega's] actions" – as Pega's Code required – defendant Schuerman disregarded Baril's concerns and the Company's Code, and instead responded: "[H]ow much more do you need to do/capture?" PLT 643-A.

### 3.    The Officer Defendants Used, and Asked Others to Use, Fake Names, Fake Companies, and Corporate Fronts to Steal Appian's Trade Secrets

101.    Under the Officer Defendants' direction and on their watch, Pega utilized a network of "spies" and other vast resources to accomplish A. Trefler's mission of misappropriating Appian's trade secrets.

102.    Defendant Baril himself resorted to subterfuge to misappropriate Appian's trade secrets.  For instance, in or around August 2019, defendant Baril concocted multiple fake names, including "Andrew Powers" and "Emily Gold," to misappropriate Appian's trade secrets. 1/10/22 Baril Depo. Tr. at 79-80.  Defendant Baril also created a fictitious consulting firm, "Andrew Powers Consulting" (complete with its own unique web domain), which he used to gain access to Appian's platform. *Id*. at 79-80.  Defendant Baril informed defendant Schuerman on August 17, 2019 that he had obtained access to Appian's platform.  And Schuerman admitted during the Virginia Action trial that he knew in May 2020 that Baril was using the fake name Andrew Powers to access Appian's platform.  Trial Tr. 6445:18-6446:2.

103.    Defendant Baril recruited others to illicitly access Appian's platform as well. Around September 2019, defendant Baril enlisted Le (a Solutions Consultant at Pega) to help Pega

---

asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer or our Chief Compliance Officer."

misappropriate Appian's information by obtaining a 15-day trial of Appian's software. In addition to working at Pega, Le co-owned a salon business ("Organic Living and Wellness") with his wife. 12/3/21 Le Depo. Tr. at 73. At defendant Baril's behest, Le obtained a 15-day trial of Appian's platform, by falsely representing himself to Appian as a potential "customer" named "Organic Living and Wellness." On October 2, 2019, Le provided defendant Baril with login credentials Appian had issued to "Organic Living and Wellness." Defendant Baril – posing as "Organic Living and Wellness" – accessed Appian's platform using Le's credentials, telling Le: "Thanks so much! [Over] 15 days to make magic happen. . . . [T]his system . . . is extremely helpful." 1/10/22 Baril Depo. Tr. at 340; PLT 629.

104.    Defendant Baril also recruited Michael Fine ("Fine") (a Solutions Consulting Manager at Pega) to assist with Pega's teardown. In addition to working at Pega, Fine co-owned a business space rental company ("Palencia Business Center") with his wife. 12/1/21 Fine Depo. Tr. at 26. Defendant Baril asked Fine to obtain a trial of Appian's platform for Baril, cautioning Fine not to disclose his affiliation with Pega when seeking the trial from Appian. Fine carried out Baril's request and obtained a free trial of Appian in October 2019 by falsely posing as a potential "customer" called "Palencia Business Center." Fine then provided Baril the login credentials Appian had issued to "Palencia Business Center." Fine also set up a new email account for Baril, using Fine's palenciabusinesscenter.com web domain, to facilitate Baril's access to Appian's platform. Posing as "Palencia Business Center," defendant Baril used Fine's credentials to access Appian's platform.

105.    In October 2019, defendant Baril enlisted Peter Bessman ("Bessman") (a Pega Solutions Engineer) to assist with the teardown. As Baril explained to a senior employee on October 10, 2019, he was "looking to pull Peter [Bessman] into the Appian CI [competitive

intelligence] project starting immediately until the end of the year. The work Peter will be doing is outlined below: ***The overall goal is to steal 4 deals from Appian in Q4 and Q1 2020***." PLT 651.

106.     Defendant Baril sent Bessman the Appian credentials that Fine had given Baril. Bessman, posing as "Palencia Business Center," then logged into Appian's platform, wherein he "'hunker[ed] down,'" and "sho[t] a ton of footage" ("'as much . . . footage as possible'") of himself building an application within Appian's platform. 1/10/22 Baril Depo. Tr. at 86; 12/15/21 Bessman Depo. Tr. at 123, 133, 236.  The 54-minute video Bessman captured while posing as "Palencia Business Center" – one of at least 30 videos Pega created during or after 2019 using its employees' illicit access to Appian's platform – was then shared with defendant A. Trefler and several other Pega employees.

107.     Defendant A. Trefler even ***misrepresented his own identity*** in his mission to "make[] [Appian] go away for good" (1/10/22 Baril Depo. Tr. at 238) employing several aliases, including "Albert Skii," "A. Ewe," and "Paul Foon," to access clandestinely Appian's nonpublic proprietary information.  In the Virginia Action, Appian records showed that A. Trefler's email addresses ascii0@gmail.com and asciizero@gmail.com were used to register for an Appian trial under the name Paul Foon.  PLT-766 at 5; Trial Tr. 708:14-20; PLT-762 at 1 (email to A. Trefler's asciizero@gmail.com account).  When asked, Trefler ***refused*** to testify under oath that he did not sign up for an Appian trial using the name Paul Foon or Albert Skii.  Trial Tr. 696:14-22, 697:3-18, 1003:21-1004:5.

108.     Pega's India-based employees were also recruited to support A. Trefler's mission to gain access to Appian's trade secrets.[22]

109.     For example, around September 2019, Vijay Krishna Potluri ("Potluri") (a

---

[22]  According to Pega, around 29% of its employees were based in India at that time.

Director of Case Management at Pega in India and member of Pega's Product Management group) accessed Appian's platform using credentials he had obtained from a Product Manager at Pega in India, Arun Kumar Sarada ("Sarada"). Potluri's "responsibilities" included working on "releases and improvements" to Pega's software. 3/3/22 Potluri Depo. Tr. at 26. Posing as someone else, Potluri used the credentials he received from Sarada to access Appian's platform and share his findings with several of Pega's software engineers and developers. Potluri accessed Appian's platform multiple times, including in 2020.

110.    Sarada used three different login credentials – none of which belonged to him – to access Appian's platform while working at Pega: (1) one set of credentials belonged to a former colleague of his from the company OpenText, Inc.; (2) the second set of credentials he received from his cousin (Vishal Sarada), which Vishal in turn had obtained while working at the information technology firm Capgemini; and (3) the third set of credentials he had received from another cousin of his (Venugopal Sarada), and belonged to Edu Mithra, an online education company.[23] To assist Pega with its corporate espionage efforts in 2019, Sarada used at least one of these credentials to access and capture footage of Appian's platform.

111.    The Officer Defendants' efforts to misappropriate Appian's trade secrets continued into 2020. For instance, in March 2020, defendant Baril enlisted Keith Fairbrother ("Fairbrother") (a member of Pega's "go-to-market strategy group") to sign up for an Appian trial. 1/10/22 Baril Depo. Tr. at 109. To evade detection, defendant Baril directed Fairbrother to register for the trial using Fairbrother's "side project domain" (a website that generated baby names) instead of Pega's web domain. *Id*. at 111.

---

[23] Sarada possessed Appian credentials much earlier than 2019. For instance, on September 18, 2017, Sarada emailed several Pega employees login credentials to Appian's platform, warning them to "make sure any recording or screenshots don't capture user name." PLT 1027.

112.    On or about May 12, 2020, defendant Baril accessed an Appian conference by registering under one of his personas, "Andrew Powers."  Upon infiltrating Appian's conference, defendant Baril quickly alerted defendant Schuerman via instant message that he had used a fake name ("Andrew Powers," Baril's self- proclaimed "incognito self") to break into the conference. 4/28/22 Trial Tr. at 6442-43.  Defendants Baril and Schuerman then communicated about the conference via instant messaging.[24]  In addition to asking defendant Baril specific technical questions about Appian's conference, including its broadcast technology, defendant Schuerman asked Baril to "export the customer list" and "send [Schuerman] some screenshots of the overall experience." *Id*. at 6445:2-7.

113.    Further, Pega employees Potluri and Sarada accessed Appian's system in 2019 and 2020 by posing as someone else.  Around May 23, 2020, Potluri emailed Baril and Bixby (who was then serving as Pega's Vice President of Product Management), along with Pega software engineers and others about "the details of" Potluri's and Sarada's findings on Appian. PLT 627. Potluri included in his email links to various documents Pega "created based on [its] access to Appian software and gathering information from that access." 3/3/22 Potluri Depo. Tr. at 92-108. Bixby was incredibly pleased with Potluri's insights, remarking on Potluri's "[e]xcellent" work, and asking Potluri for "any key competitive insights that would be worth sharing as we determine the scope of work for [Version] 8.6." *Id*. at 290.  Potluri responded to Bixby's May 24, 2020 email by listing various "ideas worth considering" for Pega Version 8.6, which Pega released a year later in May 2021. *Id.* at 290-91.[25]

---

[24] The DRC's Report does not reflect whether the DRC reviewed any texts or instant messages as part of its investigation.

[25] Potluri accessed Appian's platform in 2019 and 2020, including while Pega was developing its Version 8.4 (which Pega released on February 25, 2020).

114.     The Illegal Scheme against Appian continued even after Appian sued Pega for this very conduct.  On or about May 28, 2020, defendant Baril discussed with Aaron Fromm (a Pega Solutions Consulting Manager) gaining access to an Appian trial in order to "'create a side-by-side comparison of the Appian flow versus Pega flow.'" 1/10/22 Baril Depo. Tr. at 73.

