# Exhibit E

# SHUMAN, GLENN & STECKER

Telephone: 303.861.3003
Facsimile: 303.536.7849
www.shumanlawfirm.com

*600 17th Street, Ste. 2800 South*
*Denver, CO 80202*

Philadelphia · San Francisco

May 17, 2023

**Via Electronic Mail**

Alan Trefler, Chairman
The Board of Directors
Pegasystems Inc.
One Main Street
Cambridge, MA 02142-1531

c/o: Michael T. Glass
Choate Hall & Stewart LLP
mgass@choate.com

Re: Demand for Action Pursuant to ALM GL ch. 156D, § 7.42

Dear Mr. Trefler:

I write on behalf of Robert Garfield (the "Stockholder"), an owner of the common stock of Pegasystems Inc., a Massachusetts corporation ("Pega" or the "Company"),[1] to demand that the Company's Board of Directors (the "Board") commence an independent investigation into potential wrongdoing by certain current and former officers and directors of Pega pursuant to ALM GL ch. 156D, § 7.42 (the "Litigation Demand").

Specifically, the Board must undertake and independent, good-faith investigation into whether you ("A. Trefler"), Peter Gyenes, Richard Jones, Steven Kaplan, James O'Halloran, William Wyman, Christopher Lafond, Dianne Ledingham, Sharon Rowlands, Larry Weber, Pega's Chief Product Officer ("CPO") Kerim Akgonul ("Akgonul"), Chief Technology Officer ("CTO") Don Schuerman ("Schuerman"), and A. Trefler's brother Leon Trefler ("L. Trefler"), Head of Product Marketing Douglas Kim ("Kim"), John Petronino, Pega's former Director of Product Marketing, Ben Baril, Pega's Director, Office of the CTO, and Chief Administrative Officer Kenneth Stillwell ("Stillwell") (together the "Pega Insiders" or "Management") breached their fiduciary duties by: (i) causing or permitting the Company to perpetrate a scheme whereby third parties were paid to steal trade secrets from a competitor, Appian Corporation ("Appian"); (ii) causing or permitting the Company to perpetrate a scheme whereby Pega employees created false personas to infiltrate and/or access Appian's platform for the purpose of misappropriating Appian trade secrets; (iii) violating the Company's Code of Conduct by engaging in an illegal

---

[1] As used herein, the terms "Pega" and the "Company" include all Pega employees and directors, as well as all affiliates, joint ventures, and subsidiaries.

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 2

scheme to misappropriate trade secrets from Appian; (iv) failing to ensure that the Company's senior officers and/or employees and/or directors were acting in compliance with state and federal laws; and (v) causing the Company to issue a series of materially false and misleading public statements concerning Pega's purported compliance with state and federal laws.

Should the Board's investigation conclude that any or all of the Pega Insiders breached their fiduciary duties, the Stockholder demands that the Board institute litigation against such individuals to recover the damages their misconduct has caused the Company. In addition, the Board must investigate whether any stock sales made by any of the Pega Insiders between approximately February 2012 and the present were made while in possession of material, non-public, adverse information regarding the foregoing in violation of Massachusetts and federal law. If so, the Board must file suit against those individuals to reclaim their unjust profits for the benefit of the Company. Finally, the Stockholder believes that the Company's legal claims for relief against A. Trefler, Akgonul, Scheurman, Kim, and L. Trefler are ripe for filing right now based on testimony presented under oath in the Virginia Action (discussed herein below). These Pega Insiders have been found to have plausibly committed fraud, and thus the Company should immediately file suit to recover the damages their misconduct has caused Pega.

I.  **The Stockholder Is A Current Owner Of Pega Stock**

The Stockholder is a current Pega stockholder with a right to demand the relief requested herein. The Stockholder previously made a demand for inspection of Pega books and records pursuant to G. L. ch. 156D, § 16.02 dated April 18, 2023 (the "Inspection Demand").[2] In connection with the Inspection Demand, the Stockholder provided the Company with a Declaration attesting to the Stockholder's ownership of Pega stock and evidence of that ownership since May 31, 2016. These documents should still be in the Company's possession.

II. **Overview of the Pega Insiders' Alleged Misconduct**

A.  **Pega, "Project Crush" and Appian**

According to its public SEC filings, Pega operates in the intensely competitive Business Process Management ("BPM") industry, providing a "low-code" development platform that allows customers to build customized workflow-based applications for their business needs. According to Pega, "low-code" software allows customers to "configure and evolve" customized business applications without having to "write code." Analyst J.P. Morgan has similarly described "[l]ow-code (no-code) platforms" as "allow[ing] business users with minimal coding experience (citizen developers) to easily create workflow-based process-centric applications."

