# Exhibit G

# BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

ATTORNEYS AT LAW

NEW YORK ◦ CALIFORNIA ◦ ILLINOIS ◦ LOUISIANA ◦ DELAWARE

Jeroen van Kwawegen
(212) 554-1472
Jeroen@blbglaw.com

March 25, 2024

**VIA FEDERAL EXPRESS**

Board of Directors
Pegasystems Inc.
One Main Street
Cambridge, MA 02142

**VIA HAND-DELIVERY**

Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Re: **_Demand for the Board of Directors to Take Action Pursuant to M.G.L. ch. 156D § 7.42_**

Dear Members of the Board of Directors of Pegasystems Inc.:

We represent John Dwyer (the "Stockholder"), the beneficial owner of shares of Pegasystems Inc. ("Pega" or the "Company") common stock. Stockholder has held Pega stock continuously since at least August 2023. Verified documentary evidence of Stockholder's beneficial ownership of common stock is attached hereto as **Exhibit 1**, and such documentary evidence is a true and correct copy of what it purports to be. A power of attorney appointing Bernstein Litowitz Berger & Grossmann LLP and Bottini & Bottini, Inc. (together, the "Firms") to act on behalf of Stockholder is attached hereto as **Exhibit 2**.

This letter is a demand ("Demand"), pursuant to M.G.L. ch. 156D § 7.42 that Pega's board of directors (the "Board") cause Pega to take suitable action in response to the misconduct set forth below. Stockholder does not concede the independence of the Board and, in fact, strongly believes that the Board breached its fiduciary duties and is conflicted and incapable of giving disinterested consideration to this Demand. Stockholder makes this Demand solely because Massachusetts is a universal demand state. If the Board does not cause the Company to take suitable action, Stockholder will file a stockholder derivative action.

The Demand arises from breaches of fiduciary duty by Pega's directors and officers with respect to the substantial financial and reputational liabilities Pega faces from lawsuits[1] related to the Company's corporate espionage scheme targeting Appian Corporation ("Appian").

---

[1] These lawsuits include: (a) *Appian Corporation v. Pegasystems Inc.*, et al., Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) (the "Virginia Action"); and (b) *City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems Inc., et al.*, Civil Action No. 1:22-cv-11220-WGY (D. Mass.) (the "Securities Action").

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 2 of 9

Stockholder demands that the Board act to correct Pega's fraudulent corporate espionage practices and hold the responsible directors and officers accountable for the harm they caused to Pega, as described below.

<b><u>PEGA'S ILLEGAL CORPORATE ESPIONAGE SCHEME</u></b>

**I.      Company Background**

According to Pega, the Company's business is to: "develop, market, license, host, and support enterprise software that helps organizations build agility into their business so they can adapt to change."[2] The Company states that its "powerful low-code platform for workflow automation and artificial intelligence-powered decisioning enables the world's leading brands and government agencies to hyper-personalize customer experiences, streamline customer service, and automate mission-critical business processes and workflows" and that "clients can leverage our intelligent technology and scalable architecture to accelerate their digital transformation. In addition, our client success teams, world-class partners, and clients leverage our Pega Express methodology to design and deploy mission-critical applications quickly and collaboratively."[3]

The Company is incorporated in Massachusetts and maintains its principal executive offices in Cambridge, Massachusetts. The Company's stock trades on the Nasdaq Stock Market under the ticker "PEGA."

**II.     Pega Executed an Illegal Espionage Scheme to Gather Information on Its Competitor Appian**

    **a. Beginning in 2012, Pega Used a Corporate Spy to Steal Information from Appian in a Scheme Called "Project Crush"**

Pega's executives engaged in an illegal, near decade-long corporate espionage scheme targeting the Company's chief rival, Appian. All the while, Pega's Board was either asleep at the switch or complicit in this spying campaign, which has now exposed the Company to ***billions of dollars in damages***.

Pega develops customer relationship management ("CRM") and business process management ("BPM") software for major global companies and government agencies. The Company's "low-code" software allows companies to create customized business applications. J.P. Morgan has described "[l]ow-code (no-code) platforms" as "allow[ing] business users with minimal coding experience (citizen developers) to easily create workflow-based process-centric

---

[2] Pegasystems, Inc., Annual Report, (Form 10-K) (Feb. 15, 2023) at 4.

[3] *Id.*

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 3 of 9

applications." Pega's customers include companies across the life sciences, healthcare, communications, media, insurance, manufacturing, tech, and consumer services sectors.

Appian is one of Pega's rivals in the competitive CRM and BPM industry. According to J.P. Morgan, Appian's strength is in its low-code application development software platform. Appian licenses its software to its customers, which allows them to develop applications and run them using Appian's software platform. This license also allows the licensee to access the technical features of Appian's software platform.

The Company's founder, Chairman, Chief Executive Officer, and controlling stockholder Alan Trefler ("A. Trefler") spearheaded a sprawling corporate espionage scheme that involved enlisting corporate spies, creating aliases and fake companies, and using Company resources to steal confidential and proprietary intelligence and trade secrets from Appian. This scheme allowed the Company to illegally gain a competitive advantage when pursuing the same clients as Appian and to improve Pega's own software platform.