115.     Vijay Vaddem (a Senior Product Manager at Pega) obtained access to the Appian platform in September 2021, by posing as someone else.  Others at Pegasystems accessed Appian's platform after the Virginia Action was filed, including in mid-2021 and around October 2021.  Meanwhile, Eric Davis ("Davis") (a Solutions Consultant at Pega) testified during his January 2022 deposition that he gained access to an Appian trial in December 2021, "***shortly after learning of this suit***." 1/21/22 Davis Depo. Tr. at 164.

116.     Similar to Davis, Potluri testified he did not learn of the Virginia Action until December 2021, three months before Appian took Potluri's deposition.  Potluri and Davis were just two of an unknown number of Pega employees who remained oblivious to the Virginia Action and free to continue the scheme to misappropriate Appian's trade secrets.

117.     Indeed, evidence showed that Pega employees that participated in Pega's scheme were not disciplined, leaving them free to continue spying on Appian and using Appian's trade secrets to win business.  For instance, defendant Schuerman admitted in October 2021 that, to his knowledge, Pega management never directed employees to not seek access to Appian's platform:

> Q. Has Pegasystems management ever directed Pega employees to not seek access to Appian's platform?
>
> A. I don't think explicitly, no.
>
> Q. An email has never been sent out? A. Not to my knowledge, no.

10/13/21 Schuerman Depo. Tr. at 51.

118.     Pega's CPO, defendant Akgonul, admitted during his January 25, 2022 deposition

that ***none*** of the India-based employees who had accessed Appian's platform using others' credentials had been disciplined. Defendant A. Trefler's testimony further revealed that none of the senior Pega executives involved in the scheme received "any formal disciplinary consequences," leaving Pega's employees free to build on their scheme:

Q. Now, have you considered firing Benjamin Baril?

A. No.

Q. Have you considered in connection with issues that have come up in this lawsuit firing any other Pegasystems executives or employees?

A. No.

119.    Under the Officer Defendants' direction and on their watch, Appian's valuable trade secrets were provided to Pega's officers, senior executives, and other employees.

120.    Pegasystems employees routinely emailed one another documents containing Appian's trade secrets. For instance, on December 4, 2019, defendant Baril sent an email to various Pega employees in which he "included links to some videos" that "give insight into some of the woes of creating applications in Appian," while cautioning the "videos are STRICTLY INTERNAL." PLT 761. On another occasion, defendant Baril emailed Bixby to inform him that he had an "'Appian trial system for a few more days and wanted to know if anyone [from Pega's product management group] would like to get any specific intel/demos before it expires.'" 1/10/22 Baril Depo. Tr. at 211. In response, Bixby provided defendant Baril with three employee "listserv" addresses, including pxmanagement@pega.com (Bixby's "direct reports") and pxall@pega.com (Bixby's "entire organization of about 500 people"). *Id*. at 211-12.

121.    Materials were also saved at the Company containing Appian's trade secrets on

shared directories accessible to employees, including "Sales Hub" and "Box."[26]  For example, during a WebEx meeting with other Pega employees on or about September 11, 2019, defendant Baril helped create an hour-long recording within Appian's platform, which was then saved to a shared folder at Pega.  One of the WebEx attendees – Pega employee Barak – then circulated the video to various colleagues, cautioning them in a September 11, 2019 email: "[T]he situation between u[s] and Appian is apparently a bit sensitive right now, so please be judicial in sharing this." PLT 624.  Pega's employees also shared Appian's trade secrets via internal message "posts" and shared hyperlinks to documents saved on Pega's system.

122.    Pega employees would also reach out to members of the competitive intelligence group in connection with competition against Appian.  Meanwhile, defendant Baril and other employees with illicit access to Appian's platform would solicit requests for specific information about Appian from others at Pega (including Pega's Product Management group).

123.    Pega employees were paid bounties for obtaining and sharing Appian's information.  For instance, extra compensation was awarded to employees for completing management-based objectives ("MBO"), one of which required employees to obtain and internally present information regarding competing platforms.  For example, Bessman (one of Pega's "spies") internally circulated a presentation on Appian as "homework or proof to receive his MBO credit." 9/23/21 Baril Depo. Tr. at 122.  Meanwhile, Fine and Le – the Pega employees who posed as small businesses to obtain Appian credentials in the third quarter of 2021 – both received cash bonuses in that quarter for their competitive intelligence on Appian. 1/10/22 Baril Depo. Tr. at 352-54.

---

[26]  The Company's worldwide sales team had access to Sales Hub.

### B.    Defendants Conceal the Existence of Appian's Lawsuit and Shocking Allegations of Egregious Misconduct From Stockholders

124.    In early 2020, Appian caught wind of Pega's scheme from two whistleblowers, both former Pega employees. Shortly after discovering Pega's scheme, Appian filed the Virginia Action against the Company on May 29, 2020.

125.    Petronio had joined Appian in early 2019, but he had remained silent about Pega's work with Zou until January 2020, out of fear of retaliation by Pega.[27]

126.    Bearden approached Appian shortly thereafter, in February 2020.  Pega had employed Bearden for 12 years before firing him in early 2020.  Bearden had worked on Project Crush with defendant Baril, Petronio, and others, and possessed intimate knowledge of the scheme to misappropriate Appian's trade secrets over the years.  Bearden had also worked on deals for which Pega employed Appian's misappropriated information, including a deal over customer Bank of America in which (as Bearden later testified in September 2021) "'Appian was kicking our [Pega's] butts.'" 9/20/21 Bearden Depo. Tr. at 242.

127.    Following his termination from Pega in early 2020, Bearden came across a thumb drive containing a cache of Appian documentation that Zou had misappropriated for Pega. Bearden wrote to Pega's Human Resources ("HR") division on February 15, 2020, noting he had discovered a "USB drive containing Appian documentation that Pega acquired back in 2014 from an Appian consultant [Zou] who our marketing team hired." *Id.* at 242.  Bearden explained to Pega's HR that the documents "'clearly are not our [Pega's] IP, but we did pay for them,'" and asked Pega's HR to "'[p]lease let me know if you would like the documents returned to you or

---

[27]  For instance, Petronio testified in early 2022 he "was concerned . . . [because] in the past, there have been former employees who had been sued for either going to a competitor or whatnot." 2/8/22 Trial Tr. at 1722:12-1723:9.

whether I should return them to Appian.'" *Id.* at 243.

128.    Bearden sent Pega the electronic documents at Pega's request.  Shortly thereafter, Pega asked Bearden to confirm "if I still had the documents in my possession and if I had notified anybody that I had had the documents." *Id.* at 245.

129.    As Bearden later testified, he was "troubled" by Pegasystems' request for confirmation that he had told no one else about the Appian documents:

> [U]p until that time, 2019 . . . all of us having access to Appian documents and whatnot, obviously seemed very shady. . . . My assumption was, even as shady or gray as it seemed, it was all aboveboard. This was the first time that I began to think maybe it wasn't all aboveboard and was wondering . . . what I had been a part of.

*Id.* at 245-46.

130.    According to Bearden, following his termination from Pega, the Company:

> Never asked me about any Pega IP that I might have in my possession or if I got rid of it. . . . Pega never followed up with me about did you return all of the architecture slides you created in the last 12 years, any of the white papers, any of the competitive intelligence we had. They never followed up on that. This is the only thing they wanted to know about, that they followed up on.

*Id.* at 246.

131.    Pega's request for assurances that no one else knew about the misappropriated documents, as well as Pega's apparent lack of concern over anything else but the Appian documents, was a "turning point" for Bearden. *Id*. at 245.  He reached out to Appian's general counsel a day or two later to inform Appian of the scheme.

132.    On May 29, 2020, Appian filed suit against Pega and Zou.  Appian's operative complaint at trial included claims under the Virginia Uniform Trade Secrets Act ("VUTSA") and the Virginia Computer Crimes Act ("VCCA"), and eventually in its amended complaint, sought damages in an amount not to exceed $3,032,847,000 (exclusive of attorney's fees, interest, and other relief).  The Director Defendants and the CFO, however, did not disclose the existence of

the Virginia Action against Pega or the allegations made by Appian until February 2022.

133.    The Virginia Action featured damning allegations against the Company and Zou. According to Appian's complaint, A. Trefler and other high-ranking Pega executives had engaged in "unlawful schemes . . . [that] involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers."

134.    Appian's initial complaint sought various forms of relief against Pega, including actual losses of $90 million, unjust enrichment including a disgorgement of Pega's profits, attorney's fees, costs, punitive damages, treble damages, and sweeping injunctive relief.   In Appian's Second Amended Complaint, it asserted a claim for damages of more than $3 billion.

135.    Despite Appian's damning and well-supported allegations that Pega, its CEO, Chairman, and controlling stockholder A. Trefler, and other officers had coordinated a multi-year espionage operation against Appian, and the astounding financial and reputational damage Pega faced from the litigation, ***the existence of the Virginia Action was concealed from stockholders for 18 months***. During that time, the Director Defendants and CFO misleadingly assured stockholders that litigation from unnamed competitors ***could*** arise at some indeterminate point in the future. The Director Defendants and CFO also misleadingly told stockholders that Pega prohibited the very tactics it secretly employed against Appian, including, *inter alia*, using "***illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . misrepresenting your identity in hopes of obtaining confidential information***." Moreover, the Director Defendants and CFO reassured stockholders regarding A. Trefler's responsibilities in providing "guidance as to the propriety" of employees' actions.