According to Pega's SEC filings, the Company's "target clients are Global 3000 organizations and government agencies," including companies in the financial services, life

---

[2] The Stockholder received the materials produced by the Board in response to the Inspection Demand on May 11, 2023.

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 3

sciences, healthcare, communications and media, insurance, manufacturing, high tech, and consumer services industries.

Appian operates in the same industry as Pega and is one of the Company's primary competitors. Founded in 1999, Appian competes in the same BPM industry as Pega, providing a low-code development platform for customers to quickly develop business applications. As analyst J.P. Morgan stated in August 2020, Appian's "strength lies in its low-code application development platform." Appian generates revenue by licensing its software to customers and business partners. An Appian license permits the licensee to develop custom, low-code applications using Appian's development environment and run them on Appian's platform. An Appian license also permits the licensee to access Appian's documentation, which describes the technical features of Appian's software platform, and techniques that can be used to build applications on Appian's platform.

Management viewed Appian as a serious competitive threat and one of Pega's top competitors. Management commenced an illicit scheme against Appian in early 2012 with "Project Crush," an operation that involved recruiting an experienced Appian developer who was willing to misappropriate Appian's trade secrets for Pega. Management hired outside third party KForce Inc. ("KForce") to identify candidates for Pega to recruit, emphasizing to KForce that the potential candidate could not be "loyal" to Appian. In February 2012, KForce introduced Management to Youyong Zou ("Zou"). For years, Zou worked for U.S. government contractors utilizing Appian's platform to build software applications. Zou's employment with government contractors provided Zou with access to the Appian software and documentation that Management coveted.

From approximately February 2012 to September 2014, Zou collaborated extensively with Management, by using his Appian credentials to access Appian's trade secrets and sell them to Pega. Management in turn funneled payments to Zou through KForce, the middleman entity. Management also employed several measures to conceal the improper operation, including assigning Zou the pseudonym "Matt (so that he isn't 'outed' as our spy)."[3]

Zou's undertaking for Management included creating extensive video footage of Appian's platform, covertly downloading for Management large volumes of Appian's confidential documentation, showcasing for Management the functionality of the Appian platform, providing Management with valuable insight into Appian's software, showing Management how to use and navigate Appian's platform, and answering Management's detailed technical questions about Appian's software. Zou also met and collaborated with several of Pega's officers, senior executives, engineers, and managers as part of Project Crush, including A. Trefler, Akgonul, Scheurman, Kim, and L. Trefler.

Armed with Appian's misappropriated trade secrets and confidential information, Management used this information to, *inter alia*, develop invaluable sales and intelligence materials, train Pega's salesforce to effectively compete against Appian, win customers and deals

---

[3] PLT 377. References to "PLT," "PLTD," "Depo. Tr.," and "Trial Tr." herein are to exhibits and/or transcripts in the Virginia Action, which is defined below. Emphasis is added throughout.

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 4

over which Pega and Appian directly competed, and make improvements to Pega's own software. Management disseminated Appian's misappropriated information to hundreds of Pega employees, extolling its importance and promising that – with the benefit of Zou's information – Pega "will win EVERYTIME" and "should never lose against Appian!"[4] Management used the highly valuable information obtained from Zou for many years – up until at least 2020.

Pega's top executives were also in on this illicit scheme. A. Trefler – Pega's Chief Executive Officer ("CEO"), founder, and Chairman of the Board – personally met with Zou at Pega's corporate headquarters, reviewed information Zou had misappropriated for Pega, and employed that information to "blow…up" Appian's deals.[5] As one of the two whistleblowers who alerted Appian to Pega's scheme in 2020 later testified, "Alan Trefler [and] all of these people obviously knew we were doing this."[6]

For years before whistleblowers eventually "outed" the scheme in 2020, Project Crush was a raging success, and Management's appetite for Appian's trade secrets proved insatiable. Accordingly, by 2019, Management was already charting a course for another "teardown" of Appian's software. A. Trefler allegedly personally directed this latest "teardown," which Pega employees carried out through an array of subterfuge and illicit tactics. Instead of recruiting another Appian developer, under Management's direction, Pega used fake names and fake or front companies to illicitly gain access to Appian's trade secrets. One employee concocted multiple "personas," including ones named "Andrew Powers" and "Emily Gold," and a fake consulting firm ("Andrew Powers Consulting"), to infiltrate Appian's platform. Other employees falsely posed to Appian as "customers," using their spouses' businesses as corporate fronts to obtain access to Appian's software.

Management persisted in this scheme despite explicit concerns internally over the "legality" of Pega's actions.[7] A. Trefler even apparently misrepresented his own identity in his mission to "make[] [Appian] go away for good",[8] employing several aliases including "Albert Scii," "A. Ewe," and "Paul Foon") to access Appian's information.