A Pega employee stated that A. Trefler and his brother, Leon Trefler ("L. Trefler"), were "very focused on destroying Appian. Like making it go away for good."[4] In order to accomplish this goal, in early 2012, Pega initiated a corporate espionage scheme to steal Appian trade secrets and confidential information. Pega called the scheme "Project Crush" and it was administered by the Company's top executives. A. Trefler, Don Schuerman (("Schuerman") Chief Technology Officer), L. Trefler (Chief of Clients and Markets), Kerim Akgonul (("Akgonul"), Chief Product Officer), and Benjamin Baril (("Baril"), Director, Office of the CTO) were all intimately involved in the execution of Project Crush. Pega's goal was to use the stolen information to give the Company's salesforce an advantage, to create opposition research on Appian that would provide a leg up in direct competitions for contracts, and to bolster Pega's own software.

Appian employed numerous defensive measures to protect its trade secrets. This meant that Appian was highly selective about what companies could access its software on a trial basis, and it excluded competitors from accessing the Appian platform. A number of Pega employees testified in the Virginia Action that Appian made it very difficult to access its software for a free trial. Thus, Pega determined that it would need a corporate spy that could bypass Appian's safeguards, gain access to Appian's software, and funnel that information to Pega.

Pega enlisted KForce Inc. ("KForce") in February 2012 to recruit an Appian developer with several years of experience and access to Appian's systems. Pega outsourced this task to KForce so that it could maintain some distance from the recruitment of the prospective corporate spy. Pega explicitly told KForce that the developer "should not have worked directly with Appian" and could not be "loyal' to Appian because Pega did not want the spying to lead back to Pega.[5]

---

[4] Trial. Tr., *Appian Corporation v. Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) 3/22/22 at 70 [hereinafter Trial Tr.].

[5] Trial. Tr., 3/22/22 at 52-53.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 4 of 9

KForce connected Pega to Youyong Zou ("Zou"), who had worked with U.S. government contractors that utilized Appian's software platform. Through Zou, Pega would have access to proprietary Appian software and trade secrets.

Zou became a key asset in Project Crush. Starting in February 2012, Zou made videos of himself accessing Appian's software platform, downloaded Appian's software documentation, demonstrated to Pega the features of Appian's software platform and supplied information about the software's uses and strengths and weaknesses, and answered Pega's technical questions about Appian's software platform. In short, Zou provided Pega with all manner of key, confidential information about Appian.

Zou also worked directly in person with Pega executives, visiting the Pega corporate headquarters in Cambridge, Massachusetts several times. Zou spoke directly with Pega executives and other employees and provided them with information he had obtained from Appian. In fact, John Petronio ("Petronio"), the director of product marketing at the time, informed A. Trefler, L. Trefler, and Schuerman, among others, that on January 29, 2013, Zou would be visiting Pega's offices and would provide "demonstrations of building an application in Appian 7."[6] During the January 29, 2013 meeting, A. Trefler, Schuerman, and L. Trefler met with Zou and they, along with other Pega employees, strategized on ways to use Appian's trade secrets for Pega's advantage. After the meeting, Petronio emailed A. Trefler to inform him that Pega would update the Appian competition whitepaper based on the meeting. Pega attempted to conceal these dealings with Zou. The Company paid Zou through a middleman and only a few employees knew his real name—the rest of the Company referred to him by the pseudonym: "Matt."

Zou's insight into Appian was hugely beneficial to Pega. A whistleblower testified that Zou provided Pega information that it did not have before and gave Pega access to the "black box."[7] L. Trefler stated that the stolen information was "useful" and agreed that it assisted Pega in its marketing efforts to compete against Appian.[8] L. Trefler worked on developing Pega's strategies to use Appian's stolen information. The stolen Appian information was widely circulated and utilized across Pega's organization by over 200 executives, salespersons, engineers, product developers, and other employees. The work product created from Zou's spying included: (a) marketing aids; (b) training materials; (c) screenshots of Appian's software platform; and (d) memos and briefs for strategies to compete against Appian. These materials included memos called "Understanding Appian" and "12 Challenges"—which included Zou's stolen information— that were created for the stated goal to beat Appian in head-to-head interaction.[9] Pega used the stolen information to torpedo Appian on multiple fronts, including: (a) a competition with Appian to secure the U.S. Census Bureau's contract for the 2020 Census; (b) a competition with Appian

---

[6] Trial. Tr., 3/24/22 at 764-65.

[7] Trial. Tr., 5/5/22 at 8110.

[8] Trial. Tr., 5/5/22 at 8110-12.