136.    Yet at the time the Director Defendants and CFO made these and other public

misstatements, unbeknownst to stockholders, Pega had already employed "questionable" tactics for years, and was already ensnared in potentially ruinous litigation as a result. Moreover, the Director Defendants and CFO failed to disclose that defendant A. Trefler – Pega's founder, Chairman, CEO, controlling stockholder, and purported moral compass – was himself an active participant in, and stood behind, the very misconduct that flouted Pega's own Code and allegedly violated the law. Further, despite the seriousness of Appian's allegations the Board ignored this obvious red flag and did nothing at that time to investigate the nature of the alleged Illegal Scheme or the persons responsible for it.

        C.     **The Director Defendants and the CFO Disclose the Virginia Action on the Eve of Trial in February 2022, While Misleadingly Assuring Stockholders That Appian's Claims Lack Merit and Any Claims for <u>Damages Are Unsupported</u>**

137.     On February 16, 2022, nearly two years after the Virginia Action was filed and with a $3 billion merits trial around the corner, the existence of the Virginia Action was finally disclosed in a Company filing with the SEC, including that Appian sought up to $3 billion in damages (representing all of Pega's revenue, less its direct costs, from the fourth quarter of 2013 ("4Q13") to the third quarter of 2021 ("3Q21")), and that Pega faced liability under VUTSA and the VCCA (the "2021 10-K").

138.     The 2021 10-K did not disclose, however, the material details of Pega's egregious scheme, while misleadingly assuring stockholders that Appian's claims "***are without merit***," Pega has "***strong defenses to these claims***," and "***any alleged damages claimed by Appian are not supported***." In truth, Appian's claims were well-supported by the evidence: as the Director Defendants and CFO knew or recklessly disregarded that for years Pega engaged in willful and malicious conduct aimed at misappropriating Appian's proprietary information and using it to benefit Pega in violation of the law. Defendant A. Trefler's cadre of executives were themselves

participants in the Illegal Scheme, and had fully supported his mission to "destroy[] Appian." 1/10/22 Baril Depo. Tr. at 238-39. Meanwhile, Pega's purportedly "strong defenses" had been proven hollow, as the Virginia Action steadily marched towards trial.

139.    Appian's damages were also well supported by extensive factual evidence and testimony, including Pega's own internal documents. In fact, when presented with overwhelming evidence that Pega used Appian's trade secrets to improve Pega's software, and ***despite Pega facing claims for over $3 billion in damages***, Pega's own expert "***accept[ed] the premise that all of [Pega's] sales [from 4Q13 to 3Q21]" were tainted by misappropriation***. 5/3/22 Trial Tr. at 7508. Pega's expert also conceded that Appian's damages from the 201 opportunities for which Appian and Pega directly competed from 4Q13 to 3Q21 were upwards of $187 million if Pega was found liable for misappropriation.

140.    The 2021 10-K was reviewed and signed by all of the Director Defendants and by the CFO.

141.    Pega filed its Quarterly Report on SEC Form 10-Q for the first quarter of 2022 on April 28, 2022 (the "1Q22 10-Q"), over a month after trial in the Virginia Action had begun on March 21, 2022. Similar to the 2021 10-K, in Pega's 1Q22 10-Q, the Director Defendants and the CFO omitted material facts regarding the Illegal Scheme to misappropriate Appian's trade secrets.

### D.    Following a Seven Week Trial, a Jury Finds for Appian and Awards Appian Over $2 Billion in Damages

142.    On May 9, 2022, the jury in the Virginia Action returned a unanimous verdict in favor of Appian. The jury concluded that Pega and Zou misappropriated Appian's trade secrets in violation of VUTSA and awarded compensatory damages of $2,036,860,045 (before interest) as against Pega and $5,000 as against Zou. The jury also found that Pega acted willfully and maliciously in misappropriating Appian's trade secrets, entitling Appian to later seek

approximately $22.6 million in attorney's fees and $4.2 million in costs.[28]  The jury also found that Pega had committed computer crimes in violation of the VCCA, and awarded Appian the one dollar in symbolic damages it sought under the VCCA.

143.    Pega's stock price sank by nearly 21% ($13.68 per share) on May 10, 2022, as news of the verdict in the Virginia Action began to ripple through the market.  One analyst acknowledged the verdict's "reputational harm to Pegasystems," which could cause customers to "***shift[] PEGA resources over to Appian's platform***."  Another analyst remarked that the verdict "***will be a blot on Pega's record when dealing with federal contracts as the company will likely have to disclose its violation of the [VCCA]***."

144.    Pega's stock price dropped another 8% ($4.18 per share) on May 11, 2022, as analysts slashed their price targets in the wake of the Virginia Action verdict.  Morgan Stanley cited "***the damage to Pegasystems' record***," while Morningstar noted "the heightened risk" to Pega's business.  Another analyst reduced its price target due to "***potential ACV [Annual Contract Value] growth headwinds as a result of the lawsuit decision***" and Appian's "***edge versus Pegasystems for future government contracts***."[29] Certain of the Defendants publicly chastised the verdict as "ridiculous" and assured stockholders there were absolutely no "facts of any wrongdoing".

145.    On September 16, 2022, final judgment was entered in the Virginia Action,

---

[28]  According to the jury instructions delivered in the Virginia Action: "Willful conduct occurs when a party acts without regards for the rights of another, knowing injury will probably follow. Malicious conduct occurs when a party acts with ill will or spite."

[29]  According to Pega, ACV "represents the annualized value of our active client contracts as of the measurement date," and is "the most important metric" at Pega. For instance, defendant Stillwell stated on February 17, 2021 that "growth in annual contract value remains the most important operational metric that reflects the underlying growth of our business," and stated on October 27, 2021 that "[w]hen it comes to our most important metric that we measure as our business success, ACV continues to be the most important metric."

affirming the jury's verdict, including its award to Appian of $2,036,860,045 in damages for Pega's violations of VUTSA, its finding that Pega violated the VCCA, and its determination that Pega acted willfully and maliciously.  The Virginia trial court ordered Pega to pay Appian over $23.6 million in attorney's fees and costs, as well as post-judgment interest at an annual rate of 6%, or around $122 million per year.

146.    Pega's stock price swiftly dropped by nearly 6% ($2.39 per share) on September 16, 2022 and again by nearly 6% ($2.27 per share) on September 19, 2022, as the market reacted to the news that the jury's May 9, 2022 verdict (including its findings on liability and damages) was affirmed, and as analysts' estimates were slashed further over "uncertainty stemming from the lawsuit," "clients['] deci[sions] to re-evaluate their Pega investments," and the ruling's "impact . . . [on] [Pega's] federal business."

147.    The trial court denied Pega's post-trial motions to strike the evidence, set aside the verdict and for a new trial or remittitur.  Pega then filed an appeal in the Court of Appeals of Virginia.  On July 30, 2024, the Court of Appeals of Virginia concluded, *inter alia,* that the trial court did not err in denying Pega's motion to strike and to set aside the verdict, that ***Appian did not fail as a matter of law to show that the misappropriated information qualified as trade secrets, and that the record contained ample evidence that the contested information was not generally known nor reasonably ascertainable and that Appian took reasonable steps to protect its trade secrets***.  However, the Court of Appeals of Virginia found that the trial court erred in certain respects, and accordingly reversed the judgment as to Appian's VUTSA claims and remanded the Virginia Action for a new trial consistent with its opinion. Appian's appeal of the decision by the Court of Appeals of Virginia was accepted by the Virginia Supreme Court, and briefing is currently ongoing. Accordingly, the Virginia Action remains pending subject to further

appeal and/or remand, and Pega remains exposed to enormous risks associated with further proceedings, including possible substantial damages, as well as ongoing legal fees and expenses.

## VI.    THE DIRECTOR DEFENDANTS' AND CFO'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

148.    As alleged herein, over a multi-year period, certain Defendants made a series of false and misleading statements to stockholders and omitted material facts necessary to make the statements not false or misleading in earnings calls, conferences, and SEC filings.  The materially false and misleading statements and omissions that violated the federal securities laws and Massachusetts law included: (a) statements touting Pega's competition and sales and marketing practices, while failing to disclose, *inter alia*, that Pega was relying on corporate espionage to gain a competitive advantage; (b) statements concerning Pega's competitors' intellectual property rights and that infringement claims by unnamed competitors ***could*** arise at some indeterminate point, while concealing, *inter alia*, the existence of the Virginia Action and evidence of the egregious scheme to misappropriate Appian's trade secrets; (c) statements that Appian's claims lacked merit and any damages were not supported, while failing to disclose, *inter alia*, Appian's liability and damages claims were well-supported; (d) statements regarding Pega's Code and ethical practices, which failed to disclose, *inter alia*, egregious corporate espionage and flagrant violations of Pega's own guidelines; and (e) statements concerning purported compliance with the federal securities laws, which failed to disclose that, *inter alia*, Pega's SEC Forms 10-K and 10-Q were materially misleading and contained false financial statements.  Each of these types of misstatements and omissions, and the several reasons each were materially false and misleading as reflected in U.S. District Court Judge William G. Young's ("Judge Young") decision sustaining the Securities Action.

### A. Misstatements and Omissions Regarding Pega's Competition and Sales and Marketing Practices in the BPM Market

149.    Pega filed its Annual Report on SEC Form 10-K for fiscal year 2020 ("2020 10-K") on February 17, 2021, touting its competitive differentiators and sales and marketing tactics, while misleadingly failing to disclose the Virginia Action or the egregious misappropriation of Appian's confidential information which was used to improve the Company's product and gain a competitive advantage. The Company's 2020 10-K was reviewed and signed by the Director Defendants and CFO.