In early 2020, Appian caught wind of Management's scheme from two whistleblowers, both of whom were former Pega employees. Shortly after discovering Management's scheme, Appian filed a lawsuit against Pega in the Circuit Court of Fairfax County, Virginia (the "Virginia

---

[4]   PLT 721; PLT 196

[5]   PLT 227.

[6]   9/20/21 Bearden Depo. Tr. at 246.

[7]   PLT 643-A.

[8]   1/10/22 Baril Depo. Tr. at 238

Court"). *See Appian Corporation v. Pegasystem Inc., et al.,* Civil Action No. 2020-07216 (the "Virginia Action").

The Virginia Action featured damning allegations against the Company and Zou. According to Appian's May 2020 complaint in the Virginia Action, "as recently as [2019]," the defendants had engaged in "unlawful schemes . . . [that] involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers." Appian alleged that the scheme "[i]nvolv[ed] personnel at Pegasystems up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives."

Appian's six-count complaint sought various relief against Pega, including actual losses, unjust enrichment including a disgorgement of Pega's profits, attorneys' fees, costs, punitive damages, treble damages, and sweeping injunctive relief. Despite Appian's well-supported allegations that Pega, A. Trefler, and other senior officers had coordinated a multi-year, illicit espionage operation against Appian, and the astounding financial and reputational damage Pega faced in connection with the Virginia Action, Management failed to disclose to stockholders the existence of the Virginia Action for approximately **18 months**. During that time, Management misleadingly assured stockholders that litigation from unnamed competitors ***could*** arise at some indeterminate point in the future. Management also falsely indicated to stockholders that Pega prohibited the very tactics which had been knowingly and secretly employed against Appian, including, *inter alia*, using "illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . misrepresenting your identity in hopes of obtaining confidential information." Management also misleadingly reassured stockholders regarding A. Trefler's responsibilities in providing "guidance as to the propriety" of Pega employees' actions.

Yet at the time Management made these misstatements, unbeknownst to stockholders, Management had already employed "questionable" tactics for years, and Pega was already ensnared in potentially ruinous litigation as a result. Moreover, Management failed to disclose that A. Trefler – Pega's purported moral compass – was himself an active participant in, and was perhaps the mastermind of, the very misconduct that flouted Pega's ethics code and allegedly violated the law.

While concealing the Virginia Action and the underlying misconduct from stockholders, Management rushed to eliminate the Virginia Action as quickly and quietly as possible. Management's tactics included concealing evidence of misconduct, filing motions to stay or restrict discovery, filing motions to compel non-public arbitration, verifying misleading interrogatory responses, falsely testifying during depositions, and altering Pega's internal documents. The Virginia Court, however, did not countenance these maneuvers; Pega's losses piled up and Management's desperate efforts to dispel the Virginia Action proved unsuccessful.

On February 16, 2022, nearly two years after the Virginia Action was filed and with a merits trial around the corner, Management finally publicly disclosed the existence of the Virginia Action to stockholders in a Company SEC filing, including that Appian was seeking up to $3 billion in damages (representing all of Pega's revenue, less its direct costs, from the fourth quarter

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 6

of 2013 ("4Q13") to the third quarter of 2021 ("3Q21")), and that Pega faced liability under the Virginia Uniform Trade Secrets Act ("VUTSA") and the Virginia Computer Crimes Act ("VCCA").

The February 16, 2022 disclosure, however, concealed material details of Management's egregious scheme, while misleadingly assuring stockholders that Appian's claims were "without merit," that the Company had "strong defenses to these claims," and that "any alleged damages claimed by Appian are not supported." In truth, Appian's claims were strong and meritorious: as Management knew, for years Management had engaged in willful and malicious conduct aimed at misappropriating Appian's information and using it to benefit Pega. A. Trefler's cadre of executives were themselves participants in the long-running illicit scheme, and had fully supported A. Trefler's mission to "destroy[] Appian."[9]

Meanwhile, Management's purportedly "strong defenses" were proven hollow as the Virginia Action steadily marched towards trial. Appian's damages claims were also well-supported by extensive factual evidence and testimony, including by Pega's own internal documents. In fact, when presented with the overwhelming evidence that Appian's trade secrets were used to improve Pega's software, although the Company was potentially facing having to pay $3 billion in damages, Pega's own expert "accept[ed] the premise that all of [Pega's] sales [from 4Q13 to 3Q21]" were tainted by misappropriation.[10] Pega's expert also conceded that Appian's damages from the 201 opportunities for which Appian and Pega directly competed from 4Q13 to 3Q21 were upwards of $187 million if Pega was found liable for misappropriation.