[9] Trial. Tr., 5/5/22 at 8077-78.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 5 of 9

to acquire Rabobank as a customer; and (c) to share Appian's trade secrets with Pega's customers. In fact, in February 2013, A. Trefler himself requested that a competitive brief on Appian be given to Rabobank that was filled with negative information about Appian derived from Appian's trade secrets. Additionally, Pega used Appian's trade secrets to improve Pega software. Akgonul and Head of Social Product, Agya Garg, had meetings with Zou to analyze Appian's software's capabilities and implemented certain Appian features in Pega's products. Akgonul requested that Zou provide information on specific features of Appian's software and was particularly interested in using this information to give Pega a competitive advantage. Confidential Company memorandums also document that Pega planned to integrate Appian technology into Pega's software. And, on February 26, 2014, A. Trefler and other executives received over 200 presentation slides with information about Appian that included screenshots collected by Zou.

Finally, in September 2014, Pega ended its deal with Zou after he switched roles with his employer and no longer had access to Appian's software platform. Baril co-wrote a memorandum documenting Project Crush in 2014 which included action items on how to utilize the stolen information going forward. Thereafter, Pega used Zou's stolen information for years.

### b. In 2019, Pega Began a Second Project to Steal Appian Technology Called the "Teardown"

In 2019, Pega executives decided to expand on the perceived success of the Project Crush. A. Trefler, Schuerman, L. Trefler, Baril and other Pega executives contemplated a new effort to steal Appian data that would be even more ambitious. They called the new project the Teardown. In February 2019, Pega executives—including A. Trefler, Schuerman, L. Trefler, Akgonul, and Baril—decided to try and find an outside contractor that could obtain a free trial of Appian's software platform or purchase the software to share with Pega. Pega wanted to learn more details about Appian's methodology and potential software weaknesses.[10] However, when no outside contractor was willing to do so, Pega decided to use its own employees to misappropriate the free trial.

Baril was in charge of doing a deep dive on the technical details of Appian's software.[11] Baril regularly communicated with Schuerman on this project, and Pega officers directed Baril to "work on a critical CI [competitive intelligence] Brief for Alan [Trefler] due 8/30/19."[12] Around August 2019, Baril used multiple fake names and created a fake consulting firm called "Andrew Powers Consulting" to gain access to Appian's software platform. Additionally, in order to accomplish A. Trefler's goal, Baril enlisted the help of numerous employees to serve as "spies." By August 17, 2019, Baril had secured access to Appian's software platform. Baril recruited Pega employees Nguyen Le and Michael Fine to illicitly obtain 15-day trials of the Appian software by

---

[10] Trial Tr. 3/28/22 at 1125.

[11] Trial Tr. 3/29/22 at 1354-55.

[12] Trial Tr. 4/28/22 at 6421-22.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 6 of 9

posing as potential Appian customers. They were both successful. Baril also recruited Pega employee Peter Bessman to utilize the 15-day trial that Michael Fine had acquired to create videos of himself building an application using Appian software. Additionally, Baril enlisted Pega's India-based employees to use various login credentials to access Appian's software platform.

On September 8, 2019, Baril sent L. Trefler a draft of the Teardown memo that Baril, Schuerman, and others were putting together. On September 21, 2019, A. Trefler said that he was "thrilled to have" Baril in this role.[13] A. Trefler's goal was to have a write up on Appian's "compelling weaknesses to form a more targeted and damning attack" and he also asked Baril for an hour-long demonstration of Appian's platform.[14] On September 27, 2019, Baril told certain Pega employees, including Schuerman, that his "spies" had secured a 15-day Appian trial.[15] Schuerman responded: "Awesome. So we have some stuff we can show Alan [Trefler]..."[16] In October 2019, Baril told a senior Pega employee that the Teardown's "overall goal is to steal four deals from Appian in Q4 [2019] and Q1 2020."[17] On October 4, 2019, Baril admitted to Pega's Director of Solutions Consulting that "Alan [Trefler] and Leon [Trefler] are very focused on destroying Appian. Like making it go away for good."[18] On October 5, 2019, Baril updated L. Trefler and Schuerman, among others, on the status of the Teardown, and L. Trefler responded that he wanted Baril "to think aggressively" and that he would devote "more resources" to the Teardown because Baril's "mission is urgent" and Baril was "understaffed."[19]

A. Trefler met with Baril at least twice in late 2019 (once in October 2019 and another time in December 2019) to discuss the Teardown. A. Trefler and Baril discussed the information that Pega had acquired from the project, and A. Trefler provided Baril with directions on what to focus on with the spying efforts. Pega's corporate espionage efforts continued into 2020 and 2021, even after Appian sued Pega for the espionage scheme in May 2020. For example, Baril used a fake name to access an Appian conference on May 12, 2020. Additionally, Baril asked a Pega employee to gain access to an Appian free trial on May 28, 2020 and other employees were gaining access to free trials throughout 2021. In fact, these efforts continued even after former Pega employees blew the whistle on Pega's scheme.

---

[13] Trial Tr., 3/28/22 at 1111.

[14] Trial Tr., 3/28/22 at 1125, 1112.

[15] Trial Tr., 4/28/22 at 6426; Trial Tr., 3/28/22 at 1115-16.

[16] Trial Tr., 4/28/22 at 6428; Trial Tr., 3/28/22 at 1116-17.