150.    Pega's SEC filings and public statements during the relevant period regarding its competition and sales and marketing practices in the BPM market were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, included:

(a)    Pega engaged in a far-reaching, malicious, and willful scheme to misappropriate Appian's trade secrets through various subterfuge, false pretenses, and other dishonest tactics, exposing Pega to substantial financial and reputational harm;

(b)    Pega's sales and marketing practices, including its "playbook" and "plays" for competing in the BPM market, included the use of paid agents, fake names, corporate fronts, and/or fictional companies to infiltrate the competition's software platforms, misappropriate its trade secrets, and use them to Pega's advantage;

(c)    Pega owed its competitive success to espionage and a "war chest of materials" (PLT 248) – including sales and marketing aids, training materials, video footage, "technical" and "competitive briefs," and "kill points" – it amassed through misappropriating the competition's trade secrets and confidential

information;

(d)      Pega had leveraged the misappropriated trade secrets and confidential

information in order to win hundreds of contracts competing directly against

Appian, including work with the U.S. Census Bureau;

(e)      Pega had paid its employees cash bounties in exchange for helping Pega

capture its competitors' confidential information; and

(i)      The statements failed to disclose the Virginia Action and potential loss

exposure in the 2020 10-K the Company filed with the SEC, in violation of GAAP

and SEC disclosure regulations, specifically, Item 103 and ASC 450.

## B.    Misstatements and Omissions Regarding Pega's and Its Competitors' Intellectual Property

151.    Similarly, Pega's SEC filings during the relevant period misleadingly failed to

disclose the existence of the Virginia Action or the egregious misappropriation of Appian's

confidential information.  Instead, the 2Q20 and 3Q20 10-Qs referred to, and thereby incorporated

by reference, various statements in Pega's Annual Report on SEC Form 10-K for fiscal year 2019

(the "2019 10-K"), which was reviewed and signed by Defendant Stillwell and the Director

Defendants, misleadingly representing to stockholders that "intellectual property rights claims"

against Pega "***could***" occur, while failing to disclose Pega had ***already*** engaged in a scheme to

misappropriate Appian's intellectual property, had ***already*** been caught in the act by Appian, was

***already*** mired in litigation over its scheme, and ***already*** faced enormous financial and reputational

risk as a result.

152.    On February 17, 2021, Pega filed its 2020 10-K, which was reviewed and signed

by Defendant Stillwell and the Director Defendants.

153.    By February 2021, Pega had been buried in the Virginia Action against Appian

for nearly nine months over the Illegal Scheme.  Nevertheless, the 2020 10-K repeated the very same false and misleading statements that pre-dated the Virginia Action, which had been incorporated into the 2Q20 and 3Q20 10-Qs as set forth above.

154.    The Director Defendants and CFO continued to conceal the existence of the Virginia Action and the details of the Illegal Scheme from stockholders throughout 2021, and each of the Company's 10-Qs for the first three quarters of 2021 incorporated by reference the very same false and misleading statements in Pega's 2020 10-K set forth above, all of which pre-dated the Virginia Action.

155.    Pega's public statements and SEC filings concerning its competitors' intellectual property were materially false and misleading when made.  The true facts, which were then known to or recklessly disregarded by the Director Defendants and CFO, included:

(a)    that Pega had engaged in willful and malicious misappropriation of Appian's trade secrets and confidential information, was *already* snared in costly litigation against Appian since May 2020 over Appian's claims of trade secret misappropriation, and was *already* facing meritorious claims that Pega's CEO and other officers had orchestrated and condoned Pega's scheme;

(b)     Pega faced potentially devastating injunctive relief arising from the Illegal Scheme, that would have prevented Pega from selling tainted software or relying on tainted sales processes, leading to significant harm to the Company; and

(d)  Pega's failure to disclose the Virginia Action and potential loss exposure in the Forms 10-Q and Form 10-K the Company filed with the SEC violated GAAP and SEC disclosure regulations, specifically, Item 103 and ASC 450.

### C. Misstatements and Omissions Regarding the Virginia Action and Appian's Claims Against Pega

156.    The Director Defendants and CFO also violated GAAP and SEC disclosure rules by failing to disclose Pega's egregious misconduct and potential loss exposure stemming from the Virginia Action.  These violations rendered each of Pega's SEC Forms 10-K and 10-Q filed between July 28, 2020 and October 27, 2021 materially false and misleading.

157.    The Director Defendants' and CFO's public statements regarding the Virginia Action were materially false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, included:

(a)    Defendants knew that Appian's claims in the Virginia Action were supported by voluminous evidence.  Defendant A. Trefler also knew of the misconduct at issue as a result of his own direct participation in the Illegal Scheme. For example, A. Trefler knew that: (i) Pega hired a spy (Zou) to help Pega misappropriate Appian's trade secrets and confidential information; (ii) Pega's employees also accessed Appian's platform using false pretenses, fake names, fake or front companies, and other inappropriate means; and (iii) Pega created various internal documents and video footage based on its illicit access to Appian's platform, and used that information to snatch Appian's business and improve Pega's software;

(b)    Under Defendants' direction and on their watch, Pega acted willfully and maliciously in misappropriating Appian's trade secrets and confidential information.  Pega's officers and employees misappropriated information to, *inter alia*, "destroy[] Appian," "set . . . traps" for Appian, "torpedo appian," develop "attack materials" for use against Appian, "blow . . . up" Appian's business, "steal"

deals from Appian, and "mak[e] [Appian] go away for good"; and

(c)    Appian's claimed damages were well supported, including by lay testimony, expert testimony, and Pega's own internal documents and data.

### D.    Misstatements and Omissions Regarding Pega's Code and Compliance With Ethical and Legal Guidelines

158.    Pega's 2020 and 2021 10-Ks assured stockholders that Pega had "adopted a written code of conduct that applies to our Board of Directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, and persons performing similar functions." Indeed, the Director Defendants and CFO specifically directed stockholders to Pega's publicly-available Code, stating in Pega's 2020 and 2021 10-Ks that "[a] copy of our code of conduct can be found on our website, www.pega.com," and that "[o]ur Code of Conduct is available on our website in the 'Governance' section."

159.    Pega's Code contained very specific statements that falsely indicated to stockholders that the Company complied at all times with ethical and legal standards, and that its officers and directors helped ensure compliance by others at Pega. For instance, the Code stated: "This Code applies to *all our interactions* in various areas of our shared professional lives *including those of our officers, full and part-time employees, interns, all people retained as independent consultants, and members of the Board of Directors of Pega and its subsidiaries worldwide*."

160.    The Code also stated that the Company is "commit[ted]" to "*[c]ompete fairly, honestly*, and vigorously," and "[m]aintain a culture that values and nurtures *ethical conduct* and fosters *transparency and honesty* by being fair and trustworthy in all our interactions with each other, our clients, and our partners."

161.    The Code included specific statements regarding Pega's treatment of competitors'

confidential information. For instance, the Code stated that the Company's "policy is to **protect the confidential information of third parties with the same care that we use to protect our own** confidential information."

162. The Code also assured stockholders that Pega would "**[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information**, such as trespassing, burglary, wiretapping, bribery, stealing, seeking confidential information from a new employee who recently worked for a competitor, **or misrepresenting your identity in hopes of obtaining confidential information**."

163. The Code also assured stockholders that the Company's Chairman, CEO, founder, and controlling stockholder – defendant A. Trefler – was one of Pega's moral compasses. For instance, a section of the Code titled "Compliance with the Code: If Issues or Questions Arise" assured stockholders that "[i]f any of [Pegasystems' employees] are asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer or our Chief Compliance Officer."

164. Defendants also assured stockholders that they "will not tolerate any deviation from our Code," and that they would "take prompt action to enforce this Code and all of Pega's other policies. Depending on the seriousness of the violation and the other relevant circumstances, violations of this Code may result in a formal or informal warning or reprimand, demotion, suspension, dismissal, or other disciplinary action."

165. Furthermore, the Code assured stockholders that "any supervisor who directs or approves of any conduct in violation of this Code, or who has knowledge of such conduct and does not immediately report it, also will be subject to disciplinary action, which may include suspension

or termination of employment."

166.    The Director Defendants' and CFO's statements in and about the Code were materially false and misleading when made, as reflected in Judge Young's opinion sustaining the Securities Action.  The true facts, which were then known or recklessly disregarded by the Defendants, included:

(a)    At Defendants' direction and on their watch, Pega regularly and knowingly competed unfairly and dishonestly by engaging in the far-ranging, malicious, and willful Illegal Scheme since as early as 2012, exposing Pega to reputational harm and billions of dollars in damages;

(b)    The Officer Defendants employed and/or knew their colleagues employed "illegal or questionable means to acquire a competitor's trade secrets or other confidential information," including collaborating with spies such as Zou to misappropriate Appian's trade secrets, and using fake names, corporate fronts, fictional companies, and other unethical and inappropriate means; Pega's employees had also "misrepresent[ed] [their] identify in hopes of obtaining confidential information," including, but not limited to, defendant A. Trefler (posing as "Albert Skii, "A. Ewe," and "Paul Foon"), defendant Baril (posing as "Andrew Powers" and "Emily Gold"), Fine, Le, Bessman, Potluri, and Sarada;

(c)    Defendant A. Trefler, whom Pega assured stockholders was responsible for providing "clarification and/or guidance as to the propriety of" employees' actions, knew (or recklessly disregarded) that he and Pega employees repeatedly violated ethical guidelines and the law by, *inter alia*, using fake names and aliases (as well as fake companies and corporate fronts) to infiltrate and misappropriate Appian's

confidential information.  A. Trefler's direct participation in (and knowledge of) egregious misconduct (including Project Crush and other teardown efforts) saddled him with an insurmountable conflict of interest, precluding A. Trefler from offering objective "clarification and/or guidance" with respect to employees' misconduct regarding Appian;

(d)    Pega's officers were unwilling and/or unable to seek A. Trefler's and/or the Chief Compliance Officer's "clarification and/or guidance as to the propriety of" Pega's conduct.  For instance, on or about October 17, 2019, defendant Baril questioned the "legality" of Pega's conduct and asked his direct supervisor – defendant Schuerman (Pega's CTO) – who Baril "can ping about the legality of using the [Appian's] system."  Defendant Schuerman – who knew Pega's CEO was behind Pega's "teardown" of Appian's system – failed to refer defendant Baril to Pega's CEO or Chief Compliance Officer, and instead directed defendant Baril to proceed with Pega's illicit conduct; and

(e)    Defendants failed to discipline employees that knew of or participated in Pega's scheme, in essence neutering Pega's Code.  For instance, not only did Pega continue to employ, and even promote, employees who participated in Pega's misappropriation of Appian's trade secrets – bounties were paid to employees who successfully obtained competitors' information.  Moreover, as alleged herein, under Defendants' direction and on their watch, Pega employees were permitted to continue spying on Appian and using Appian's trade secrets to win business.