On May 9, 2022, following a seven-week jury trial before the Virginia Court, the jury unanimously decided in favor of Appian, finding that Pega and Zou had misappropriated Appian's trade secrets in violation of the VUTSA, and awarding compensatory damages in the amount of ***$2,036,860,045*** as against Pega (before interest, which itself reached into the hundreds of millions of dollars, as discussed below), and the amount of $5,000 as against Zou.

The jury in the Virginia Action also found that Pega acted willfully and maliciously in misappropriating Appian's information, entitling Appian to seek tens of millions of dollars in attorneys' fees and costs. According to the jury instructions delivered in the Virginia Action: "Willful conduct occurs when a party acts without regards for the rights of another, knowing injury will probably follow. Malicious conduct occurs when a party acts with ill will or spite." Finally, the jury found that Pega violated the VCCA.

Pega's stock price sank by 20.75% ($13.68 per share) on May 10, 2022, as news of the verdict in the Virginia Action began to ripple through the market. One analyst acknowledged the verdict's "reputational harm to Pegasystems," which could cause customers to "shift[] PEGA resources over to Appian's platform." Another analyst remarked that the verdict "will be a blot on

---

[9]   1/10/22 Baril Depo. Tr. at 238-39.

[10]  5/3/22 Trial Tr. at 7508.

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 7

Pega's record when dealing with federal contracts as the company will likely have to disclose its violation of the [VCCA]."

Pega's stock price dropped by another 8% ($4.18 per share) on May 11, 2022, as analysts slashed their price targets of Pega in the wake of the Virginia Action verdict. Morgan Stanley cited "the damage to Pegasystems' record," while Morningstar noted "the heightened risk" to Pega's business. Another analyst reduced its price target due to "potential ACV [Annual Contract Value] growth headwinds as a result of the lawsuit decision" and Appian's "edge versus Pegasystems for future government contracts." Meanwhile, Management publicly chastised the verdict as "ridiculous" and assured stockholders there were absolutely no "facts of any wrongdoing", claiming the "facts of the case" did not support any damages, "let alone [a] ridiculous" amount in excess of $2 billion.

On September 16, 2022, Management and Appian each separately disclosed that a final judgment had been entered in the Virginia Action, affirming the jury's verdict, including its award of $2,036,860,045 in damages for Pega's violations of the VUTSA, its finding that Pega had violated the VCCA, and its determination that Pega acted willfully and maliciously. It was also disclosed that the Virginia Court had ordered Pega to pay Appian over $23.6 million in attorneys' fees and costs, as well as post-judgment interest at an annual rate of 6%, or around ***$122 million per year***. Pega's stock price swiftly dropped by nearly 6% ($2.39 per share) on September 16, 2022, and by nearly 6% ($2.27 per share) again on September 19, 2022, as the market reacted to the news that the jury's May 9, 2022 verdict (including its findings on liability and damages) had been affirmed, and as analyst estimates were slashed further over "uncertainty stemming from the lawsuit," "clients['] deci[sions] to re-evaluate their Pega investments," and the ruling's "impact . . . [on] [Pega's] federal business."

## B. The Securities Action is Filed

On June 19, 2022, Pega investor City of Fort Lauderdale Police and Firefighters' Retirement System filed a purported securities fraud class action lawsuit against Pega, A. Trefler, and Stillwell for alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. *See City of Fort Lauderdale Police and Firefighters' Ret. Sys. v. Pegasystems Inc., et al.*, Case No. 1:22-cv-11220-WGY (D. Mass.) (the "Securities Action"). The Securities Action, which remains pending, alleges that the named defendants committed securities fraud from June 16, 2020 through May 9, 2022 by engaging in the illicit Project Crush scheme and then misleading stockholders by covering up the scheme in SEC filings.

## III. Conclusion

The Board must independently investigate these events and allegations in good faith, determine whether any or all of the Pega Insiders breached their fiduciary duties to Pega and its stockholders, and if so, hold any such individuals to account for the damages their fiduciary failures caused the Company. Furthermore, the Board must immediately implement new, robust corporate governance policies and procedures designed to remedy the misconduct and fiduciary failures alleged to have occurred herein. The members of the Board must ensure that they are

*Pegasystems Inc., Board of Directors Demand*
May 17, 2023
Page 8

equipped with the necessary information to effectively oversee the Company so as to prevent a recurrence of the events which have harmed Pega. To the extent the Board may decide that it is not willing to immediately commence an investigation regarding the misconduct alleged herein and that such an investigation is to be deferred, the Stockholder demands that the Board obtain agreements from each Pega Insider tolling any and all applicable statute of limitations and provide such agreements to the Stockholder as soon as they are reached.

        Sincerely,

        SHUMAN GLENN & STECKER

        */s/ Rusty E. Glenn*

        Rusty E. Glenn

cc:    Robert Garfield
       Marty Lacoff, Greenwich Legal Associates, LLC