[17] Trial Tr., 3/28/22 at 1130.

[18] Trial Tr., 3/22/22 at 70.

[19] Trial Tr., 3/28/22 at 1129.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 7 of 9

### III. The Company's Illegal Espionage Practices Have Harmed Pega Because Pega is Liable for Over $2 Billion in Damages and Counting and Has Suffered Tremendous Reputational Damage

In early 2020, two former Pega employees blew the whistle on Pega's espionage and alerted Appian. Petronio, whom Pega fired in 2015, joined Appian in early 2019 and disclosed the Pega espionage scheme to Appian in January 2020. Shawn Bearden, who worked on Project Crush but was fired by Pega in 2020, disclosed the espionage scheme to Appian in February 2020.

Nonetheless, Pega's officers and directors continued to deny the truth—concealing their past misconduct from investors and engaging in new misconduct by making false statements in SEC filings. As late as February 2022, management still maintained in the Company's public filings that "[t]he claims brought by Appian against the Company are without merit" and that "the Company ha[d] strong defenses to these claims."[20] As Judge Young later found in denying Pega's and Trefler's motion to dismiss in the Securities Action, "there is little doubt that Trefler knew or was reckless in not knowing" that he was making false statements in "reassuring investors that Appian's ... claim against Pega had no merit[.]"[21]

Ultimately, investors learned the truth. On May 9, 2022, following a seven-week trial, the jury in the Virginia Action unanimously found in favor of Appian, finding that Pega had misappropriated Appian's trade secrets in violation of the Virginia Uniform Trade Secrets Act and violated the Virginia Computer Crimes Act, and awarded Appian compensatory damages of **$2,036,860,045** (before interest, which is over $122 million per year). The jury also found that Pega acted willfully and maliciously in misappropriating Appian's information, entitling Appian to seek $22.6 million in attorney's fees and $4.2 million in costs. The Virginia court denied Pega's motion to set aside the verdict.

Pega faces additional financial liabilities. The Securities Action against Pega and A. Trefler in the U.S. District Court for the District of Massachusetts, survived a motion to dismiss and was proceeding to trial. However, in March 2024, Pega agreed to settle the case with the Securities Action plaintiffs. The settlement value is not yet public information, but this adds to the severe financial penalties the Company has already suffered.

Also, in March 2023, the Securities and Exchange Commission requested certain information from the Company relating to Pega's accounting treatment of the Company's litigation with Appian. This investigation is ongoing and could lead to further financial penalties against the Company.[22]

---

[20] *See, e.g.*, Pegasystems, Inc., Annual Report (Form 10-K) (Feb. 16, 2022) at 23.

[21] *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 2023 WL 4706741, at *4 (D. Mass. July 24, 2023).

[22] Pegasystems, Inc., Annual Report (Form 10-K) (Feb. 14, 2024) at 66.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 8 of 9

      Moreover, Pega also faces significant reputational harm. The Virginia Action made public the extent of Pega's illicit corporate espionage schemes. Barclays Research stated that it expected investors would have a "negative reaction for Pega."[23] The trial record makes clear that Pega's internal organization was dominated by bad actors. Worse still, the trial and the espionage scheme are evidence that Pega could not keep up with competitors without resorting to fraudulent tactics. CFRA Research stated that after the Virginia Action was decided that "recent events have rekindled fears surrounding [Pega's] competitive positioning and a general inability to distinguish itself from peers.[24] The jury's findings could also harm Pega's ability to secure additional contracts and retain current customers.

## DEMANDS

      The Company has been, and continues to be, significantly harmed by the conduct described above. As such, Stockholder demands that the Company's Board take immediate action to ensure the Company take action against those responsible for the harm they have caused the Company to date. Specifically, Stockholder demands that the Board:

- file lawsuits for breaches of fiduciary duty and any other claims the Company might have against any current or former officer or director who directed, encouraged, or was otherwise aware of (or should have been aware of) the illegal corporate espionage practices described herein to recover damages for the harm caused to the Company as described above;

- publicly disclose for each director and officer, details of any lack of independence from A. Trefler as a result of social, personal, or business relationships;

- terminate each officer and employee who breached their fiduciary duty and/or engaged in corporate espionage;

- clawback improperly awarded compensation and bonuses;

- establish fully funded new board committee(s) empowered to hire fully independent advisors to investigate the Company's corporate espionage schemes and oversee the Company's business ethics practices;

- publicly disclose all findings of the investigation and remedial actions taken; and

---

[23] Raimo Lenschow & Vinod Srinivasaraghavan, *Appian Corporation / Pegasystems, Inc.* BARCLAYS EQUITY RESEARCH (Sept. 16, 2022) at 1.

[24] David Holt, *Stock Report Pegasystems*, CFRA (July 23, 2022) at 1.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Pegasystems Inc.
March 25, 2024
Page 9 of 9

- establish new Board and management policies, practices, and procedures regarding business ethics and competition with business rivals.