### E.    False and Misleading Sarbanes-Oxley Act Certifications

167.    Each of the Company's SEC Forms 10-K and 10-Q referenced herein included signed, substantially identical certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")

by defendants A. Trefler and Stillwell.

168.    Those SOX certifications signed by defendants A. Trefler and Stillwell each certified, *inter alia,* that:

(a) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and

(b) "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

169.    At the time that these SOX certifications were signed, Defendants knew or recklessly disregarded facts indicating the statements in the SOX Certifications were materially misleading, including that: (a) Pega's SEC Forms 10-K and 10-Q did contain material misstatements and omissions of material facts; and (b) Pega filed false financial statements.

### F.    The Director Defendants and CFO Caused Pega to Fail to Disclose <u>Legal Proceedings in Violation of SEC Disclosure Rules</u>

170.    As alleged herein, the Director Defendants and CFO concealed the existence of their egregious misconduct and the Company's potential loss exposure related to the Virginia Action.

171.    The Director Defendants' and CFO's failure to disclose the existence of the Virginia Action in the Company's financial statements violated SEC disclosure rules.  The Director Defendants and CFO failed to make these required disclosures in each of Pega's SEC Forms 10-Q filed on July 28, 2020, October 28, 2020, April 28, 2021, July 28, 2021, and October

27, 2021, and Pega's SEC Form 10-K filed on February 17, 2021.

172.    The Director Defendants' and CFO's failure to disclose the Virginia Action by no later than the filing of Pega's 2Q20 10-Q was in direct violation of Item 103, which requires disclosure of any material pending legal proceedings:

> ***Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business***, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought.

17 C.F.R. §229.103(a).

173.    Accordingly, Item 103 required Pega to disclose the Virginia Action because it qualified as a material legal proceeding outside "'ordinary routine litigation incidental to [Pega's] business.'"

174.    Defendants' failure to disclose the Virginia Action prior to February 16, 2022 violated Item 103 and rendered Pega's public filings materially false and misleading.

**VII.    The Securities Action**

175.    Meanwhile, based on these same events, the Securities Action was filed against Pegasystems in the District of Massachusetts in 2022 on behalf of a class of investors.  On July 24, 2023, notwithstanding the materially heightened pleading standard applicable in the Securities Action pursuant to the Private Securities Litigation Reform Act ("PSLRA"),[30] Judge Young sustained the federal securities fraud claims raised against the Company and defendant A. Trefler

---

[30] The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086 (9th Cir. 2002).

in the Securities Action based largely on the facts supporting the judgment in the Virginia Action.[31] In so doing, Judge Young concluded, *inter alia*, that the allegations in the operative Securities Action complaint "raise a strong inference that [A.] Trefler was aware of, involved in, and directed Pega's corporate espionage against Appian" and that "[A.] Trefler knew or was reckless in not knowing that Pega's promise not to misappropriate trade secrets and his assurance that Appian's claims were 'without merit' posed a substantial danger to mislead investors."

176.    Moreover, in sustaining the Securities Action, Judge Young opined that "***far from involving just 'a few bad apples,' Pega's espionage campaign was organized and directed by the very 'nerve center' of the organization…[i]n short, Pega's most senior executives orchestrated and directed the conspiracy while fostering a corporate culture that promoted and harbored precisely the kind of behavior that Pega promised investors it would prohibit***."

177.    As to the allegations of Pega's issuance of false and misleading statements, Judge Young held that "***[a] false denial of Appian claims' merit posed an obvious danger to mislead investors as to the substantial financial risks Pega was facing in connection with the Virginia Action. The same can be said of Pega's promise not to engage in the very conduct underlying the Virginia Action, which caused the emergence of that financial risk***."

178.    Judge Young further found that certain statements contained in Pega's Code were "***objectively false***" and expressly rejected defendants' arguments that those statements were merely "aspirational" and that "only a 'handful' of Pega employees participated in the conspiracy.'". and Judge Young also noted that "Pega did not discipline the participants of the ***conspiracy…[r]ather, it encouraged and rewarded their malfeasance through cash bonuses***."

179.    Following Judge Young's July 24, 2023 ruling, the parties to the Securities Action

---

[31] The claims raised against defendant Stillwell in the Securities Action were dismissed without prejudice.

agreed in March 2024 to a $35 million settlement, of which the Company paid $32.4 million with its insurers paying the remaining $2.6 million.

180.    Notably, and unsurprisingly given that defendant A. Trefler at all times had "the ability to exert significant influence" over the DRC members' continued service on or removal from the Board, and that the DRC was advised by conflicted counsel, the DRC Report ignores Judge Young's ruling and the ample evidence from the Virginia Action supporting his findings.

## VIII.    PEGA'S BOARD-LEVEL BOOKS AND RECORDS AND THE DRC'S REPORT SHOW THAT THE DIRECTOR DEFENDANTS FAILED TO OVERSEE AND MONITOR ILLEGAL AND ANTI-COMPETITIVE ACTIVITIES

181.    Prior to serving their Demands, Plaintiffs made a statutory request pursuant to Section 16.02 for corporate books and records to Pega, seeking to inspect documents related to the Board's oversight of competitive intelligence activities and in particular the Illegal Scheme and related activities (the "Requests").

182.    In response, Pega produced to Plaintiffs certain non-public Board and Audit Committee materials purportedly reflecting relevant and responsive documents.  Pega notably did not produce any documents to Plaintiffs which pre-dated December 2020, despite the fact that the alleged Illegal Scheme occurred in significant part from 2012 until early 2020.  In response to an inquiry by counsel for Plaintiffs, counsel for Pega confirmed that it produced "all minutes and board materials containing any references to the litigation between Appian and Pegasystems in Virginia state court *and the underlying allegations between 2012 and the date of the verdict*". (Emphasis added).

183.    None of the documents produced by the Company pursuant to Section 16.02 refer to or reflect discussion of any processes or systems for monitoring or overseeing the Company's intellectual property compliance and competitive intelligence activities.  Nor do they reflect any

action taken by the Board in response to the allegations asserted by Appian in its complaint. Although the Company's Annual Proxy Statements state that the Board receives periodic updates on competition issues, and that the Company maintains a Competitive Intelligence group, no such discussion or reports reflecting or relating to those matters appears in the Board materials until there is a litigation discussion related to disclosure of the Virginia Action in February 2022 – nearly two years after Appian filed its complaint.

184.    The Company's failure to produce Board-level documents pursuant to Section 16.02 reflecting the Board's oversight during the period from 2012 through 2020 evidence that no such reporting to the Board occurred and/or no such system was in place, and that the reports described in the Company's Proxy materials did not exist.

185.    At most, Pega produced Board minutes and resolutions from December and October 2020 and from December 2021 containing references to the Board's review and approval of the Company's Code of Conduct.

186.    In short, none of the Board-level documents produced pursuant to Section 16.02 contained any report(s) to the Board on Pega's intellectual property compliance and competitive intelligence activities prior to February 2022 or the existence of any process to oversee such activities.

187.    The DRC Report confirms that the Board had no controls in place for overseeing the Company's intellectual property compliance or competitive intelligence activities until after Plaintiffs served their Demands.  The Report states unequivocally that there is "no evidence" that Independent Directors (*i.e.*, the Director Defendants except for A. Trefler) "were even aware (or should have been aware) that Pegasystems personnel had engaged Mr. Zou or other third-party competitive intelligence consultants or were accessing Appian's trial environment until these

activities were alleged in the Appian Litigation[.]"[32]  Given the evidence showing that A. Trefler was aware of both Zou's engagement and Company employees accessing Appian's trial environments, the Board's lack of controls and reporting requirements and/or A. Trefler's lack of candor with the Board are the only reasonable explanations for their complete lack of awareness.

188.    In response to the Demands the Board created a Risk Sub-Committee of the Audit Committee ("Risk Sub-Committee") focused on risk and compliance.    Among other responsibilities, the Risk Sub-Committee was responsible for receiving and reviewing "quarterly reports from the Chief Compliance Officer, or more often as necessary, concerning (a) the Company's risk management framework and policies; (b) the Company's material compliance with applicable laws and regulations, including those concerning trade secrets and intellectual property; and (c) any recommendations regarding the foregoing."[33]  And the Risk Sub-Committee was to "provide an update to the full Board at least once per financial quarter on its work and observations."[34]  Given the lack of any board materials on these topics, it is reasonably inferable that no such reports were made to the Board until after Plaintiffs served their Demands and the Board adopted these new controls.