We believe that this Demand complies with the provisions of M.G.L. ch. 156D § 7.42 in all material respects. If the Company believes this letter is deficient in any respect, we request that you inform the undersigned (Jeroen van Kwawegen; Telephone: 212-554-1472) immediately.

As stated above, this letter serves as the Stockholder's demand to the Board pursuant to M.G.L. ch. 156D § 7.42. If the Stockholder's demands are not met within ninety days, it will have no choice but to commence a derivative lawsuit. We look forward to your prompt response.

Very truly yours,

_____
Jeroen van Kwawegen

/s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

Encl.

# EXHIBIT 1

## STATEMENT UNDER OATH

I, the undersigned, hereby depose and state under oath that:

(a) I have read the demand letter made pursuant to M.G.L. Ch. 156D § 7.42 addressed to Pegasystems, Inc., and the statement of purpose and any other statements contained therein are true and correct under penalty of perjury.

(b) I am the beneficial owner of Pegasystems, Inc., common stock. The beneficial ownership of these shares is demonstrated by documentary evidence set forth in the exhibit to this Statement. This documentary evidence is true and correct, to the best of my knowledge based on the information provided to me.

By _____*Mr. John Dwyer*_____
      John Dwyer



# Schwab One® Account of

JOHN DWYER
DESIGNATED BENE PLAN/TOD

Account Number

Statement Period
February 1-29, 2024

## Account Summary

Ending Account Value as of 02/29

Beginning Account Value as of 02/01

Total Value Change ($)



Mar'23  Apr  May  Jun  Jul  Aug  Sep  Oct  Nov  Dec  Jan'24  Feb

- $0.0K
- $1.3K
- $2.6K
- $4.0K
- $5.3K
- $6.7K

Beginning Value
Deposits
Withdrawals
Dividends and Interest
Transfer of Securities
Market Value Change
Fees
Ending Value

This Statement   Previous Statement   Change

Account Ending Value reflects the market value of your cash and investments. It does not include pending transactions, unpriced securities or assets held outside Schwab's custody.

## Manage Your Account

**Customer Service and Trading:**
Call your Schwab Representative
1-800-435-4000
24/7 Customer Service

For the most current records on your account visit schwab.com/login. Statements are archived up to 10 years online.

**Commitment to Transparency**
Client Relationship Summaries and Best Interest disclosures are at schwab.com/transparency.
Charles Schwab & Co., Inc. Member SIPC.

**Online Assistance**
Visit us online at schwab.com

Visit schwab.com/stmt to explore the features and benefits of this statement.

JOHN DWYER



# Schwab One® Account of
JOHN DWYER
DESIGNATED BENE PLAN/TOD

Statement Period
**February 1-29, 2024**

## Asset Allocation
Investment Objective: Growth

| | This Period | Current Allocation |
|---|---|---|
| Cash and Cash Investments | | |
| Equities | | |
| **Total** | | |

## Top Account Holdings This Period

| SYMBOL/CUSIP | Description | Market Value | % of Accounts |
|---|---|---|---|
| PEGA | PEGASYSTEMS INC | 910.56 | 15% |

## Gain or (Loss) Summary

| | Short-Term (ST) | | | Long-Term (LT) | | |
|---|---|---|---|---|---|---|
| | Gain | (Loss) | Net | Gain | (Loss) | Net |
| This Period | | | | | | |
| YTD | | | | | | |
| **Unrealized** | | | | | | |

Values may not reflect all of your gains/losses; Schwab has provided accurate gain and loss information wherever possible for most investments. Cost basis may be incomplete or unavailable for some of your holdings and may change or be adjusted in certain cases. Please login to your account at Schwab.com for real-time gain/loss information. Statement information should not be used for tax preparation, instead refer to official tax documents. For additional information refer to Terms and Conditions.

## Income Summary



| | This Period | | | YTD | | |
|---|---|---|---|---|---|---|
| Federal Tax Status | Tax-Exempt | Taxable | Tax-Exempt | | Taxable |
| Bank Sweep Interest | | | | | |
| Cash Dividends | | | | | |
| **Total Income** | | | | | |

## Margin Loan Information

| Opening Margin Loan Balance | Closing Margin Loan Balance | Funds Available to Withdraw* | Securities Buying Power* |
|---|---|---|---|

Margin Loan Rates Vary by Balance

* Values include any cash plus the amount available using margin borrowing. For more information about the margin feature, please visit schwab.com/margin.

## Schwab One® Account of
JOHN DWYER
DESIGNATED BENE PLAN/TOD

Statement Period
February 1-29, 2024

## Positions - Summary

| Beginning Value as of 02/01 | + | Transfer of Securities(In/Out) | + | Dividends Reinvested | + | Cash Activity | + | Change in Market Value | = | Ending Value as of 02/29 | Cost Basis | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | | ■ | | ■ | | ■ | | ■ | | ■ | ■ | ■ |

Values may not reflect all of your gains/losses; Schwab has provided accurate gain and loss information, wherever possible for most investments. Cost basis may be incomplete or unavailable for some of your holdings and may change or be adjusted in certain cases. Statement information should not be used for tax preparation; instead refer to official tax documents. For additional information refer to Terms and Conditions.