189.    Similarly, only after Plaintiffs made their Demands did the Board require management-level reports to the Board on the following topics: "the Company's material compliance with applicable laws and regulations, including those concerning trade secret protection and intellectual property compliance."[35]  Again, given the lack of any Board materials on these topics, the only reasonable inference is that no such reports were made to the Board until after Plaintiffs served their Demands and the Board adopted these new controls.

---

[32] Report at 75.
[33] Report at 112-13.
[34] *Id.* at 113.
[35] *Id.*

## IX.    DAMAGES TO PEGASYSTEMS

190.    Pegasystems has been, and will continue to be, severely damaged and injured by the Defendants' breaches of fiduciary duty and other serious misconduct.

191.    As a direct and proximate result of the Defendants' actions, Pegasystems has expended and will continue to expend significant sums of money, easily exceeding $110 million to date.  Such expenditures include, but are not limited to:

a.    More than $2 billion in potential liability and millions in additional legal fees associated with the ongoing Virginia Action;

b.    Payment of $32.4 million in connection with the settlement in the Securities Action;

c.    Legal fees and expenses associated with the Virginia Action, the Securities Action, and an SEC investigation totaling more than $80 million;

d.    loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Defendants' false statements and lack of candor to the securities markets;

e.    amounts paid to outside lawyers, accountants, and investigators in connection with various investigations; and

f.    loss of revenues and profits.

## X.    THE DRC REPORT IS INADEQUATE AND DOES NOT SUPPORT WHOLESALE REJECTION OF THE DEMANDS

192.    The DRC issued the Report on October 7, 2024.  In the Report, the DRC concluded that "it would not be in the Company's best interests to pursue litigation against any of the challenged directors and officers with respect to the matters raised in the Demands and that

there are no valid claims against them." Report at 4.

193.    In sharp contrast to the sworn testimony and evidence detailed above, the DRC found that "between 2012 and 2014, *at Mr. Petronio's initiative*, Pegasystems periodically worked with a consultant, Mr. Zou," to learn about Appian.[36]  And ***between 2012 and 2021, ten full-time Pegasystems employees accessed Appian's free trial*** platform by misrepresenting their identities and/or purposes, and that Mr. Trefler registered for Appian marketing materials using a personal email address that did not disclose his name" but did not himself access an Appian free trial.[37] The DRC credited the reports of the Officer Defendants "that they did not realize the means by which Mr. Baril had acquired … access [to the Appian free trials], *i.e.*, using aliases, until the Appian Litigation."[38] And despites reams of evidence from the Virginia Action to the contrary, the Report concludes that none of Pega's clandestine access of Appian's software involved trade secrets.  The DRC based these "factual" findings on the unsworn statements and opinions of the Officer Defendants and their litigation counsel.[39]

194.    Based on this contrived narrative, the DRC rejected the Demands in their entirety citing four reasons:

a) "the Fiduciaries did not breach their fiduciary duties in connection with the alleged misappropriation of competitors' trade secrets."

b) "the Company's disclosures decisions were reasonable and fully compliant with the federal securities laws."

c) the DRC found insufficient "evidence that the Fiduciaries caused Pegasystems to incur expenses related to the Appian Litigation … in bad faith, irrationally, or antithetically to the Company's best interests."

d) the DRC "did not identify evidence to support an unjust enrichment claim arising from the Fiduciaries receiving renumeration based on an artificial valuation of Pegasystems'

---

[36] Report at 74-75.
[37] *Id.* at 75.
[38] Report at 79.
[39] *Id.* at 75-76.

stock or that was otherwise unjust in light of bad faith conduct."

195.    The Report is deficient and cannot be credited. The Report lacks the requisite factual support to demonstrate that the Board and DRC members were independent and relies on a flawed process and summary conclusions drawn from an incomplete and skewed evidentiary record.

### A.    The Director Defendants (Including the DRC Members) Are Not Independent

196.    Strikingly, the Report fails to include any analysis of the independence of the full Board itself (a conspicuous omission particularly given A. Trefler's control over the election and removal of all other Board members). And the Report devotes just one sentence (p. 24) to describing the process for confirming the DRC members' independence before summarily concluding that all DRC members were "independent and disinterested."  Other than describing the DRC members' respective professional backgrounds as reflected in the Company's publicly-available proxy materials, noting the occurrence of meetings with the DRC's counsel, and reviewing an undisclosed checklist regarding certain relationships, the Report includes no facts or information adduced through any background check or any reasonable, good faith analysis supporting a conclusion regarding the adequacy of any independence or lack thereof. Such cursory analysis cannot support independence.

197.    The Director Defendants and DRC members lack independence for purposes of the DRC's investigation and Report based on *multiple* factors including: (i) A. Trefler's control of the Board and the Company, including Defendants' lucrative compensation; (ii) that the Director Defendants face a substantial likelihood of liability for their failure to implement reasonable controls concerning Pega's business practices, in breach of their fiduciary duties to the Company; (iii) the Director Defendants are named as defendants in numerous lawsuits that involve the subject

of the Demands; (iv) that one member of the DRC acquired shares of Pega stock while in possession of material non-public information concerning the results of the investigation; and (v) the DRC's legal counsel has conflicting ties to a Director Defendant, who is a client of the firm.

198.    *First*, the Director Defendants and DRC members lack independence from A. Trefler. According to the Company's Annual Report on SEC Form 10-K filed in February 2023, just before the earliest of Plaintiffs' Demands was issued to the Board in March 2023, at that time defendant A. Trefler held approximately 48% of the outstanding shares of Pegasystems common stock.  At various times during the relevant period, A. Trefler's holdings exceeded 50%.  As Pega's controlling stockholder, Chairman, CEO, and founder, A. Trefler is able to control the Company's business and all major decisions requiring a vote of stockholders, including the election of directors which occurs annually.  The Director Defendants, by signing Pega's Annual Reports on Form 10-K, admitted to A. Trefler's control over the Company.

199.    Each member of the Board depends upon (and for many years has depended upon) A. Trefler for their lucrative director positions and related compensation they receive for service as Board members.  Each of them has received millions of dollars' worth of stock or securities for their service on the Board.

200.    The members of the DRC are no different.  Defendant Rowlands has been a Board member since 2016 and has received compensation in cash and stock of over $1,949,000. Defendant Rowlands' current stock holdings of 43,370 shares of Pega as per the Company's 2024 Proxy Statement, are worth over $3.1 million based on Pega's current market price of over $72.00 per share.   Defendant Ledingham has been a Board member since 2016 and has received compensation in cash and stock of over $1,809,300.  Defendant Ledingham's current Pega stock holdings of 36,311 shares are worth over $2.6 million.   Defendant Lafond has been a Board

member since 2019 and has received compensation in cash and stock of over $1,405,260. Defendant Lafond's current Pega stock holdings of 28,945 are worth over $2.1 million.

201.     In sum, the Report makes no attempt whatsoever to explain how the DRC members were determined to be independent in the first instance – or thereafter actually investigated and responded to the Demands objectively and impartially – despite the fact that at all times, as repeatedly admitted in Pega's own SEC filings, defendant A. Trefler had and has "the ability to exert significant influence over all matters submitted to our stockholders for approval, including the election and removal of directors" from the Board.  This stunning omission from the Report, in the circumstance where perhaps the central figure of the DRC's investigation holds the power to remove the DRC members from their Board positions if he was displeased by any investigative steps they took or conclusions they reached, frankly sticks out of the Report like a sore thumb.

202.     *Second*, the Director Defendants and DRC face a substantial likelihood of liability for their failure to establish controls to detect the Illegal Scheme and their failure to respond to the glaring red flag revealed to them with the filing of the Appian complaint.

203.     Under Massachusetts law, corporate directors lack are liable for a non-exculpated breach of their fiduciary duties for "a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure that a reasonable information and reporting system exists, or particularized facts that support an inference that the directors did possess knowledge of facts suggesting potential accounting improprieties ... and took no action to respond to them."  *Blake v. Friendly Ice Cream Corp.*, 2006 WL 2714976, at *4 (Mass. Super. Aug. 24, 2006) (citations omitted).  Plaintiffs' Demands clearly asked that the Board investigate and take appropriate action for any such oversight liability.  For example, Plaintiff Birch's pre-suit demand

asked that "Pegasystems fully investigate and take appropriate action ... concerning … the Board's failure to oversee and investigate the Company's business practices …."  Birch Demand at 2.

204.    The DRC, however, omitted oversight liability from the scope of its investigation. As discussed above, the Report essentially concedes that the Board exercised no effort to oversee the Company's intellectual property compliance or competitive intelligence practices.  *Supra*, §§_. Given the substantial likelihood of liability for the Director Defendants' failure to act on their oversight obligations until well after the Appian Action was filed, they are not independent.

205.    *Third*, every member of the Board, including all the members of the DRC, are named individual defendants in multiple lawsuits related to the allegations set forth in the Demands.  In addition to this Action, there is another derivative action pending in federal court naming as defendants the Director Defendants.[40]  As defendants, the Director Defendants face potential liability for their alleged misconduct as described herein.