## Cash and Cash Investments

| Type | Symbol | Description | Quantity | Price($) | Beginning Balance($) | Ending Balance($) | Cost Basis($) | Change in Period Balance($) | Pending/Unsettled Cash($) | Interest/ Yield Rate | % of Acct |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bank Sweep | | | | | ■ | ■ | | ■ | | ■ | ■ |
| **Total Cash and Cash Investments** | | | | | ■ | ■ | | ■ | | | ■ |

## Positions - Equities

| Symbol | Description | Quantity | Price($) | Market Value($) | Cost Basis($) | Unrealized Gain/(Loss)($) | Est. Yield | Est. Annual Income($) | % of Acct |
|---|---|---|---|---|---|---|---|---|---|
| PEGA | PEGASYSTEMS INC (M) | 14.0000 | 65.04000 | 910.56 | 1,788.22 | (877.66) | 0.18% | 1.68 | 15% |
| **Total Equities** | | | | ■ | ■ | ■ | | ■ | ■ |

Estimated Annual Income ("EAI") and Estimated Yield ("EY") calculations are for informational purposes only. The actual income and yield might be lower or higher than the estimated amounts. EY is based upon EAI and the current price of the security and will fluctuate. For certain types of securities, the calculations could include a return of principal or capital gains in which case EAI and EY would be overstated. EY and EAI are not promptly updated to reflect when an issuer has missed a regular payment or announced changes to future payments, in which case EAI and EY will continue to display at a prior rate.



# Schwab One® Account of
JOHN DWYER
DESIGNATED BENE PLAN/TOD

Statement Period
February 1-29, 2024

## Transactions - Summary

Beginning Cash* as of 02/01 + Deposits + Withdrawals + Purchases + Sales/Redemptions + Dividends/Interest + Fees = Ending Cash* as of 02/29

*Cash (includes any cash debit balance) held in your account plus the value of any cash invested in a sweep money fund.

**Other Activity**  Other activity includes transactions which don't affect the cash balance such as stock transfers, splits, etc.

## Transaction Details

| Date | Category | Action | Symbol/CUSIP | Description | Quantity | Price/Rate per Share($) | Charges/Interest($) | Amount($) | Realized Gain/(Loss)($) |
|---|---|---|---|---|---|---|---|---|---|
| 02/16 | Interest | | | | | | | | |
| 02/28 | Sale | | | | | | | | |
| | Purchase | | | | | | | | |
| | Purchase | | | | | | | | |
| **Total Transactions** | | | | | | | | | |

Date column represents the Settlement/Process date for each transaction.

## Bank Sweep Activity

| Date | Description | Amount | Date | Description | Amount |
|---|---|---|---|---|---|
| 02/01 | Beginning Balance x,z | | 02/29 | Ending Balance x,z | |
| 02/15 | | | 02/29 | Interest Rate z | |
| 02/28 | | | | | |

* Your interest period was 01/16/24 - 02/15/24. z

## Endnotes For Your Account

(M) Denotes a security that is marginable. Some mutual fund or ETF investments may not be immediately marginable.

X Bank Sweep deposits are held at FDIC-insured Program Banks, which are listed in the Cash Features Disclosure Statement.

Z For the Bank Sweep and Bank Sweep for Benefit Plans features, interest is paid for a period that differs from the Statement Period. Balances include interest paid as indicated on your statement by Schwab or one or more of its Program Banks. These balances do not include interest that may have accrued during the Statement Period after interest is paid. The interest paid may include interest that accrued in the prior Statement Period.