206.    *Fourth*, defendant Rowlands, who is a member of the DRC, had a conflicting financial interest in the DRC's decision.  Defendant Rowlands acquired 8,600 shares of Pega common stock on June 11, 2024 for approximately $504,218 through an open market or private purchase while the findings of the DRC's investigation absolving Defendants of wrongdoing in the Appian matter were pending, but before the Report was issued.  The Report's findings on non-culpability of the Director and Officer Defendants would likely be considered by the market as positive news for the Company, which strongly suggests (or at minimum gives rise to a reasonable inference) that defendant Rowlands traded in Pega stock while in possession of material, non-public information.

---

[40] *Larkin v. Trefler, et al.*, 1:25:-cv-10303 (D. Mass. 2025).

### B.    The DRC Investigation Followed a Defective Process

207.    Predictably, the conflicted DRC issued the Report whitewashing the Defendants' misconduct. The Report describes an investigatory process that purportedly included a review of internal documents, certain trial evidence, and unsworn interviews of seventeen witnesses. However, many of the fact witnesses with firsthand knowledge of the Illegal Scheme interviewed by the DRC all have significant personal bias as to the Demands, as they could potentially be subject to liability if they provided any information suggesting culpability. Other central witnesses to the events were not interviewed and their testimony from the Appian Litigation was ignored.

208.    The DRC interviewed seven members of senior management, five of whom are defendants in various related litigation matters. It also interviewed four members of Pega's outside legal counsel who have no firsthand contemporaneous knowledge of the Illegal Scheme, and their representation of Pegasystems was limited primarily to the trial and appeal in the Virginia Action. The remaining witnesses interviewed by the DRC were the Director Defendants, including the DRC members, all of whom are co-defendants in this Action for their failure to implement reasonable business controls.

209.    The DRC conspicuously failed to interview a number of key witnesses with first-hand knowledge of the Illegal Scheme. Those witnesses included, among others, Petronio, defendant Baril, Kim, Bearden, Bixby, and KForce. Petronio and defendant Baril are particularly notable omissions, given the Report's conclusions attributing the genesis of the Illegal Scheme to them. The only reasonable inference arising from the DRC's decision not to interview these key witnesses is that the DRC chose to avoid information conflicting with the self-serving interview statements from the Officer Defendants – those who had most to lose from the investigation.

210.    The DRC's failure to interview defendant Baril is particularly egregious because he still works for the Company and would have been available to assist the DRC, if it had asked

him.

211.     Unlike the DRC, Plaintiffs asked Petronio to sit for an interview.  The information that Petronio provided flatly contradicts the Report's core conclusions.  If the DRC had bothered to interview him, it would have learned, for example, that Petronio did not contact KForce to establish the Pega's relationship with Zou at his own initiative, as the Report claims.[41]  Instead, Pega management directed Petrinio to use KForce to find an Appian consultant.  And Petronio regularly updated his superiors, including the Officer Defendants, regarding his work with Zou.

212.     Additional information highly relevant to the Report from Petronio, which is largely corroborated by sworn testimony and trial exhibits from the Virginia Action, included the following:

- A. Trefler met with Zou during a meeting at Pega.[42]  Afterwards, A. Trefler asked for a detailed follow-up presentation regarding information learned from Zou, which Petronio presented to him.[43]

- Petronio discussed his work with Zou with Pega's in-house counsel, who reported to A. Trefler.[44]

- Petronio discussed the budget for Zou with Defendant L. Trefler.[45]

- Defendant Schuerman led a white-board discussion with Zou and Pega employees about how to pitch Pega's software to beat Appian.[46]

- Defendant Schuerman reviewed videos of Zou's demonstrations of Appian's platform and provided feedback on them before they were disseminated at Pega.[47]

---

[41] Report at 74.
[42] *See* PLT-191; Trial Tr. 1675:14-1676:7.
[43] *See* PLT-43.
[44] Petronio did not disclose the substance of any conversation with Pega's in-house counsel.
[45] See Trial Tr. 1648:18-51:14.
[46] *See* Trial Tr. 1678:2, 1678:4-18; PLT-734.
[47] See Trial Tr. 1736:15-38-6.

- Defendant Baril meet with Zou for an entire day and used the information he learned for a report that went to Defendant Schuerman and others.[48]

- Zou made a presentation for Defendant Akgonul.[49]

- Petronio was given a severance package and laid off with a number of other people in marketing; he was not placed on a performance plan or told that his performance was the reason for his termination.

213.    Petronio would have also highlighted Pega's deficient culture, which the Report ignores entirely.  Tellingly, Pega employees were rewarded for providing information about the Company's competitors, and management did not care where that information came from.  Simply put, Pega did not have the right culture to even ask if was appropriate for a consultant to provide access to a competitor's platform.

214.    In light of the DRC's failure to interview Petronio and other relevant fact witnesses, it is not reasonable to credit the Report's factual findings, including that the Officer Defendants did not knowingly engage in misconduct. Report at 75.

215.    The DRC's document review process was also critically flawed.  Despite the Illegal Scheme having commenced in approximately 2012, it appears that the DRC inexplicably failed to review years' worth of Board minutes and materials that existed prior to 2020 – at a time the Illegal Scheme was actively being pursued.  Thus, the DRC's conclusion that none of the Director Defendants knew of the misconduct at Pega was apparently reached without any consideration of the contemporaneous Board materials and the nature of its oversight, if any, of

---

[48] *See* PLT-775 at 1-2 (2014 Project Crush Results & Next Steps document authored by Baril, stating: "Petronio and I hired an Appian Consultant to develop a simple use case that mimicked one from an opportunity where we had competed against Appian ... We spent two days with the consultant watching him develop this use case, asking questions throughout the process and taking a ScreenCam for review at a later date.")

[49] *See* PLT-61 at 1 (Dec. 20, 2012 email from Petronio to Zou: "Youyong – Next week, we're going to have an important attendee – Kerim Akgonul, our VP or [sic] Product Management. I think it would be good to build a small application from scratch."); PLT-188 at 1 (Akgonul describing the session as "pretty good").

Pega's intellectual property compliance and competitive intelligence activities—information critical to determining whether the Board and DRC are independent.   Nor is there any evidence that the DRC reviewed internal documents reflecting the existence of any internal controls over competitive intelligence activities or whether such controls, if they existed, were effective.

216.    As Pega was engaged in serious misconduct involving Appian since at least 2012, the DRC should have reviewed and considered these materials in connection with its investigation to determine what the Director Defendants knew or should have known and whether the Board exercised adequate oversight or implemented sufficient measures to oversee intellectual property compliance, among other things.

217.    In contrast, Plaintiffs demanded to inspect and thereafter obtained and analyzed Board-level documents pursuant to Section 16.02 concerning Defendants' misconduct.   As discussed above, the documents produced by Pega pursuant to Section 16.02 in fact show that the Director Defendants utterly failed in their oversight responsibilities—a topic conspicuously avoided by the DRC in the Report.

C.    **Evidence From an Incomplete Record Does Not Support the Conclusion that Defendants Did Not Breach Their Fiduciary Duties**

218.    More troublingly, the DRC had available to it a fully-developed evidentiary record from the Virginia Action, as described above, but instead relied on unsworn and biased witness statements while discounting contrary sworn testimony and other evidence from the Virginia Action in reaching its conclusions.  Among other things the Report:

- Provides only a cursory factual record with conclusory determinations and without citing any relevant internal documents while relying heavily on unsworn interviews with biased witnesses;

- Fails to consider or summarily dismissing sworn testimony and record evidence from the Virginia Action that is contrary to the "unsworn" statements from interviews of interested and potentially culpable witnesses;

73

- Fails to consider the harm occasioned from the more than $80 million in legal fees incurred from the Virginia Action which stemmed from the Illegal Scheme and will continue to mount;

- Fails to consider the harm resulting from the Company paying a $32.4 million settlement in the sustained Securities Action; and

- Fails to consider the institutional intent to destroy Appian as reflected in the corporate culture and driver of a multi-year Illegal Scheme led by its CEO and controlling stockholder.

219. Given these material gaps in the DRC's investigation, especially in light of the sworn statements and other evidence detailed above, the Report cannot support dismissal of the Action.

### D. Defendant Rowlands Was and Is a Client of Fried Frank, Which the DRC Report Fails to Disclose or Account For

220. The myriad failings of the DRC set forth above are all that much more glaring in light of the fact that the DRC's handpicked, purportedly "independent" counsel, Fried Frank, represented Rowlands in the Rowlands Matter. The Report does not disclose the pre-existing attorney-client relationship between Fried Frank and Rowlands, let alone describe any process by which the DRC and/or Fried Frank determined that Fried Frank could serve as independent counsel to the DRC and objectively investigate alleged wrongdoing by its own client.

221. Notably, according to public filings in the Rowlands Matter, the Fried Frank partner who led the defense of defendant Rowlands in the Rowlands Matter is Peter L. Simmons, Esq. ("Mr. Simmons"). Fried Frank's website states that Mr. Simmons currently serves alongside Scott B. Luftglass, Esq. ("Mr. Luftglass") as Co-Heads of Fried Frank's Securities and Shareholder Litigation Practice. Per the Report, Mr. Luftglass, the Vice Chairman of Fried Frank, was one of two Fried Frank partners leading the Fried Frank team that served as purportedly independent counsel to the DRC.

## XI.    DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

222.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Defendants' breaches of fiduciary duties.

223.    As set forth above, Plaintiffs are current shareholders of the Company and were shareholders of the Company at the time of the Defendants' wrongdoing alleged herein.

224.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

225.    Because the DRC wrongfully refused Plaintiffs' Demands, Plaintiffs commenced this derivative litigation in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused Pegasystems.