# Schwab One® Account of

JOHN DWYER
DESIGNATED BENE PLAN/TOD

Statement Period
February 1-29, 2024

## Terms and Conditions

**GENERAL INFORMATION AND KEY TERMS:** This Account statement is furnished solely by Charles Schwab & Co., Inc. ("Schwab") for your Account at Schwab ("Account"). Unless otherwise defined herein, capitalized terms have the same meanings as in your Account Agreement. If you receive any other communication from any source other than Schwab which purports to represent your holdings at Schwab (including balances held at a Depository Institution) you should verify its content with this statement. **Accrued Income:** Accrued Income is the sum of the total accrued interest and/or accrued dividends on positions held in your Account, but the interest and/or dividends have not been received into your Account. Schwab makes no representation that the amounts shown (or any other amount) will be received. Accrued amounts are not covered by SIPC account protection until actually received and held in the Account. **AIP (Automatic Investment Plan) Customers:** Schwab receives remuneration in connection with certain transactions effected through Schwab. If you participate in a systematic investment program through Schwab, the additional information normally detailed on a trade confirmation will be provided upon request. **Average Daily Balance:** Average daily composite of all cash balances that earn interest and all loans from Schwab that are charged interest. **Bank Sweep and Bank Sweep for Benefit Plans Features:** Schwab acts as your agent and custodian in establishing and maintaining your Deposit Account(s) as a feature of your brokerage Account(s). Deposit accounts held through these bank sweep features constitute direct obligations of one or more FDIC insured banks ("Program Banks") that are not obligations of Schwab. Funds swept to Program Banks are eligible for deposit insurance from the FDIC up to the applicable limits for each bank for funds held in the same insurable capacity. The balance in the Deposit Accounts can be withdrawn on your order and the proceeds returned to your brokerage Account or remitted to you as provided in your Account Agreement. For information on FDIC insurance and its limits, as well as other important disclosures about the bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement available online or from a Schwab representative. **Cash:** Any Free Credit Balance owed by us to you payable upon demand which, although accounted for on our books of record, is not segregated and may be used in the conduct of this firm's business. **Dividend Reinvestment Customers:** Dividend reinvestment transactions were effected by Schwab acting as a principal for its own account, except for the reinvestment of Schwab dividends, for which an independent broker-dealer acted as the buying agent. Further information on these transactions will be furnished upon written request. **Gain (or Loss):** Unrealized Gain or (Loss) and Realized Gain or (Loss) sections ("Gain/Loss Section(s)") contain a gain or a loss summary of your Account. This information has been provided on this statement at the request of your Advisor, if applicable. **Schwab does not provide tax advice and encourages you to consult with your tax professional. Please view the Cost Basis Disclosure Statement for additional information on how Schwab reports adjusted cost basis information to the IRS. Gain (or loss) is calculated and may differ from the Statement Period. Balances include interest paid as indicated on your statement by Schwab or one or more of its Program Banks. These balances do not include interest that may have accrued during the Statement Period after interest is paid. The interest paid may include interest that accrued in the prior Statement Period. For the Schwab One Interest feature, interest accrues daily from the second-to-last business day of the prior month and is posted on the second-to-last business day of the current month. For the Bank Sweep and Bank Sweep for Benefit Plans features, interest accrues daily from the 16th day of the prior month and is credited/posted on the first business day after the 15th of the current month. If, on any given day, the interest that Schwab calculates for the Free Credit Balances in the Schwab One Interest feature in your brokerage Account is less than $.005, you will not accrue any interest on that day. For balances held at banks affiliated with Schwab in the Bank Sweep and Bank Sweep for Benefit Plans features, interest will accrue even if the amount is less than $.005. **Margin Account Customers:** This is a combined statement of your margin account and special memorandum account maintained for you under Section 220.5 of Regulation T issued by the Board of Governors of the Federal Reserve System. The

permanent record of the separate account as required by Regulation T is available for your inspection. Securities purchased on margin are Schwab's collateral for the loan to you. It is important that you fully understand the risks involved in trading securities on margin. These risks include: 1) You can lose more funds than you deposit in the margin account; 2) Schwab can force the sale of securities or other assets in any of your account(s) to maintain the required account equity without contacting you; 3) You are not entitled to choose which assets are liquidated nor are you entitled to an extension of time on a margin call; 4) Schwab can increase its "house" maintenance margin requirements at any time without advance written notice to you. **Market Price:** The most recent price evaluation available to Schwab on the last business day of the report period, normally the last trade price or bid as of market close. Unpriced securities denote that no market evaluation update is currently available. Price evaluations are obtained from outside parties. Schwab shall have no responsibility for the accuracy or timeliness of any such valuations. Assets Not Held at Schwab are not held in your Account or covered by the Account's SIPC account protection and are not otherwise in Schwab's custody and are being provided as a courtesy to you. Information on Assets Not Held at Schwab, including but not limited to valuations, is reported solely based on information you provide to Schwab. Schwab can neither validate nor certify the existence of Assets Not Held at Schwab or the accuracy, completeness or timeliness of the information about Assets Not Held at Schwab, whether provided by you or otherwise. Descriptions of Assets Not Held at Schwab may be abbreviated or truncated. Some securities, especially thinly traded equities in the OTC market or foreign markets, may not report the most current price and are indicated as Stale Priced. Certain Limited Partnerships (direct participation programs) and unlisted Real Estate Investment Trust (REIT) securities, for which you may see a value on your monthly Account statement that reflects the issuer's appraised estimated value, are not listed on a national securities exchange, and are generally illiquid. Even if you are able to sell such securities, the price received may be less than the per share appraised estimated value provided in the account statement. **Market Value:** The Market Value of your present holdings in your specified Schwab Account or a summary of the statement, other than certain direct investments which may be held by a third party, are held in your Account. This is the dollar value of your present holdings in your specified Schwab Account or a summary of the Market Value summed over multiple accounts. **Non-Publicly Traded Securities:** All assets shown on this statement, other than certain direct investments which may be held by a third party, are held in your Account. Values of certain Non-Publicly Traded Securities may be furnished by a third party as provided by Schwab's Account Agreement. Schwab shall have no responsibility for the accuracy or timeliness of such valuations. The Securities Investor Protection Corporation (SIPC) does not cover many limited partnership interests. **Schwab Sweep Money Funds:** Includes the primary money market funds into which Free Credit Balances may be automatically invested pursuant to your Account Agreement. Schwab or an affiliate acts and receives compensation as the Investment Advisor, Shareholder Service Agent and Distributor for the Schwab Sweep Money Funds. The amount of such compensation is disclosed in the prospectus. The yield information for Schwab Sweep Money Funds is the current 7-day yield as of the statement period. Yields vary. If on any given day, the accrued daily dividend for your selected sweep money fund as calculated for your account is less than ½ of 1 cent ($0.005), your account will not earn a dividend for that day. In addition, if you do not accrue at least 1 daily dividend of $0.01 during a pay period, you will not receive a money market dividend for that period. Schwab and the Schwab Sweep Money Fund's investment advisor may be voluntarily reducing a portion of a Schwab Sweep Money Fund's expenses. Without these reductions, yields would have been lower. **Securities Products and Services:** Securities products and services are offered by Charles Schwab & Co., Inc., Member SIPC. **Securities products and services, including unswept intraday funds and net credit balances held in brokerage accounts are not deposits or other obligations of, or guaranteed by, any bank, are not FDIC insured, and are subject to investment risk and may lose value. SIPC does not cover balances held at Program Banks in the Bank Sweep and Bank Sweep for Benefit Plans features. Yield to Maturity:** Please see your Cash Feature Disclosure Statement for more information on insurance coverage. **Yield to Maturity:** This is the actual average annual return on a note if held to maturity. **IN CASE OF ERRORS OR DISCREPANCIES:** If you find an error or discrepancy relating to your