226.    Plaintiffs timely filed this derivative litigation within the three-year statute of limitations period under Massachusetts law.

## XII.    CLAIMS

## <u>COUNT I</u>

## Breach of Fiduciary Duty Against the Officer Defendants

227.    Plaintiffs incorporate by reference and restate each and every allegation set forth above, as if fully set forth herein.

228.    The Officer Defendants—*i.e.*, A. Trefler (in his capacity as a Pega officer), L. Trefler, Schuerman, Akgonul, Stillwell, and Baril—were and are fiduciaries of the Company. As such, the Officer Defendants owed and continue to owe the Company and its stockholders the highest duties of loyalty, due care, good faith, and prudence.

229.    Consistent with their fiduciary duties, the Officer Defendants were required not to take illegal, prohibited, or unethical actions with regard to its business practices and competition with its peer companies and to report any such potential conduct to the Board.

230.    The Officer Defendants consciously breached their fiduciary duties and/or acted with gross negligence in myriad ways, including directing, participating in, and failing to terminate or report the Illegal Scheme.

231.    As a direct and proximate result of Officer Defendants; bad faith failure to carry out their fiduciary duties, Pega has sustained, and will continue to sustain, significant damages, both financially and to its corporate profile and goodwill.  Those damages include an amount Pega potentially owes as a result of the Virginia Action, the settlement amount already paid in the Securities Action, and associated legal fees.

232.    As officers of the Company, the Officer Defendants are not entitled to exculpation under BCL 2.02(b)(4).

233.    As a result of the conscious and bad faith misconduct alleged herein, the Officer Defendants are liable to the Company.

234.    Plaintiffs and Pega have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty Against the Director Defendants

235.    Plaintiffs incorporate by reference and restate each and every allegation set forth above, as if fully set forth herein.

236.    The Director Defendants, as Board members, were and are fiduciaries of the Company.    As such, the Director Defendants owed and continue to owe Pega and its stockholders the highest duties of loyalty, due care, good faith and prudence.

237.    Consistent with its fiduciary duties, the Director Defendants were required to implement and monitor policies and systems of corporate controls and reporting to ensure that Pega did not take illegal, prohibited, or unethical actions with regard to its business practices

and competition with its peer companies. The Director Defendants knowingly and in bad faith failed to implement and monitor such Board-level system of oversight. The Director Defendants also failed to respond to an obvious red flag when presented with the serious allegations of the theft of trade secrets in Appian complaint.

238.    The Director Defendants failed to implement and monitor a Board-level system of oversight to ensure compliance with: (i) ethical corporate business practices; (ii) the Company;s Articles of Organization; (iii) state trade secret law; and (iv) federal law, including trade secret and securities laws.

239.    By failing to make a good faith effort to timely implement and monitor an oversight system, the Director Defendants individually and collectively failed to exercise their fiduciary duties to Pega and its stockholders.

240.    As a direct and proximate result of the Director Defendants' bad faith failure to carry out their fiduciary duties, Pega has sustained, and will continue to sustain, significant damages, both financially and to its corporate profile and goodwill. Those damages include an amount Pega potentially owes as a result of the Virginia Action, the settlement amount already paid in the Securities Action, and associated legal fees.

241.    As a result of the conscious and bad faith misconduct alleged herein, the Director Defendants are liable to the Company.

242.    Plaintiffs and Pega have no adequate remedy at law.

## COUNT III

**Breach of Fiduciary Duty Against the Director Defendants and Defendant Stillwell**

243.    Plaintiffs incorporate by reference and restate each and every allegation set forth above, as if fully set forth herein.

77

244.     As directors and officers of the Company, the Director Defendants and CFO are fiduciaries of the Company and owe Pega and its stockholders the highest duties of loyalty, due care, good faith and prudence.

245.     The Director Defendants and CFO made public statements containing materially misleading and incomplete concerning (i) Pega's competition, sales, and marketing practices in the BPM market; (ii) Pega and its competitors' intellectual property; (iii) the Virginia Action and Appian's claims against Pega; (iv) Pega's Code of Conduct and compliance with ethical and legal guidelines; and (v) SOX certifications.

246.     As a direct and proximate result of the Director Defendants' and CFO's bad faith failure to carry out their fiduciary duties, Pega has sustained, and will continue to sustain, significant damages, both financially and to its corporate profile and goodwill.   Those damages include the settlement amount already paid in the Securities Action and future liability involving stockholders who have opted out of the Securities Action and related fees and expenses.

247.     Plaintiffs and Pega have no adequate remedy at law.

## COUNT IV

### Derivatively Against the DRC Defendants for Breach of Fiduciary Duty

248.     Plaintiffs incorporate by reference and restate each and every allegation set forth above, as if fully set forth herein.

249.     The DRC Defendants lack independence from the Company's controlling shareholder A. Trefler, who the Company admits exerts significant influence over the election and removal of all other Board members, and they conducted an unreasonable and insufficient inquiry. The DRC Defendants breached their fiduciary duties by wrongfully considering the Demands

despite their lack of independence and rejecting the Demands based on unsupported findings and conclusions.

250.    As a direct and proximate result of the breaches of duty alleged herein, Pegasystems has sustained and will sustain significant damages, including the cost of defending this Action.

251.    As a result of the misconduct alleged herein, the DRC members are liable to the Company.

252.    Plaintiffs, on behalf of Pegasystems, have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.    An order declaring that Plaintiffs may maintain this action on behalf of Pegasystems, and that Plaintiffs are adequate representatives of the Company;

B.    An order declaring that Defendants have breached their fiduciary duties to Pegasystems;

C.    An order directing Pegasystems to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including putting forward a stockholder vote any resolutions for remedial measures that may be required, and taking such other actions as may be necessary;

D.    An order determining and awarding to Pegasystems the damages sustained by it as a result of the violations set forth above by Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E.      Awarding to Pegasystems from each Defendant and ordering them to disgorge all inequitable profits, benefits, and other compensation obtained;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: March 18, 2025

OF COUNSEL:

Edward G. Timlin*
Eric J. Riedel*
**BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400
Edward.Timlin@blbglaw.com
Eric.Riedel@blbglaw.com

*Pro hac vice motions pending

Richard A. Speirs
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 220-2912
rspeirs@cohenmilstein.com

Peretz Bronstein
**BRONSTEIN GEWITZ & GROSSMAN**
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: 212-697-6484
peretz@bgandg.com

*Counsel for Plaintiff Jayne Birch*

By:   */s/ Joel Fleming*
Joel Fleming (BBO #685285)
Lauren Godles Milgroom (BBO #698743)
**EQUITY LITIGATION GROUP LLP**
101 Arch Street, 8th Floor
Boston, MA 02114
jfleming@equitylitigation.com
lmilgroom@equitylitigation.com

*Counsel for Plaintiffs John Dwyer and Ray Gerber*

Daniel Silverman (BBO #704387)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

*Counsel for Plaintiffs*

80

Rusty E. Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
rusty@shumanlawfirm.com

Brett D. Stecker
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
brett@shumanlawfirm.com

Michele Carino
**GREENWICH LEGAL ASSOCIATES, LLC**
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
mcarino@grwlegal.com

*Counsel for Plaintiff Robert Garfield*

**VERIFICATION**

I, John Dwyer, under the pains and penalties of perjury, hereby depose under oath and say that I have read the foregoing Verified Consolidated Stockholder Derivative Complaint and that the averments contained therein are true and correct to the best of knowledge based on my personal knowledge as to myself and my own actions and the investigation of my attorneys as to other matters.

Signed under pains and penalties of perjury on 3/14/2025 | 2:54 PM PDT _____.

_____
John Dwyer

## **VERIFICATION**

I, ___Jayne Birch (Brandon)_, under the pains and penalties of perjury, hereby depose under oath and say that I have read the foregoing Verified Consolidated Stockholder Derivative Complaint and that the averments contained therein are true and correct to the best of my knowledge based on personal knowledge as to myself and my own actions and the investigation of my attorneys as to other matters.

Signed under pains and penalties of perjury this

___18th_____ day of March 2025

_____

Jayne Birch

**<u>VERIFICATION</u>**

I, Robert Garfield, under the pains and penalties of perjury, hereby depose under oath and say that I have read the foregoing Verified Consolidated Stockholder Derivative Complaint and that the averments contained therein are true and correct to the best of my knowledge, based on my personal knowledge as to myself and my own actions and the investigation of my attorneys as to other matters.

Signed under pains and penalties of perjury this <u>14th</u> day of March, 2025.

*robert garfield*
_____
Robert Garfield

**Dropbox Sign**

Audit trail

| | |
|---|---|
| Title | PegaSystems (PEGA) Robert Garfield Shuman Verification |
| File name | PegaSystems__PEGA..._Verification.pdf |
| Document ID | fb179e38cc1c12a932c04d1a5065cd999a5673b8 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **03 / 14 / 2025**<br>18:38:27 UTC-4 | Sent for signature to Robert Garfield (topsy2626@aol.com)<br>from mlacoff@grwlegal.com<br>IP: 74.108.24.200 |
| **VIEWED** | **03 / 14 / 2025**<br>20:37:23 UTC-4 | Viewed by Robert Garfield (topsy2626@aol.com)<br>IP: 73.55.43.140 |
| **SIGNED** | **03 / 14 / 2025**<br>20:38:07 UTC-4 | Signed by Robert Garfield (topsy2626@aol.com)<br>IP: 73.55.43.140 |
| **COMPLETED** | **03 / 14 / 2025**<br>20:38:07 UTC-4 | The document has been completed. |