# Schwab One® Account of

JOHN DWYER
DESIGNATED BENE PLAN/TOD

Statement Period
February 1-29, 2024

## Terms and Conditions (continued)

brokerage activity (other than an electronic fund transfer) you must notify us promptly, but no later than 10 days after this statement is sent or made available to you. If this statement shows that we have mailed or delivered security certificate(s) that you have not received, notify Schwab immediately. You may call us at 800-435-4000. (Outside the U.S., call +1-415-667-8400.) If you're a client of an independent investment advisor, call us at 800-515-2157. Any oral communications should be re-confirmed in writing to further protect your rights, including rights under the Securities Investor Protection Act (SIPA). If you do not so notify us, you agree that the statement activity and Account balance are correct for all purposes with respect to those brokerage transactions. **IN CASE OF COMPLAINTS:** If you have a complaint regarding your Schwab statement, products or services, please write to Client Service & Support at Charles Schwab & Co., Inc., P.O. Box 982603 El Paso, TX 79998-2603, or call customer service at **800-435-4000.** (Outside the U.S., call **+1-415-667-8400.**) If you're a client of an independent investment advisor, call us at 800-515-2157.

**Address Changes:** If you fail to notify Schwab in writing of any change of address or phone number, you may not receive important notifications about your Account, and trading or other restrictions might be placed on your Account. **Additional Information:** We are required by law to report to the Internal Revenue Service adjusted cost basis information (if applicable), certain payments to you and credits to your Account during the calendar year. Retain this statement for income tax purposes. A financial statement for your inspection is available at Schwab's offices or a copy will be mailed to you upon written request. Any third-party trademarks appearing herein are the property of their respective owners. Charles Schwab & Co., Inc., Charles Schwab Bank, Charles Schwab Premier Bank, and Charles Schwab Trust Bank are separate but affiliated companies and subsidiaries of the Charles Schwab Corporation. © 2024 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. **Member SIPC.** (O1CUSTNC) (0822-20UL)

# EXHIBIT 2

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that John Dwyer (the "Stockholder"), being the owner and holder of shares of Pegasystems, Inc., (the "Company"), does hereby make, constitute and appoint Jeroen van Kwawegen of Bernstein Litowitz Berger & Grossmann LLP and Francis A. Bottini, Jr. of Bottini & Bottini, Inc. and any person designated by them to act as true and lawful attorney in fact for the Stockholder, in its name, place and stead, jointly and severally, in all matters regarding the demand that the Company's board of directors cause the Company to take suitable action in response to the misconduct set forth in the demand letter, including, but not limited to: (i) making specific demands for the Company's board of directors to take immediate action to ensure the Company takes action against those responsible for the harm they have caused the Company to date; (ii) demanding inspection of books and records of the Company on its behalf as a stockholder of the Company as said attorneys deem appropriate, (iii) reviewing and/or copying any documents received in connection with any such books and records demand made on its behalf as a stockholder of the Company, and (iv) giving and granting unto said attorneys full power and attorney to perform all and every act and thing whatsoever requisite, necessary, and proper to be done in and without the premises, as fully, to all intents and purposes as they might or could do, with full power of substitution and revocation, hereby ratifying and confirming all that its attorneys or the substitute shall lawfully do or cause to be done.

The rights, powers, and authority of said attorneys shall remain in full force and effect until I tender a written notice of termination.

IN WITNESS WHEREOF, I have hereunto set my hand as of 3/24/2024 | 1:44 PM PDT.

By _____Mr. John Dwyer_____
John Dwyer